## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ST. VINCENT CATHOLIC
CHARITIES,

     *Plaintiff,*

   v.

INGHAM COUNTY BOARD OF
COMMISSIONERS,

     *Defendant.*

Civil No. _____

**COMPLAINT**

## INTRODUCTION

1. This case concerns Ingham County's efforts to retaliate against a Catholic charity because the County disagrees with the charity's religious practices and speech concerning foster care, and because the charity recently won protection for its rights in a lawsuit against the State of Michigan. Order, *Buck v. Gordon*, No. 1:19-cv-286 (W.D. Mich. Sept. 26, 2019), ECF No. 69.

2. The Ingham County Board of Commissioners (the "Board")—which has nothing at all to do with foster care—nevertheless decided to punish St. Vincent Catholic Charities ("St. Vincent") by attacking its refugee

resettlement program. St. Vincent runs the only refugee resettlement program that serves Ingham County, so the Board's actions mean fewer services for the most vulnerable.

3. In a more difficult case, the Court might encounter a government actor who at least claimed that the charity's services were subpar. Likewise, in a more difficult case the Court might encounter government officials who at least pretend publicly that they are not engaged in base retaliation.

4. This is not one of those cases. The Board expressly and repeatedly acknowledged that St. Vincent's refugee programs were excellent. And the Board's Commissioners expressly and repeatedly acknowledged that, nevertheless, they were stripping St. Vincent's refugee programming of funds. They also expressly and repeatedly acknowledged why: To punish St. Vincent both for its religious speech, practices, and beliefs, and for having the temerity to successfully defend its constitutional rights in *Buck*.

5. Absent an order from this Court, the Board will likely continue to penalize, discriminate, and retaliate against St. Vincent, to the detriment of both St. Vincent's ministry and the well-being of refugees. Indeed,

within the next two months alone, the Board's retaliation may extend to a Statement of Work St. Vincent must submit to the County Health Department—the same entity that the Board directed to find another provider so that it could stop contracting with St. Vincent. That Statement of Work is pursuant to a contract which, absent retaliatory action, will renew on January 31, 2020.

6.  During that same time, St. Vincent will be preparing its Sixth Circuit briefing in *Buck v. Gordon*, No. 19-2185, due on February 6, 2020. St. Vincent needs to know that it is free to defend itself before the Sixth Circuit without the Board retaliating against St. Vincent—again—for what it says in that ongoing litigation.

7.  The Board's actions violate the First and the Fourteenth Amendments to the U.S. Constitution. For these reasons, St. Vincent respectfully requests that the Court issue a judgment declaring these actions unlawful and enjoining the Board from further violating St. Vincent's constitutional and civil rights.

## IDENTIFICATION OF PARTIES

8.  Plaintiff St. Vincent Catholic Charities is a Michigan nonprofit corporation with charitable and religious purposes. St. Vincent is

headquartered and operates in this district. St. Vincent is party to refugee services contracts with the Ingham County Health Department and a recipient of community agency grants from Ingham County.

9.   St. Vincent was originally incorporated by the Roman Catholic Bishop of Lansing and remains affiliated with the Catholic Diocese of Lansing. As such, St. Vincent is subject to the authority of the Bishop of Lansing, who maintains certain reserved powers over St. Vincent. Because of its affiliation to the Catholic Diocese of Lansing, St. Vincent is listed in the Official Catholic Directory under the Catholic Diocese of Lansing.

10.  St. Vincent's vision is to have faith in God and love for all, as it aspires to create a healthier community. St. Vincent is dedicated to serving others in a spirit of humility and shares a genuine concern for the well-being of its neighbors, affirming the God-given dignity and worth of every human person. The mission of St. Vincent Catholic Charities is the work of the Catholic Church:  To share the love of Christ by performing the corporal and spiritual works of mercy. In this way, those served by the Church and her members (including her charitable

agencies) encounter Christ, and the Church encounters Christ in those served:

> Then the King will say to those at his right hand, "Come, O blessed of my Father, inherit the kingdom prepared for you from the foundation of the world; for I was hungry and you gave me food, I was thirsty and you gave me drink, I was a stranger and you welcomed me, I was naked and you clothed me, I was sick and you visited me, I was in prison and you came to me. . . . Truly, I say to you, as you did it to one of the least of these my brethren, you did it to me."

