UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ST. VINCENT CATHOLIC CHARITIES,

    Plaintiff,

v.

INGHAM COUNTY BOARD OF
COMMISSIONERS,

    Defendant.
_____/

CASE NO. 1:19-CV-1050

HON. ROBERT J. JONKER

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss (ECF No. 19) and Plaintiff's Motion for Partial Summary Judgment (ECF No. 28). The motions are fully briefed, and the Court finds oral argument unnecessary to decide the motions. This is the decision of the Court.

### BACKGROUND

Plaintiff St. Vincent says it is a Michigan non-profit corporation with charitable and religious purposes. (ECF No. 1, PageID.3-4.) St. Vincent is affiliated with the Catholic Diocese of Lansing, Michigan, and has as its mission "the work of the Catholic Church: [t]o share the love of Christ by performing the corporal and spiritual works of mercy." (*Id.*, PageID.4.) As part of its ministry, St. Vincent provides refugee services programs in Ingham County, Michigan. St. Vincent has done so under "annually renewed contracts with Ingham County for at least the past twenty years." (*Id.*, PageID.10-11.) St. Vincent considers its work with refugees "an integral, fundamental, and central part of St. Vincent's religious exercise." (*Id.*, PageID.5.) Federal, state,

and local government agencies oversee and fund refugee resettlement programs. (*Id.*, PageID.9.) Without government contracts, including its contracts with Ingham County, "St. Vincent would quickly lose the ability to continue providing refugee resettlement services[.]" (*Id.*)

Defendant Ingham County Board of Commissioners (the "Board") has fourteen members, all of whom are elected from single-member districts approximately equal in population. (*Id.*, PageID.5-6.) The Board governs Ingham County, exercising legislative and administrative functions. (*Id.*, PageID.5-6.) The Board controls the County budget and is responsible for authorizing County contracts and grants. (*Id.*, PageID.6.) The County Controller, who is appointed by a two-thirds vote of the Board and serves at its pleasure, guides the administration of the County. (*Id.*) The Board has two standing committees, the Human Services Committee (the "HSC") and the Finance Committee.

## REFUGEE SERVICES CONTRACT

The HSC met on November 4, 2019 to discuss reauthorization of a Refugee Health Services Contract with St. Vincent (the "Contract").[1] (*Id.*, PageID.16.) Ingham County Health Department staff recommended reauthorization. (*Id.*) According to St. Vincent, during the HSC meeting, "[m]ultiple Commissioners criticized St. Vincent's religious beliefs, speech, and its decision to defend itself in *Buck*."[2] (*Id.*) For example, Commissioner Sebolt expressed concern that St. Vincent would discriminate based on its "publicly stated stances and lawsuit against the state of Michigan toward same-sex couples." (*Id.*) The HSC Chairman, Commissioner Tennis, spoke of having "a

---

[1] The 2019/2020 contract encompasses both refugee health and interpretive services, which in previous years St. Vincent provided under two distinct contracts. (ECF No.28-4.) It appears that St. Vincent also provides interpretive services under a separate contract that renews automatically and is no longer at issue in the case.

[2] St. Vincent is a plaintiff in a separate lawsuit, *Buck v. Gordon*, 1:19-cv-286 (W.D. Mich. April 15, 2019), which deals with its work on foster and adoptive services. St. Vincent notes that about one month after the filing of the *Buck* case, Ingham County Board Commissioner Sebolt moved to give funding priority to agencies that comply with the non-discrimination policies of Ingham County. (ECF No. 1, PageID.15) The Board approved the motion. (*Id.*) St. Vincent suggests that its position in *Buck* catalyzed Commissioner's Sebolt's motion.

difference of ideology" with St. Vincent. (*Id.*) Commissioner Stivers stated that she opposed working with St. Vincent because of the organization's "anti-LGBTQ stance" and described St. Vincent as "morally bankrupt." (*Id.*, PageID.17.) Commissioner Sebolt inaccurately claimed that "other Catholic charities permit 'adoption to same-sex couples,' but "St. Vincent's [sic] is specifically choosing not to.'" (*Id.*) Commissioner Tennis suggested that by reducing the term of the Contract from twelve months to six months, the Board could signal to St. Vincent that "it is being given time to 'come around.'" (*Id.*) The HSC voted to recommend reauthorization for a term of six months to give St. Vincent an opportunity to change its policy or for the County Health Department to identify a different provider that did not share St. Vincent's religious beliefs. (*Id.*, PageID.18-19.) The HSC proposed a resolution reflecting a twelve-month term.