*Matthew* 25:34-40. St. Vincent exercises its faith and carries out this religious mission, welcoming "the stranger" and serving "the least of these" through its refugee services program. This ministry is an integral, fundamental, and central part of St. Vincent's religious exercise.

11. Ingham County is governed by a fourteen-member Board of Commissioners elected on a partisan basis for terms of two years from single-member districts that are approximately equal in population.

12. Ingham County is a separate legal entity from the State of Michigan. The State exercises no control over the Board or its legislative actions. The County maintains the right to sue and be sued, enter into its own contracts, hold real and personal property, raise taxes, borrow money for legal purposes, perform acts necessary to safeguard county property, and conduct county affairs. It is located in this district.

13. Defendant Ingham County Board of Commissioners is the governing body for the County of Ingham, exercising legislative and administrative functions.

14. The Board annually elects from its ranks a Chairperson, Vice-Chairperson and Vice-Chairperson Pro Tem by majority vote. The administration of the County, other than as delegated to elected officials, is guided by the County Controller who is appointed by a two-thirds vote of the Board of Commissioners and serves at its pleasure.

15. The Board is responsible for authorizing county grants and contracts and controls the Ingham County budget. The Board contracts with, and provides grants to, community service agencies—like St. Vincent—to assist in refugee resettlement services.

## JURISDICTION AND VENUE

16. This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17. This Court has general personal jurisdiction over the Board because it is domiciled in the State. The Court also has specific personal

jurisdiction over the Board because this case arises exclusively from its deliberate, continuous, and substantial contacts within the State.

18.  The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

19.  The Court also has the authority to issue injunctive relief against the Board under 42 U.S.C. § 1983.

20.  Venue lies in this district pursuant to 28 U.S.C. § 1391(b). Both parties reside in this district. Additionally, a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### St. Vincent's refugee resettlement work

21.  Each year, over one hundred refugees are resettled in Ingham County. Starting in 2019, those resettlements had to be authorized by Ingham County, the State of Michigan, and the federal government. Resettlement is overseen by the U.S. Department of State, Bureau for Population Refugees and Migration ("PRM"). PRM designates local agencies to provide refugee resettlement services through national affiliate voluntary agencies. St. Vincent's national affiliate is the U.S. Conference of Catholic Bishops ("USCCB").

22.  St. Vincent is the only agency providing resettlement in Ingham County, and has provided resettlement services for more than four decades. St. Vincent has helped resettle thousands of refugees into permanent homes. St. Vincent staff secure and set up initial housing, pick refugees up from the airport, and make sure they have access to food. St. Vincent provides intensive orientation; it helps enroll refugees in benefits and services including school enrollments, ESOL classes, obtaining social security cards, and Michigan ID cards. Case managers work with clients to develop a self-sufficiency plan. St. Vincent's trainer provides job readiness, and job developers help refugees secure jobs. The trainer also provides classes on computer literacy, financial literacy, small business development and home purchasing.

23. With support from Ingham County contracts and grants, St. Vincent's staff help refugees through their health screenings and follow-up appointments. St. Vincent does so by setting appointments, then orienting, transporting, and escorting refugees to their appointments. St. Vincent also provides interpreting services for refugees' initial appointments, follow-up appointments, laboratory work, and pharmaceuticals. St. Vincent also provides interpreters to assist

refugees in obtaining health services at local health centers and the Ingham County Department of Health and Human Services office.

24. St. Vincent is a priority resettlement site for LGBTQ refugees, including those who have fled their homelands due to persecution for their sexual orientation. In the past ten years, St. Vincent has welcomed twenty-four LGBTQ refugees from seven countries. St. Vincent excels at serving refugees, and through its long years of experience, it has developed expertise and programs that no other agency in Ingham County can provide.

25. Because local, state, and federal government agencies oversee and fund refugee resettlement, St. Vincent cannot provide many of these services without authorization from and contracts with government agencies, including PRM and the Department of Health and Human Services (via grants to USCCB and its affiliates), the Michigan Department of Labor and Economic Opportunity, and Ingham County. Without these contracts, St. Vincent would quickly lose the ability to continue providing refugee resettlement services, would have to shut down its existing programs, and lay off staff who serve those refugees.