The full Board considered the HSC's proposed resolution at its meeting on November 12, 2019. (*Id.*, PageID.20.)[3] The minutes of the meeting reflect that Board members discussed a risk that a six-month term "was not a long time and could lead to service disruption." (ECF No. 19-2, PageID.463.) Commissioner Tennis "stated that it was tough to be in a position between offering refugee services and treatment of the LGBT community" and that he would oppose a twelve-month term." (*Id.*) He observed that no one on the Board "is questioning the quality of services or the wonderful work St. Vincent's has done for the refugee community. The issue at hand is regarding other areas of St. Vincent's work and litigation pending against the State that goes against the principles of many of us on the Board." (ECF No. 1, PageID.21.) Commissioner Celentino "stated that a year-long contract would provide time to have a robust conversation about the issues raised without interrupting services to refugees." (ECF No. 19-2, PageID.463.) The Board voted 9-5 to

---

[3] After the HSC meeting, and before the meeting of the full Board, "St. Vincent contacted County Commissioners to correct false allegations and explain the important work that St. Vincent does to serve refugees, including LGBTQ refugees." (*Id.*, PageID.19.) St. Vincent notes that it is "a priority resettlement site for LGBTQ refugees, including those who have fled their homelands due to persecution for their sexual orientation." (*Id.*, PageID.9.)

3

amend the proposed resolution to reflect a twelve-month term. (*Id.*, PageID.464.)[4] The motion to adopt the resolution, as amended, carried by a vote of 11-3, with Commissioners Morgan, Sebolt, and Stivers voting against it. (*Id.*) No one disputes that the Contract is presently in effect for a twelve-month term.

## COMMUNITY AGENCY GRANT

The HSC met again the following week, on November 18, 2019. (ECF No. 1, PageID.21.) St. Vincent's application for a $4,500 community agency grant came up before the HSC at the meeting. (*Id.*) The County Controller recommended that St. Vincent and every other organization that timely applied for a community agency grant – a total of 32 organizations -- receive a grant. The HSC voted against awarding a grant to St. Vincent. The Committee explained that it was giving priority to "direct aid for the basics and necessities of life: food, shelter, and clothing." (*Id.*, PageID.22.) St. Vincent points out that it sought the grant "to provide direct aid to refugees, including assistance with home purchasing and maintenance, language services, and job skills training" and notes that other organizations received funding for services such as home repairs and modification. (*Id.*) The full Board accepted the HSC's recommendation and denied St. Vincent's grant application. (*Id.*, PageID.24.) The Board approved the applications of all the other thirty-one community agencies seeking grants. (*Id.*)[5]

## CURRENT MOTIONS

---

[4] Commissioner Grebner "stated that this would be a good time to add a new WHEREAS to the effect that [ST. Vincent] discriminated against people and a THEREFORE, BE IT RESOLVED that the Board wished it would stop." (*Id.*)

[5] The Court considers a limited record on a motion to dismiss. Though not a factor in the Court's analysis of the motion now before it, the Court notes that the record includes an affidavit from counsel describing counsel's review of the numbers of Community Agency Grant applications considered by the Board and the County Controller for the past ten years. (ECF No. 28-3.) The calculation reflects a total of 390 applications and shows that the Board "either adopted the County Controller's recommendation or departed from it by awarding additional funds 387 times." (*Id.*, PageID.652.) St. Vincent's application is one of only three instances in which the Board did not follow the County Controller's recommendation or depart upward. (*Id.*)