26.  There is no dispute that Ingham County depends on St. Vincent. As one Commissioner put it, closing St. Vincent's refugee resettlement program will create an "unavoidable . . . lapse in these services, the availability of these services, to the people who need them, there's not really any way around that . . . ." Audio: Ingham Cty. Human Servs. Comm. Meeting at 1:15:14 (Nov. 4, 2019), (Commissioner Trubac), https://perma.cc/NR7G-SRAJ.

27. St. Vincent holds Catholic beliefs regarding marriage, human sexuality, the inherent dignity of every human person, and the importance of serving those in need. This comprehensive moral vision leads St. Vincent to serve all refugees in need, regardless of sexual orientation.

28.  St. Vincent provides the same services to LGBTQ refugees that it provides to all other refugees. St. Vincent has never been unable to serve a refugee due to his or her sexual orientation or gender identity, nor is it aware of any complaints by LGBTQ refugees against the agency and its services.

29.  St. Vincent has provided refugee resettlement services pursuant to annually renewed contracts with Ingham County for at least the past

twenty years. In reliance upon these contracts, St. Vincent currently employs twelve staff members who work part-time on these contracts, has budgeted and raised funds designed to supplement public funding on those contracts, and has taken other concrete steps in expectation that it will continue to be able to perform its duties under these contracts.

30. St. Vincent offers a significant subsidy to Ingham County by supplementing its refugee contracts and grants with private donations and volunteer hours to cover costs that public funding cannot.

31. St. Vincent receives funding for some of its refugee services through multiple grants and contracts, all of which Ingham County has put at risk because of St. Vincent's religious beliefs, speech, and its actions to safeguard its beliefs and speech. The Board of Commissioners has final decision-making authority to determine whether Ingham County may enter into these contracts and grants. The Board of Commissioners approves these contracts and grants via individual resolutions and gives directives to County staff on how to carry out its duties in administering those contracts, demonstrating the adoption of an unconstitutional policy. The Board's actions also demonstrate an unconstitutional custom of violating St. Vincent's rights.

32. First, Ingham County has put at risk a subcontract to help refugees access health care ("Refugee Health Services Contract"). That subcontract has been renewed annually for at least twenty years. The subcontract between Ingham County and St. Vincent is subject to a master contract between Ingham County and the Michigan Department of Health and Human Services ("MDHHS"). The contract amounts to $128,000 for FY 2020.

33. Second, Ingham County has terminated an annual grant for refugee services (the "Community Agency Grant"). Ingham County makes dozens of annual grants to community agencies for a variety of services. The grant to St. Vincent was $4,500 in FY 2019 and will be $0 in FY 2020.

34. Third, Ingham County has put at risk a contract to provide interpreting services for refugees at County health centers ("Health Center Interpreting Contract"). That contract has renewed annually for 4 years, and St. Vincent is performing services under that contract pursuant to a Statement of Work which expires January 31. The contract is made pursuant to a grant to Ingham County from HHS. The Health Center Interpreting Contract is for $40,000. The County must approve a

new Statement of Work by January 31, and the contract is set to renew

January 31 absent adverse action by the County.

**The Ingham County Board discriminates and retaliates against St. Vincent for possessing—and defending—its religious beliefs and protected speech.**

35. St. Vincent is a plaintiff in *Buck v. Gordon*, 1:19-cv-286 (W.D.

Mich. April 15, 2019), ECF No. 1, where it has challenged state and

federal actions which threaten to close its foster care and adoption

ministry unless St. Vincent provides home-study endorsements for same-

sex couples. St. Vincent challenged these actions as a violation of the Free

Exercise Clause and the Free Speech Clause, because Michigan sought

to compel St. Vincent to engage in speech contrary to its sincerely held

beliefs. As both the district court and the Sixth Circuit have explained,

Michigan's Attorney General targeted St. Vincent's religious beliefs, an

action which sought to bypass "a carefully balanced and established

practice that ensures non-discrimination in child placements while still

accommodating traditional Catholic religious beliefs on marriage." Order

at 22, *Buck*, 1:19-cv-286, ECF No. 69.