St. Vincent contends that the Board's rejection of St. Vincent's community agency grant application manifests hostility toward St. Vincent's religious beliefs. St. Vincent also posits that the Board may in the future choose to discontinue contracting with St. Vincent for refugee services due to this alleged hostility. St. Vincent claims violations of the First Amendment's Free Exercise (Count 1) and Free Speech Clauses (Counts II, III); retaliation for St. Vincent's actions to protect its civil rights (Count IV); and discrimination on the basis of religion in violation of the Equal Protection Clause of the Fourteenth Amendment (Count V). The Board seeks dismissal of the case under Rule 12. St. Vincent seeks partial summary judgment on its Free Exercise and First Amendment retaliation claims.

## LEGAL STANDARDS AND DISCUSSION

### 1. Justiciability

"Although the Constitution does not fully explain what is meant by '[t]he judicial Power of the United States,' Art. III, § 1, it does specify that this power extends only to 'Cases' and "Controversies,' Art. III, § 2." *Spokeo Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). The doctrine of standing is "rooted in the traditional understanding of a case or controversy" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* Three elements comprise the "irreducible constitutional minimum" of standing: (1) an injury in fact to the plaintiff; (2) that is fairly traceable to the challenged conduct of the defendant; (3) that a favorable judicial decision will likely redress. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An "injury in fact" is a "concrete harm suffered by the plaintiff that is actual or imminent, rather than conjectural or hypothetical." *Friends of Tims Ford v. Tennessee Valley Authority*, 585 F.3d 955, 966 (6th Cir. 2009). Courts in the Sixth Circuit address ripeness under the constitutional standing framework. *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014). "The ripeness

doctrine serves to avoid premature adjudication of legal questions and to prevent courts from entangling themselves in abstract debates that may turn out differently in different settings." *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (quotation omitted). A claim is not justiciable "when it is filed too early (making it unripe), when it is filed too late (making it moot), or when the claimant lacks a sufficiently concrete and redressable interest in the dispute (depriving the plaintiff of standing)." *Id.*

To the extent St. Vincent premises its claims on a truncated Contract, or on the risk of discontinuation of the Contract, the claims are not justiciable. There is no injury in fact or claim that is ripe. All agree the Contract remains in effect for the twelve-month period. A risk that the Board will not approve future contracts with St. Vincent is merely "conjectural or hypothetical," not concrete. To the extent St. Vincent premises its claims on the denial of the community agency grant application, St. Vincent satisfies the standing and all other jurisdictional requirements.

### 2. Rule 12(b)(6)

The Federal Rules provide that a claim may be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In determining whether a claim has facial plausibility, a court must construe the complaint in the light most favorable to the plaintiff, accept the factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "When a court is presented with a Rule 12(b)(6) motion, it may consider the

6

Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Id.*

### A. *Legislative Immunity*

The Board contends that legislative immunity bars Plaintiff's claims. The Court disagrees. Individual legislators in their individual capacities have long enjoyed immunity from liability for their legislative activities. *Bogan v. Scott-Harris*, 523 U.S. 44, 48-49 (1998). This immunity rests on the policy that "[r]egardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability." *Id.* at 52. This is because "[a]ny restriction on a legislator's freedom undermines the public good by interfering with the rights of the people to representation in the democratic process." *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir. 1997) (citing *Tenny v. Bandhove*, 341 U.S. 367, 377 (1951)). But the individual Board members are not defendants in the case in their individual capacities. The Board as an entity – the functional equivalent of the County – is the sole defendant. Legislative immunity does not extend to the Board as an entity. *See Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc) ("[C]ounties and other local governments – while 'persons' for the purposes of § 1983 liability in the sense that they can be sued – do not enjoy the defenses of absolute and qualified immunity that are available to human defendants sued in their individual capacities….That is to say, the liability of counties and other local governments under § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the county or local government.'").