36. Consistent with established Michigan law, *see* Mich. Comp. Laws

§ 722.124(e), (f), and as Chief Judge Jonker explained, rather than

engage in speech that violates its religious beliefs, "St. Vincent stands aside and allows other qualified agencies to make recommendations on behalf of unmarried or LGBTQ couples." Order at 6, *Buck*, 1:19-cv-286, ECF No. 69 (internal quotation marks and citation omitted). "Historically," as Chief Judge Jonker also explained (and a Sixth Circuit motions panel agreed), "the State of Michigan has permitted" this reasonable accommodation. *Id. See also* Order at 2, *Buck v. Gordon*, No. 19-2185, ECF No. 29-2 (denying stay of injunction pending appeal to "ensure that St. Vincent may continue to operate as it has for the past seventy years"). Michigan's new policy was the result of religious targeting and is now enjoined from enforcement against St. Vincent because it violates the First Amendment.

37. The *Buck* litigation is ongoing with upcoming deadlines. In the Sixth Circuit, for example, the State of Michigan must file its principal brief on or before January 6, 2020. St. Vincent must file its principal brief on or before February 5, 2020. *See* Order at 2, *Buck v. Gordon*, No. 19-2185.

38.  About one month after St. Vincent filed its well-publicized lawsuit, on May 20, 2019, Commissioner Sebolt successfully moved the Board to

condition the future distribution of community agency funds not simply on the prior standard—whether an agency "address[es] the County's overarching long-term objective of 'Meeting Basic Needs', such as food, clothing, and shelter[.]" Now, "priority" would be "given to those agencies that comply with the County's non-discrimination policies." *See* Ingham Cty. Human Servs. Comm. Minutes (May 20, 2019), https://perma.cc/B7E6-MPF3.

39. The proposed addition puzzled other Board members. Commissioner Naeyaert asked whether Commissioner Sebolt could identify any agencies that did not comply with that provision—it "seems like all of them do," Naeyaert said. *See* Audio: Ingham Cty. Human Servs. Comm. Meeting at 3:27 (May 20, 2019), https://perma.cc/WT3Y-6ZA8. Jared Cypher, Deputy County Controller, stated he could not think of any non-complying agency. *See id.* at 3:37. Sebolt said he "just want[s] to make sure," and the amendment passed. *See id.* at 3:49.

40. On September 26, 2019, St. Vincent received a well-publicized preliminary injunction in *Buck*. Shortly after it received this injunction and the resulting public attention, St. Vincent's contracts and grant with Ingham County came up for renewal. Both the Refugee Health Services

and Community Health Interpreters Contracts have been put at risk—and the Community Agency Grant has been canceled—as a result of religious targeting, religious discrimination, and retaliation for St. Vincent's actions in *Buck*.

41. The Refugee Health Services Contract came up for reauthorization on Nov. 5, 2019. At that time, County Health Department staff recommended reauthorization, since no other agency in Lansing had the capacity to perform this refugee work. But Commissioner Sebolt—the same Commissioner who added the revised "priority" non-discrimination provision to community grant authorizations—pulled the resolution on St. Vincent's contract from the consent agenda, thereby opening the floor to Commissioner comment.

42. Multiple Commissioners criticized St. Vincent's religious beliefs, speech, and its decision to defend itself in *Buck*. For example:

- Commissioner Sebolt stated his belief that St. Vincent would discriminate "based on St. Vincent's Catholic Charities publicly stated stances and lawsuit against the state of Michigan toward same-sex couples."
- Chairman Tennis stated there was "a difference of ideology at times in how we treat our residents and how we view our residents between ourselves and St. Vincent's Catholic Charities."

- Anne Scott, Ingham Community Health Centers Executive Director and Deputy Health Officer, stated that LGBTQ refugees receive services from St. Vincent, and "we see the benefit . . . the value of that is high for the people that it benefits, but it's not without note that there is concern about the stance of the agency."

- Commissioner Stivers stated, "I'm sure that not everybody at St. Vincent's is anti-LGBTQ, and that they probably do some great work."