### B. Plausibility Test

The Court is satisfied that the Complaint states a plausible claim for relief on its face as to the denial of the community service grant application. The Complaint alleges in detail disparaging statements of multiple Board members regarding St. Vincent's purported views of LGBTQ issues; sincerely held religious beliefs; and position in the *Buck* litigation. The Complaint alleges that the HSC recommended a six-month term for the Contract for the purpose of persuading St. Vincent to change its position, or giving the Health Department time to identify a different provider with a different religious viewpoint. The Complaint alleges that contemporaneously, within the same month, the Board took the unusual step of disregarding the recommendation of the County Controller by denying St. Vincent's grant application. The Complaint alleges that this was the sole denial out of the thirty-two community grant applications for which the County Controller recommended approval in 2019, a striking statistic. The Complaint alleges that the stated reason for the denial was pretextual, noting that St. Vincent sought to provide services comparable to those offered by grant recipients. [6] Accepted as true, and drawing all factual inferences in favor of St. Vincent, these allegations are sufficient to state plausible claims under Section 1983.

To prevail on a First Amendment retaliation claim, a plaintiff must show three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The Complaint states a plausible First Amendment retaliation claim. Defendant does not dispute that St. Vincent's pursuit

---

[6] The Board states that it denied the grant because St. Vincent sought funds only for payroll expenses, which were a low-priority item for the board, as the grant application form plainly stated, but the Board's own exhibits reflect that another agency received grants for items that included over $10,000 in payroll expenses. (ECF No. 16-7, PageID.207).

8

of the *Buck* litigation is protected conduct. (ECF No. 16, PageID.163.) The Complaint describes an adverse action: the rejection of the grant application. And the Complaint alleges a causal connection: a series of disparaging comments by Board members, including disparaging comments regarding St. Vincent's religious viewpoint and its position in the *Buck* litigation, made around the same time the Board chose not to follow the County Commissioner's recommendation regarding approval of the grant.

Similarly, the Complaint states a plausible Free Exercise claim. The Supreme Court has "often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). A law is not neutral if it seeks "to infringe upon or restrict practices because of their religious motivation[,]…and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533. The Complaint alleges that the Board singled out St. Vincent to discourage St. Vincent from disfavored religious practice. This is enough to survive a motion under Rule 12(b)(6). The Complaint states an Equal Protection claim for the same general reasons. *See Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260.

The Complaint also states a plausible claim of violation of the First Amendment based on compelled speech. "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *U.S. v. United Foods, Inc.*, 533 U.S. 405, 410 (2001). The Complaint alleges that the Board conditioned approval of the community agency grant on St. Vincent's willingness to express a viewpoint with which it disagrees.

For these reasons, the Court concludes that dismissal under Rule 12(b)(6) is not warranted.

### 3. Rule 56

St. Vincent seeks partial summary judgment on its Free Exercise and First Amendment retaliation claims. Summary Judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Summary judgment is appropriate only if, "taking the evidence in the light most favorable to the non-moving party, 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (quoting FED. R. CIV. P. 56(2)). In considering a motion for summary judgment, the Court draws all justifiable inferences in favor of the non-moving party. *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). On a summary judgment motion, "the ultimate question . . . is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that [the moving party] should prevail as a matter of law." *Id.* at 748-49.

The Court finds Plaintiff's motion for partial summary judgment premature. The parties disagree on the basis for the Board's decision to deny the grant application. The issue can and should be developed through plenary discovery and can then be considered on a more complete factual record.

**ACCORDINGLY, IT IS ORDERED**:

1. Defendant's Motion to Dismiss (ECF No. 19) is **GRANTED** to the extent that Plaintiff's claims are premised on a truncated Contract, or on the risk of a future discontinuation of the Contract, and is **DENIED** in all other respects.

2. Plaintiff's Motion for Partial Summary Judgment (ECF No. 28) is **DENIED without prejudice** to renewal of the motion following discovery.


Dated:    September 18, 2020              /s/ Robert J. Jonker
                                                                    ROBERT J. JONKER
                                                                    CHIEF UNITED STATES DISTRICT JUDGE