- Commissioner Stivers also stated she "can't support working with this group" because of "the anti-LGBTQ stance of the greater organization."

- Commissioner Stivers claimed—without any conceivable basis in fact—"that this Charity has been implicated in the separation of families at the border . . . in order to be adopted out to Christian white families."

- Commissioner Sebolt claimed—incorrectly and without any evidence—that other Catholic charities permit "adoption to same-sex couples," but "St. Vincent's is specifically choosing not to."

- Chairman Tennis then speculated that, perhaps by cutting the duration of St. Vincent's contract in half (from one year to six months), St. Vincent will realize it is being given time to "come around."

- Chairman Tennis acknowledged that it is "unusual" for the County board to second-guess the health center board, which had recommended renewing the contract, and noted that such distinctions could be a concern under federal law governing the health center.

- Chairman Tennis further stated that St. Vincent is "the best game in town" "when it comes to [refugee resettlement]," but "I do share concerns with some of the more recent decisions the organization has made."

- Finally, Commissioner Stivers spoke again just to confirm that St. Vincent is "an organization that I feel is kind of morally bankrupt."

Commissioners also made other demeaning and untrue allegations throughout this commentary. These statements may all be heard on the County's November 4, 2019 audio recording. Audio: Ingham Cty. Human Servs. Comm. Meeting at 1:05:00 (Nov. 4, 2019), https://perma.cc/NR7G-SRAJ.

43. As the recording demonstrates, after learning from County staff that no other agency could provide the refugee health services in question, the Committee voted to reauthorize the contract for only six months. The stated reason for the six months was "giving St. Vincent's an opportunity to change their policy," or the Health Department time to locate another provider. Audio: Ingham Cty. Human Servs. Comm. Meeting at 1:13:35 (Nov. 4, 2019), https://perma.cc/NR7G-SRAJ.

44. As the recording demonstrates, several Commissioners confirmed that, if the County had an alternative provider for St. Vincent's refugee services that did not share St. Vincent's religious beliefs, it would have chosen to stop partnering with St. Vincent.

45. Several Commissioners also criticized the County Health Department's staff for not presenting alternatives. The Commissioners

18

then pressured the staff to seek out alternatives to St. Vincent. For example:

- Commissioner Morgan chastised the Health Department's staff for not providing the Board any alternatives to St. Vincent: "[W]hat's up with that? If there are alternatives, I really prefer staff list them or allude to them at the very least as opposed to saying in four words that there are none." Audio: Ingham Cty. Human Servs. Comm. Meeting at 1:12:28 (Nov. 4, 2019), https://perma.cc/NR7G-SRAJ.

- Commissioner Stivers wanted to "temporarily table" the resolution of St. Vincent's refugee services contract to "allow staff some time to give us more alternatives and not necessarily vote it down right now." *Id.* at 1:13:20.

- Commissioner Stivers also thought it was "a shame" that the lack of alternatives "wasn't brought to our attention" before the deadline to renew St. Vincent's Refugee Health Services Contract. *Id.*

- Commissioner Tennis expressed his "hope" that "we would approve this but also ask our staff and our health officer and our CHC director to bring us some other options for doing this in the future." *Id.*

- Commissioner Tennis supported the six-month extension because it "at least would give our staff some time to look for alternatives and not put refugee health in jeopardy." *Id.*

46.  After this vote, the Refugee Health Services Contract went before the full Board for a final decision. Ahead of this meeting, St. Vincent contacted County Commissioners to correct false allegations and explain the important work that St. Vincent does to serve refugees, including LGBTQ refugees.

47.  Counsel for the Diocese of Lansing also sent a letter to the full Board informing them that, if the Board chose not to renew the Refugee Health Services Contract, the Board would likely run afoul of the preliminary injunction in *Buck*. The *Buck* injunction, among other things, prohibits those working "in concert" with MDHHS from declining to renew contracts with St. Vincent because of St. Vincent's protected religious exercise. Since the Refugee Health Services Contract is a subcontract subject to and governed by a master contract with MDHHS, the Board is working in concert with MDHHS and is therefore covered by the injunction.

48. After receiving these communications and consulting with its attorneys, the Board narrowly voted (8-6) to reauthorize the Refugee Health Services Contract for the full term on November 12, 2019.

49.  Notably, unlike the November 4th meeting where Commissioners freely denigrated St. Vincent after Commissioner Sebolt removed the Refugee Health Services Contract from the Board's "consent" agenda, this reauthorization was kept on the "consent" agenda. This occurred after the Board received the aforementioned attorney letter explaining that it had engaged in unconstitutional targeting and retaliation.

50. Nevertheless, one of the six Board members who voted against renewal, Commissioner Tennis, stated the reasoning for these actions on the record. Commissioner Tennis said: "I don't think anyone on this Board is questioning the quality of services or the wonderful work St. Vincent's has done for the refugee community. The issue at hand is regarding other areas of St. Vincent's work and litigation pending against the State that goes against the principles of many of us on this Board." Audio: Ingham Cty. Human Servs. Comm. Meeting at 10:02 (Nov. 12, 2019), https://perma.cc/X7EY-X4ZH. He further stated that it was "truly horrible to be placed in a situation where we have to choose between services to a very vulnerable population and our own principles of equality and fairness." *Id.* at 10:32.

51. Commissioner Tennis chairs the Human Services Committee. The following week, on November 18, 2019, the Community Agency Grant came up before the Human Services Committee, the same committee which had previously demeaned and criticized St. Vincent. The Committee voted not to renew St. Vincent's grant, and the resolution confirming that vote was adopted by the Board on November 26, 2019.

52. This vote was contrary to the recommendation of the County Controller, who recommended that St. Vincent receive a $4,500 grant. In fact, the Controller recommended a grant for every organization that timely applied. For organizations which received a grant last year, the Controller recommended a grant in the amount of either the amount the organization requested, or the amount that the organization received last year, whichever was lower. Ex. A.

53. The Committee sustained a motion to remove the Community Agency Grant from St. Vincent. The only explanation for this change was that the Commissioners wished to "provide funding, first and foremost, for direct aid for the basics and necessities of life: food, shelter and clothing." Audio: Ingham Cty. Human Servs. Comm. Meeting at 9:48 (Nov. 18, 2019), https://perma.cc/7NRV-YLVG; *see also* Resolution, Ex. A. But St. Vincent sought the Community Agency Grant to provide direct aid to refugees, including assistance with home purchasing and maintenance, language services, and job skills training.

54. Other organizations received funding for services including home repairs and modification, "emotional support" via a crisis intervention hotline, "helping clients navigate systems that will reduce barriers that

originally brought them to the criminal justice system," and "telephone reassurance services to provide assistance and social calls to elderly." *See* Ex. A. These are important and valuable services to the Ingham County community, but they are not "food, shelter and clothing."

55.  After learning of the vote, one commissioner who does not serve on that committee privately expressed the opinion that the "fix" was in before the meeting and the decision was all political.

56.  Indeed, the Board's vote on the Community Agency Grant is inconsistent with how Commissioner Tennis previously described the community grant authorization process. As Tennis said, the Board tries "to make everyone happy" in this process—even if it means "expand[ing]" beyond the amount budgeted for grants. *See* Audio: Ingham Cty. Human Servs. Comm. Meeting at 9:09 (May 20, 2019), https://perma.cc/WT3Y-6ZA8. The Board "[o]ften" exceeds the budgeted allocation in these grants, "and sometimes we have a resolution to spend a little out of our contingency fund" to ensure any organization that provides "food, clothing, and shelter" receives a grant. *See id.* at 9:30. The Board used the contingency fund this year, too, but refused to give any grant to St. Vincent.

57. St. Vincent's outside counsel then sent a letter to the Board, listing several constitutional provisions and laws that would be broken if the Board approved the resolution to deny the Grant to St. Vincent. However, based upon current knowledge and information, the Grant is not covered by the *Buck* injunction, therefore the Board was not informed that it needed to renew the grant in order to comply with an existing court order.

58. The Board did not heed the letter, but instead approved the resolution, denying the Community Agency Grant to St. Vincent. The chart adopted with the Board's resolution shows that every agency to request a grant received one—except St. Vincent. *See* Ex. A. In other words, thirty-two organizations sought grants. Thirty-one of them received grants.

### Further retaliation and adverse action is impending without judicial relief

59. St. Vincent's Health Center Interpreting Contract, for $40,000, which expires on January 31, 2020. Absent reauthorization—which requires Health Department approval of the Statement of Work and potentially Board budgetary approval as well—St. Vincent will lose the ability to provide important health access services to refuges.

60. Based upon the Ingham County Board of Commissioners' statements and actions to date, St. Vincent also believes that County staff will explore and seek alternatives to contracting with St. Vincent, not out of dissatisfaction with its services, but out of disagreement with its religious beliefs and speech and its use of legal actions to protect them. Moreover, there are other contracts and grants—including the Community Agency Grant and the Refugee Services Contract—that St. Vincent will need to have renewed by the Board throughout 2020. The Board may, again, retaliate against St. Vincent in considering its other contract and grant applications. And, even if St. Vincent's 2020 contracts are renewed, St. Vincent reasonably fears that these will be the last renewals, as the Board has all but commanded the Health Department to find alternatives to St. Vincent.

61. The Health Center Interpreting Contract and St. Vincent's Statement of Work under that contract are set to renew January 31, and even after renewal, can be canceled by the County at any time with 10 days' notice. If it is terminated, St. Vincent will lose the ability to provide significant services to refugees, and refugees in Ingham County will lose out on crucial health care access services.

62.  Like the Grant, upon information and belief, the Health Center Interpreting Contract is not covered by the *Buck* preliminary injunction, since the master contract is not with MDHHS. Therefore St. Vincent reasonably fears that, without a court order, the Board will take adverse action against St. Vincent in conjunction with performance of the contract, renewal, or the approval of the statement of work, based upon St. Vincent's religious exercise, speech, and its actions to protect its rights in *Buck*.

63. As both the Board and Health Department have multiple opportunities—just in the next two months—to manifest hostility toward St. Vincent's First Amendment rights, St. Vincent reasonably believes that further adverse action from the Board is impending.

64.  At the same time, St. Vincent is continuing to defend its First Amendment rights in *Buck*—and the cloud of further discrimination from the Board hangs over that defense. Commissioner Sebolt expressly said that it is St. Vincent's "public statements" and "lawsuit" defending its rights that justifies the Board in modifying and terminating its relationship with St. Vincent. Commissioner Tennis said that St. Vincent's "litigation pending against the State . . . goes against the

principles of many of us on this Board." The Board has thus demonstrated a desire to intimidate and chill St. Vincent out of defending itself in *Buck*—which, per the Sixth Circuit briefing schedule, St. Vincent must do while, at the same time, seeking reauthorization of one of its largest refugee services contracts in Ingham County (the interpreter services contract discussed above).

65. The Board's actions substantially burden, denigrate, and discriminate against St. Vincent, its staff members, and others who share its religious beliefs.

66. St. Vincent remains willing and able to continue its refugee program. It wants to continue serving refugees, but because of Defendant's actions, St. Vincent's decades-old ministry to refugees is in jeopardy.

## CLAIMS FOR RELIEF

### Count I

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause:  Law not neutral and generally**
**applicable, individualized assessments, religious targeting**

67.  St. Vincent incorporates by reference all preceding paragraphs.

68. "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

69. Government actions burdening religion must face strict scrutiny when they are taken pursuant to systems of individualized assessments, or when they are taken pursuant to laws which are not neutral or generally applicable. *See Lukumi,* 508 U.S. at 533-43.

70. The Board's grant and contracting decisions are made in a system of individualized assessments.

71. The Board's actions in threatening St. Vincent's contracts and denying its grant were neither neutral nor generally applicable.

72. By defunding and threatening to defund St. Vincent's grants and contracts, the Board has targeted St. Vincent's religious beliefs and practices.

73. The statements of Board Commissioners demonstrate that hostility toward St. Vincent and its religious beliefs, which were a motivation for the Board's actions.

74.  The Board does not have a compelling reason for its actions, and the Board has not selected the means least restrictive of religious exercise in order to further its interests.

75.  Absent injunctive and declaratory relief against the Board, St. Vincent will suffer imminent and irreparable harm.

## Count II

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution: Free Speech Clause: Compelled Speech

76.  St. Vincent incorporates by reference all preceding paragraphs.

77.  The Board is seeking to compel St. Vincent to make affirmative statements that contradict St. Vincent's religious beliefs. The Board is conditioning St. Vincent's contracts and grants, and the ongoing ability to engage in the religious exercise of serving refugees, on St. Vincent's willingness to make statements contrary to its religious beliefs.

78. Such compulsion amounts to compelled speech in violation of the Free Speech Clause of the First Amendment to the United States Constitution. Absent injunctive and declaratory relief against the Board, St. Vincent is and will continue to be irreparably harmed.

### Count III

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution: Retaliation for protected speech, petition, and religious exercise

79. St. Vincent incorporates by reference all preceding paragraphs.

80. St. Vincent's religious practices and statements made by and on behalf of St. Vincent about its religious beliefs are both constitutionally protected religious exercise, speech, and an attempt to petition the government.

81. The Board's refusal to provide grants, desire to terminate or not renew contracts, and its threats of additional adverse action would be sufficient to deter a person of ordinary firmness from exercising his or her constitutional and civil rights.

82. A causal link exists between the Board's adverse actions against St. Vincent and its religious exercise, protected speech, and petitions to the government.

83. Such actions are retaliation for religious exercise, protected speech, and petitioning the government in violation of the First Amendment to the United States Constitution.

84. Absent injunctive and declaratory relief against the Board, St. Vincent is and will continue to be irreparably harmed.

## Count IV

### 42 U.S.C. § 1983
### Retaliation for taking action to protect civil rights

85. St. Vincent incorporates by reference all preceding paragraphs.

86. St. Vincent is engaged in actions to protect its civil rights under Section 1983 in both its lawsuit in *Buck* and in its statements to the Board that the Board's actions were prohibited by Section 1983.

87. The Board's refusal to provide grants, desire to terminate or not renew contracts, and its threats of additional adverse action would be sufficient to deter a person of ordinary firmness from exercising his or her constitutional and civil rights.

88. A causal link exists between the Board's adverse actions against St. Vincent and its actions to protect its rights under Section 1983.

89. Such actions are retaliation for St. Vincent's actions to protect its civil rights under Section 1983.

90. Absent injunctive and declaratory relief against the Board, St. Vincent is and will continue to be irreparably harmed.

## Count V

### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment to the U.S. Constitution: Equal Protection
### Discrimination on the basis of religion

91. St. Vincent incorporates by reference all preceding paragraphs.

92. The Equal Protection Clause prohibits discrimination on the basis of religion.

93. The Board's contracting and grantmaking decisions and other adverse actions penalize St. Vincent because of its religious beliefs.

94. Contractors and grantees that espouse religious beliefs contrary to those espoused by St. Vincent are allowed to maintain their contractual and grantee relationships.

95. The Board's preference for one set of religious beliefs and against St. Vincent's religious beliefs violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

96.   Absent injunctive and declaratory relief, St. Vincent has been and will continue to be irreparably harmed.

## PRAYER FOR RELIEF

Wherefore, St. Vincent requests that the Court:

a. Declare that the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 require the Board to cease discriminating against St. Vincent and to cease its ongoing investigation and impending adverse actions on the basis of St. Vincent's religious beliefs, speech, practices, and defense of its rights;

b. Order the Board to continue performance of the Refugee Health Services Contract and the Health Center Interpreting Contract;

c. Issue preliminary and permanent injunctions enjoining the Board, its members, agents, employees, and those it acts in concert with from terminating, suspending, failing to renew, or impairing its contracts, funding, or grants with St. Vincent, or taking any adverse action against St. Vincent, for exercising its constitutional and statutory rights;

d. Award St. Vincent actual and nominal damages for the loss of its rights as protected by law;

e. Award St. Vincent the costs of this action and reasonable attorney's fees; and

f. Award such other and further relief as the Court deems equitable and just.

Dated: December 13, 2019                Respectfully submitted,

/s/ *Lori H. Windham*
Lori H. Windham
Mark L. Rienzi
Nicholas R. Reaves
William J. Haun
Jacob M. Coate
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
lwindham@becketlaw.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org

*Counsel for Plaintiff*