# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ST. VINCENT CATHOLIC CHARITIES,

        Plaintiff,

v.

INGHAM COUNTY BOARD OF
COMMISSIONERS,

        Defendant.

_____

Civil No. 1:19-CV-1050

Hon. Robert J. Jonker

Lori H. Windham
Mark L. Rienzi
Nicholas R. Reaves
William J. Haun
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave NW, Ste 400
Washington, DC 20006
lwindham@becketlaw.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
228 N. Walnut Street
Lansing, Michigan 48933-1122
(517) 342-2522
wbloomfield@dioceseoflansing.org
*Attorneys for Plaintiff*

Bonnie G. Toskey (P30601)
Sarah K. Osburn (P55539)
Cohl, Stoker & Toskey, P.C.
601 N. Capitol Avenue
Lansing, Michigan 48933
(517) 372-9000
btoskey@cstmlaw.com
sosburn@cstmlaw.com
*Attorneys for Defendant*

---

## DEFENDANT INGHAM COUNTY BOARD OF COMMISSIONERS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER Fed.R.Civ.P. 56(a)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INDEX OF EXHIBITS ................................................................................................... vi

STATEMENT OF ISSUES PRESENTED ..................................................................... vii

STATEMENT OF MATERIAL FACTS ............................................................................ 1
    A.    Background Facts Not in Dispute ................................................................ 1
    B.    Procedural History ..................................................................................... 3
    C.    Operative Facts .......................................................................................... 3
    D.    SVCC's Failure or Refusal to Comply in Its Grant Application with
           the ICBC Grant Priority Criteria ................................................................. 8
    E.    Facts Relating to SVCC's Claim of ICBC's Improper Motive ................... 11

GOVERNING LEGAL STANDARDS ............................................................................ 14

I.      Summary Judgment ......................................................................................... 14

II.     Evidentiary Admissibility ................................................................................. 14

ARGUMENT ............................................................................................................... 15

I.      SVCC is Unable to Establish a Violation of Any of Its Constitutional Rights
       and ICBC is Entitled to Summary Judgment as to Counts I, II and V of
       SVCC's Complaint ........................................................................................... 17

      A.    The criteria for Community Agency Grant funding established by
           Resolution #19-243 is neutral and generally applicable and does
           not constitute an individualized assessment or religious targeting.
           Therefore, SVCC cannot establish a violation of the Free Exercise
           Clause ..................................................................................................... 18

      B.    There is no genuine issue of fact and SVCC cannot establish a
           violation of the First Amendment Free Speech Clause: compelled
           speech. ................................................................................................... 24

      C.    There is no genuine issue of fact and SVCC cannot establish a
           violation of the Equal Protection Clause of the Fourteenth
           Amendment. ........................................................................................... 26

II.     SVCC is Unable to Establish Retaliation for Protected Speech, Petition,
       and Religious Exercise or Retaliation for Taking Action to Protect Civil and
       ICBC is Entitled to Summary Judgment as to Counts III and IV ........................ 28

i

A.      There is no competent evidence of retaliatory animus by ICBC .............. 28

RELIEF REQUESTED ................................................................................... 36

CERTIFICATE OF COMPLIANCE ................................................................ 37

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................... 14

*Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974 (6th Cir.2012) .......................... 26

*Bond v. Floyd*, 385 U.S. 116 (1966) ............................................................................. 29

*Braunfeld v. Brown*, 366 U.S. 599 (1961)...................................................................... 18

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 551 U.S. 291 (2007) ........................................................................................................... 5

*Buck v. Gordon,* 429 F. Supp. 3d 447 (W.D. Mich., 2019) ................ 5, 13, 17, 22, 29, 35

*Cantwell v. Connecticut*, 310 U.S. 296 (1940)............................................................... 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520 (1993).. 18-19, 23

*Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir.2011) ................ 26

*Elkhorn Coal Co. v. United States E.P.A.*, 622 F.2d 260 (6th Cir.1980) ......................... 30

*Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990) ........................ 23

*Fowler v. Rhode Island*, 345 U.S. 67 (1953) ................................................................. 18

*Grossbaum v. Indianapolis-Marion County Building Auth.*, 100 F.3d 1287 (7th Cir.1996)................................................................................................... 32, 36

*Haig v. Agee*, 453 U.S. 280 (1981) ............................................................................... 28

*Hartmann v. Stone*, 68 F.3d 973 (6th Cir.1995) ............................................................ 19

*Heckler v. Community Health Services*, 467 U.S. 51 (1984) ......................................... 21

*Kearney v. Town of Wareham*, 316 F.3d 18 (1st Cir.2002) ............................................ 32

*Kuivila v. City of Newton Falls* (N.D. Ohio E.D., No. 4:14-cv-01593, Feb. 11, 2016) ...................................................................................................... 30

*Lewis v. Philip Morris Inc.*, 355 F.3d 515 (6th Cir.2004) ............................................... 14

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719 (2018) ........................................................................................ 30

*McCoy Elkhorn Coal Co. v. United States E.P.A.*, 622 F.2d 260 (6th Cir.1980) ............ 22

*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir.2004) ................. 19

*Nieves v. Bartlett*, 139 S.Ct. 1715 (2019) ....................................................... 24

*O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996) ........................... 32

*Roberts v. Neace*, 958 F.3d 409 (6th Cir.2020) ................................................. 19

*Saginaw County v. Kent*, 209 Mich. 160, 176 N.W. 601 (1920) .............................. 23, 30

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir.2006) ............... 29-30

*Schweiker v. Hansen*, 450 U.S. 785 (1981) ..................................................... 21

*Snepp v. United States*, 444 U.S. 507 (1980) ..................................................... 5

*Theiss v. Scherer*, 396 F.2d 646 (6th Cir.1968) ................................................. 29

*United States v. O'Brien*, 391 U.S. 367 (1968) ............................................. 22, 30

*Utah Power & Light Co. v. United States*, 243 U.S. 389 (1917) .................................. 21

*Williams v. AT&T Mobility Svcs*, 847 F.3d 384 (6th Cir.2017) ........................................ 14

**Statutes:**

42 U.S.C. §1983 ........................................................................................ 15, 29

MCL 46.3(2) ............................................................................................. 23, 30

**Court Rules:**

Fed.R.Civ.P. 12(b)(6) ..................................................................................... 3

Fed.R.Civ.P. 56 ............................................................................................ 3

Fed.R.Civ.P. 56(a) ................................................................................... 14, 36

Fed.R.Civ.P. 56(c)(1) .................................................................................... 14

Fed.R.Civ.P. 56(c)(2) ........................................................................................... 14

Fed.R.Civ.P. 56(c)(4) ........................................................................................... 14

## INDEX OF EXHIBITS

1    Commissioner Todd Tennis Deposition Transcript

2    Commissioner Ryan Sebolt Deposition Transcript

3    Commissioner Thomas Morgan Deposition Transcript

4    Email chain between Judi Harris and Andrea Seyka dated July 25-26, 2019

5    2020 Community Agency Grant Applications

6    Minutes from November 18, 2019 Ingham County Human Services Committee Meeting

7    Minutes from November 26, 2019 Ingham County Board of Commissioners Meeting

8    December 8, 2020 Resolution Approving 2021 Community Agency Grant Funding; Resolution #20-578

## STATEMENT OF ISSUES PRESENTED

I.     Plaintiff is unable to establish a violation by Defendant of any of its constitutional rights and Defendant is entitled to Summary Judgment as to Counts I, II and V of Plaintiff's Complaint.


II.     Plaintiff is unable to establish retaliation for protected speech, petition, and religious exercise or retaliation for taking action to protect civil rights and Defendant is entitled to Summary Judgment as to Counts III and IV of Plaintiff's Complaint.

## STATEMENT OF MATERIAL FACTS

**A.     Background Facts Not in Dispute.**

The basic background facts surrounding this case are not in dispute. St. Vincent Catholic Charities ("SVCC") is a Michigan non-profit corporation with charitable and religious purposes. (ECF No. 1, PageID.3-4.) SVCC is affiliated with the Catholic Diocese of Lansing, Michigan. (*Id.*, PageID.4.) As part of its ministry, SVCC provides refugee services programs in Ingham County, Michigan.

The 14 member Ingham County Board of Commissioners ("ICBC") governs Ingham County, exercising legislative and administrative functions. (*Id.*, PageID.5-6.) The ICBC controls the County's annual budget and is responsible for authorizing County contracts and grants for services rendered. (*Id.*, PageID.6.) The County Controller, who is appointed by a two-thirds vote of the ICBC and serves at its pleasure, guides the administration of the County by implementing Board policy. (*Id.*) The Board has delegated certain functions to standing committees including the two committees relevant to this case—the Human Services Committee ("HSC") and the Finance Committee.

Ingham County has for many years contracted with SVCC to provide certain refugee services through the Ingham County Health Department's Health Centers.[1] Consideration of renewal of a Refugee Services Contract with SVCC begins with the HSC. The HSC met on November 4, 2019, to, among other things, consider the renewal of an Agreement with SVCC for 2019-2020 (*Id.*, PageID.16). During the HSC discussion

---

[1] As referenced below, SVCC's claims regarding the contracts with Ingham County have been dismissed by this Court. Discussion regarding the contracts is included in this section for background purposes and because SVCC relies on statements made in meetings regarding the contracts to support its claims regarding denial of the Community Agency Grant.

of the Contract renewal, three of the seven Commissioners attending the HSC Meeting raised concerns regarding the Contract with SVCC. (*Id.*) The HSC voted to recommend to the full ICBC reauthorization of the Contract albeit for a term of six months instead of one year. (*Id.*, PageID.18-19.)  Even so, the full ICBC rejected the recommendation and approved a full one-year contract by a vote of 11-3. (ECF No. 36, PageID.943.)

Ingham County has also provided funding in its budget to local agencies through the Community Agency Grant Program. Community Agency Grant funding is competitive in that the total amount available each year is fixed and criteria for priority in funding is set by ICBC policy considerations.  Grants are awarded on an annual basis in response to the applications received and reviewed.  (ECF No. 28-4, PageID.673, 684.) Thus, grant recipients desiring to continue a previously supported program must reapply every year. Therefore, although the funds received in SVCC's 2019 Community Agency Grant were received in the form of payment for services rendered in a contract form (*Id.*, PageID.687-695), there was no right of renewal for any grantee, so that the Contract expired by its terms on December 31, 2019 (*Id.*, PageID.687), and SVCC was required to re-apply for funding for Fiscal Year 2020 under the applicable criteria for 2020 set by the ICBC.

The 2020 Community Agency Grant funding resolution came before the HSC at its November 18, 2019, Meeting. (ECF No. 1, PageID.21.) The County Deputy Controller recommended that SVCC and every other organization that timely applied for a Community Agency Grant receive some grant funding. The HSC voted to decline to recommend awarding a $4,500 grant to SVCC. The full Board accepted the HSC's

2

recommendation and did not approve awarding Community Agency Grant funding to SVCC for the 2020 Grant year. (*Id.*, PageID.24.)

**B.    Procedural History.**

The parties both previously filed dispositive motions in this case: ICBC filed a Motion to Dismiss pursuant to Rule 12(b)(6), and SVCC filed a Motion for Partial Summary Judgment pursuant to Rule 56. This Court granted ICBC's Motion in part, dismissing SVCC's Refugee Services Contract-related claims as "conjectural or hypothetical" and therefore not justiciable. (ECF No. 36, PageID.945.)   This Court denied the Motion as to SVCC's claims relating to the denial of Community Agency Grant funding. This Court denied SVCC's Motion for Partial Summary Judgment finding that, "Plaintiff's motion for partial summary judgment is premature. The parties disagree on the basis for the Board's decision to deny the grant application. The issue can and should be developed through plenary discovery and can then be considered on a more complete factual record." (ECF No. 36, PageID.949.)

Discovery has concluded, and the "complete factual record" is now available. ICBC seeks Summary Judgment as to the remaining 2000 Community Agency Grant-related claims.

**C.    Operative Facts.**

SVCC submitted and ICBC responded to extensive written discovery including Requests for Admission and Requests for Production of Documents. SVCC deposed four Commissioners from the ICBC: Commissioners Sebolt, Morgan, Schafer and Tennis. Additionally, ICBC submitted and SVCC responded to written discovery.

The facts as developed through discovery support the fact that SVCC's 2020 Community Agency Grant Application (ECF No. 19-5, PageID.480) was not approved based on its own noncompliance with the ICBC's 2020 Policy for appropriation of limited discretionary funds formally established on May 28, 2019 in Resolution #19-243. (ECF No. 19-3, PageID.466-467.) Resolution #19-243 by its explicit terms expressed the ICBC's budgetary policy for prioritizing 2020 funding for:

> …proposals that directly contribute to addressing the Community's overarching long-term objective of 'Meeting Basic Needs', such as food, clothing, and shelter, as well as priority given to those agencies that comply with the County's non-discrimination policies.

Resolution #19-243 went further by adding emphasis in its declaration "solicitation of proposals is not a commitment to fund those proposals in fiscal year 2020," the purpose of which was to place all interested agencies on notice that funding is not guaranteed.

The "meeting basic needs" policy goal or priority was <u>not</u> new in the 2020 Grant year. It was actually adopted in 2010-2011 when the ICBC had to significantly reduce its discretionary funding for grants due to financial pressure and limited funds caused by the housing market collapse and the decrease in property values and tax base. (Exhibit 1, Todd Tennis Deposition Transcript, p. 27.) "[I]n order to more closely target those funds to where we felt they were needed most, we added a new <u>criteria</u> that they would be <u>prioritized</u> to those agencies that were providing for basic needs. And we defined that as housing, clothing or food." (*Id.*, emphasis added.) This policy prioritizing basic needs has continued annually (*Id.*)

In 2019 the ICBC also added a provision considered to be extremely important to the ICBC that Community Agency Grant applicants must agree to comply with the County's Nondiscrimination Policies.  Ingham County Commissioner Ryan Sebolt made

4

the motion to include compliance with the County's Nondiscrimination Policy as part of the criteria that would be given priority. (Exhibit 2, Ryan Sebolt Deposition Transcript, p. 21.) Sebolt explained his reasoning as follows:

> We actually had recently updated our non-discrimination ordinances, non-discrimination application -- application of our non-discrimination ordinances is something that I am passionate about, and I believe that when we update these policies and we make these policies, that they should not just sit on a shelf to collect dust, but that we should make sure that we're adhering to them in the work that we do. (*Id.*)

It is important to note that this 2019 modification to Community Agency Grant policy is immaterial in this case, as SVCC (A) was already <u>contractually</u> bound to adhere to the County's Nondiscrimination Policy (ECF No. 28-4, PageID.721-722), and (B) SVCC positively asserts—without contradiction by ICBC—that it does not (and, to date, has not) discriminate[d] on grounds relevant to *Buck v. Gordon* in providing county-funded contractual services to Ingham County residents. (ECF No. 28, PageID.581; see also Complaint, ECF No. 1, PageID.10, ¶28.)[2]

As referenced above, when the HSC met on November 18, 2019, it considered approval of Community Agency Grant funding for 2020 for its recommendation to the ICBC. Commissioner Morgan moved to amend the tentative or draft resolution prepared in advance by the Controller's Office to transfer the funding as recommended by the Deputy Controller from SVCC (ECF No. 17-13, PageID.393) as follows:

---

[2] SVCC's contractual obligations constitute a limited waiver of its free exercise rights. The power to waive individually held constitutional rights extends to First Amendment speech-related protections. *Snepp v. United States*, 444 U.S. 507, 507-511 (1980); *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 551 U.S. 291, 299-300 (2007). Accordingly, SVCC cannot invoke Catholic beliefs regarding same sex unions to justify any diminution or alteration in SVCC's services under contracts with Ingham County.

COMMISSIONER MORGAN : I would like to remove 4,500 from St. Vincent's and add 3,750 to Refugee Development Center and 750 to Haven House.

COMMISSIONER STIVERS: Second the motion.

CHAIRMAN SEBOLT: Moved and supported.

COMMISSIONER MORGAN: * * * well, first off, I wish we had the money to fund everything. * * * But it is one of **our strategic goals** as a county to provide funding first and foremost for **direct aid, the basics, the necessities of life, food, shelter and clothing**. And so by helping the Refugee Development Center get closer to its goal, we are providing **direct aid** to them, and Haven House as well with providing **meals to the homeless**.

* * *

CHAIRMAN SEBOLT: All right. It's been moved and supported. Any other discussion? (No response.)

CHAIRMAN SEBOLT: All in favor of that amendment, signify by saying aye. [Emphasis added.]

The record is clear that Commissioner Morgan expressed nothing critical, much less unkind, about SVCC or directed at its tenets or beliefs at the November 4, 2019 HSC Meeting[3] (ECF No. 17-11, PageID.353-359). Likewise, Commissioner Morgan expressed nothing critical or unkind about SVCC tenets or beliefs or theology at the November 18, 2019 HSC Meeting. Commissioner Morgan testified in this deposition squarely answering that:

---

[3] Commissioner Morgan answered that he had not had occasion to reduce another agency's grant application funding based on the rationale of direct basic needs because he was brand new. "So, I have repeatedly, though, in my term and a half of office, scrutinized budget items and questioned whether we're doing the right thing with limited funds. So it's -- there's a pattern, and I know it's irritated some of the people who may not receive funding they asked for, but **I have been one of the larger critics of us spending without close consideration**." (Emphasis added.) Commissioner Morgan offered an example of another contractor he had questioned: "Another example from that same meeting I believe is a discussion I brought up about the Spicer Group, which is an engineering firm that receives -- continues to receive county contracts through the parks department. And I also questioned whether they -- if the parks department had looked for other vendors because it seemed like things were getting a little too close with that relationship." (Exhibit 3, Morgan Dep TR, pp. 31-32.)

Sometime between November 6th and that meeting, **I was made aware that the proposed funding would be going directly to the director's salary and that -- so when the proposal came up before us, I made the motion to amend our overall agency funding to remove the amount from St. Vincent's Catholic Charities for $4500**, placing it both into the request from the Refugee Development Center, and I believe Haven House, who were **both providing direct services** as opposed to **funding the salary of someone already making $157,000 a year**." (See Exhibit 3, Thomas Morgan Deposition Transcript, pp. 28-29; emphasis added.)

When asked why he chose Haven House and Refugee Development Center, Commissioner Morgan candidly explained, "Because I like them. That's my prerogative as a legislator. Specifically with refugees, I know St. Vincent's was doing a lot of work with refugees, and I thought, you know, we could really help out with a service that's providing direct help to refugees by giving them additional funding, especially if it's a smaller organization that really makes a huge difference to them." (Exhibit 3, Morgan Dep TR, p. 30.)

On November 26, 2019, the ICBC adopted Resolution #19-502 which approved the recommendation from the HSC for funding of Community Agency Grants and which included no funding of its Director's salary for SVCC as it had sought in its Application. As recommended by the HSC, an additional $3,750 went to Haven House for direct services in the form of meals to the homeless, and $750 to Refugee Development Center for direct services to refugees (ECF No. 19-4, PageID.469, 473, 475, 477) in lieu of granting SVCC the $4,500 as the Deputy Controller recommended to be used for the Director's salary.  No negative or critical comments were made regarding SVCC or its tenets or beliefs at either the November 18 or November 26 Meeting by any Ingham Commissioner.

**D.    SVCC's Failure or Refusal to Comply in Its Grant Application with the ICBC Grant Priority Criteria.**

Contrary to SVCC's characterization (ECF No. 1, PageID.22, ¶53), SVCC's 2020 Grant Application failed to comply with Resolution #19-243's (ECF No. 19-3, PageID.466) requirements—SVCC's Application (ECF No. 19-5, PageID.480) boldly and curiously budgeted 100% of the requested funds for salaries and wages, fringe benefits, and unemployment insurance for its Executive Director.  SVCC ignored the policy directive clearly set out in Resolution #19-243, and submitted an Application for grant funds to be used for overhead—salaries for SVCC's workforce, with literally <u>nothing</u> proposed to be applied to "basic needs" of residents as required by ICBC express policy.  SVCC was fully aware of the criteria as it was set forth in the IV PROJECT BUDGET Section of the Application with a cautionary instruction telegraphed as follows:

> The Proposed Line Item Budget should be structured to address four major areas: Personnel Services, Professional and Contractual Services, Operating Expenses, and Direct Services to Ingham County Residents. **Please be advised that for 2020 emphasis will be placed on provision of direct services to county residents and use of Community Agency funds for personnel related expenditures is strongly discouraged.** (ECF No. 28-4, PageID.682; emphasis added.)

SVCC was very much aware of the emphasis placed on direct services for 2020 as evidenced by the discussion of the criteria held internally (see Exhibit 4, email chain between Judi Harris and Andrea Seyka dated July 25-26, 2019), but nevertheless chose to test the ICBC's resolve and throw the dice by submitting an Application that was directly contrary to and wholly inconsistent with the ICBC's expressed emphasis as expressed in its resolution and again on its Application Form.

To support its contention that it has been targeted, SVCC points its finger relying on other applications that SVCC claims were also not in compliance with Resolution #19-243. All 2020 Community Agency Grant Applications are attached at Exhibit 5 (Bates numbers "ING___" reference specific pages within Exhibit 5).   Specifically, SVCC would identify the following agencies:

- **Advent House Ministries**:  This comparison is not helpful to SVCC as $9,000 or 60% of the $15,000 in funds requested was for **food** (ING0070) which unquestionably met a fundamental basic need.

- **Allen Neighborhood Center** (ANC):   SVCC contention that ANC's Grant Application sought $0 for direct services (Exhibit 2, Sebolt Dep TR, p. 40) is untrue. ANC requested funding for its weekly Breadbasket Food Pantry, feeding ~120 low-income neighborhood families, refugees, students, and elderly (ING0080).  Additionally, ANC noted (ING0079) it often partners "with * * * St. Vincent Catholic Church." Although ANC's Project Budget (ING0081) shows $0 going to "direct services," the next page shows projected expenses of $11,229 for "Gardenhouse and Youth," and $90,000 for "Accelerator Kitchen Construction." Feeding vulnerable populations includes the growing of food in a garden and cooking and preparing it in a kitchen—thus 100% of the funds requested by ANC were for meeting basic needs.

- **Listening Ear Crisis Intervention**: Contrary to SVCC's misrepresentation, Listening Ear's Application (ING243) identified telephones as the community's "access point" for crisis intervention services: "The funds from Ingham County will assure that our phones stay open and available."   Listening Ear's budget

9

included $1,000 for "telephone" under "Operating Expenses"—a figure more properly categorized under "Direct Services" as "utilities" given the nature of the telephone crisis service provided—thus, 50% was for "basic needs." Additionally, during deposition testimony Commissioners explained that a telephone line used for crisis intervention services did in fact constitute a direct service of a basic human need. Commissioner Tennis testified:

> I mean, that's a hotline. Right? So that's what they do, is -- if they don't have a telephone, then they don't really have much to do, so -- so, yeah, and it's -- a hotline is aimed at serving people who are in mental or emotional distress, who might be in a domestic violence situation or something like that and may be about to lose their housing or lose any other base of support, then, yeah, **I could see that as a basic need**. (Exhibit 1, Tennis Dep TR, pp. 31-32; emphasis added.)

Similarly, Commissioner Sebolt testified:

> Yes, including funding for a telephone line, which they are a crisis prevention center, so the services they provide is the telephone hotline for individuals to call. (Exhibit 2, Sebolt Dep TR, p. 42.)

- **Northwest Lansing Healthy Communities Initiative**:  This Grant Application shows funds were requested for the Court-ordered Adult Diversion Program, to cover "emergency and basic needs services", "trauma and/or opioid assistance" (ING0261). $500 of the $15,000 requested was for "other direct assistance" (ING0265)—again, services for basic needs and $500 is more than $0.

- **Refugee Development Center**:  Again, SVCC faults this award (Exhibit 2, Sebolt Dep TR, pp. 45-46), but the proposed budget shows $1,000 or 8% in direct assistance out of $12,250 (ING0273).

Literally, no 2020 Ingham County Grant Applicant other than Plaintiff submitted a budget proposal which included zero or no dollars whatsoever directed to funding "basic needs."

In stark contrast, SVCC proposed zero dollars that could even arguably be categorized as funding directed towards meeting basic needs. Compare SVCC's 2019 Grant Application (ING0327-0330) which sought funding in the amount of $10,000 for "a series of classes called 'Living in America'," featuring "home purchasing/home maintenance," "small business development," "academic English for speakers of other languages," and "computer literacy." Instead of requesting materials or supplies for these classes which might have conceivably met the criteria, all funding requested by SVCC was to be used to cover salary and wages, unemployment and fringe benefits for SVCC personnel. There is no genuine issue of fact that SVCC failed to meet the criteria for grant funding.

**E.    Facts Relating to SVCC's Claim of ICBC's Improper Motive.**

No evidence of discriminatory or retaliatory motive or intent on the part of the ICBC in denying 2020 Community Agency Grant funding to SVCC was unearthed during discovery. Commissioner Morgan, the maker of the Motion at the November 18, 2019 HSC Meeting to transfer funding to applications for food and meals rather than executive salaries, explained his rationale for doing so during his deposition as set forth above. He moved to re-direct the funding to agencies that provided direct services (food and meals) in compliance with the spirit and letter of Resolution #19-243 and the Application Form at §IV.   SVCC has no evidence to contradict Morgan's testimony which is entirely consistent with the language he used at the time to make the motion to

11

redirect the funding from salaries and fringe benefits—the very expenses the Application Form strongly discourages.

Commissioner Sebolt testified that he authored the motion on May 20, 2019, to include compliance with the County's Nondiscrimination Policies in the criteria for prioritizing grant funding because the County had just spent significant time and resources reviewing, revising and updating its Nondiscrimination Policies. SVCC has no evidence to refute this testimony.

SVCC has attempted to use certain comments made by Commissioner Tennis during the discussion in a November 4, 2019 HSC Meeting regarding the Refugee Services Contract as evidence that there must have existed an improper motive in denying their 2020 Grant funding. SVCC asserts that "Commissioner Tennis chairs the Human Services Committee. The following week, on November 18, 2019, the Community Agency Grant came up before the Human Services Committee, the same committee which had previously demeaned and criticized St. Vincent." (ECF No. 1, PageID.21, ¶51.) This assertion is completely without merit as Commissioner Tennis was not present for either the November 18, 2019 HSC Meeting or the November 26, 2019 Meeting of the ICBC, and as a result did not even vote on Community Agency funding for 2020, much less participate in discussion regarding reallocations for direct services.

SVCC also deposed Commissioner Schafer who was not a member of the HSC in 2019 and was absent when 2020 Grant funding came before the Finance Committee. (See Exhibit 6, Minutes from November 18, 2019 HSC Meeting; and Exhibit 7, Minutes from November 26, 2019 ICBC Meeting.) At the ICBC Meeting on November 26, 2019,

12

Commissioner Schafer moved unsuccessfully to send the Community Agency Grant Approval Resolution back to the HSC and voted against approval of the Community Agency Grant funding distribution that excluded SVCC's 2020 Application. Neither Schafer's deposition testimony nor his voting record support SVCC's theory that the ICBC acted with improper motive. Instead, it illustrates that the ICBC is comprised of 14 members each of whom possess different views and opinions and cannot individually speak on behalf of or for the ICBC. SVCC's claim of "but for a retaliatory[4] motive there would have been funding" represents sheer speculation, squarely contradicted by the objective evidence as set forth above.

Between November 18 and 26, SVCC, cognizant of the HSC's recommendation and reasoning (ECF No. 28-4, PageID.655), made no effort whatsoever to contest or argue that its Application complied with the "basic needs" priority policy. Rejection of SVCC's 2020 Grant Application is 100% consistent with the policy set by Resolution #19-243 enacted many months prior as well as with the Grant Application form §IV which more than provided fair warning to receptive applicants desirous of maximizing their chance for success. What SVCC characterizes as "contemporaneous statements" were neither contemporaneous nor operative. The alleged offending remarks made by three Ingham Commissioners occurred on November 4, 2019, in a meeting of HSC; only eight days later on November 12, 2019, ICBC unanimously approved renewal of SVCC's Refugee Services Contract in the full amount, and for the full term (the County gratuitously replacing its loss of State funding with County funds to aide SVCC).

---

[4] Because neither Ingham County nor any Commissioner was a party to *Buck v. Gordon*, ICBC collectively has no motive to "retaliate" over litigation not involving or affecting Ingham County in any way. Indeed, SVCC previously described the motives of ICBC as "state retaliation" which suggests Plaintiff confuses state and county interests (ECF No. 5, PageID.54).

SVCC's 2020 Grant Application came before ICBC on November 26, more than three weeks after the subject comments, and there were no adverse comments regarding SVCC which followed (ECF No. 28-3, PageID.655; see also ECF No. 16-4, PageID.191).

## GOVERNING LEGAL STANDARDS

### I.    Summary Judgment.

Summary judgment is generally appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "We must view all evidence in the light most favorable to the nonmoving party in making this determination." *Williams v. AT&T Mobility Svcs*, 847 F.3d 384, 391 (6th Cir.2017).   But conclusory statements unsupported by specific facts will not suffice to survive summary judgment.  *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004).

### II.    Evidentiary Admissibility.

Only admissible evidence may be considered on summary judgment. Fed.R.Civ.P. 56(c)(1), (2).  Affidavits must be based on personal knowledge, include facts admissible in evidence, and show the affiant or declarant competent to testify on those matters.  *Id.*, at (c)(4). Hearsay generally cannot be considered on summary

judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994); *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir.1969).

However, it is not necessary to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

SVCC alleges the following against ICBC:

Count I:   42 U.S.C. § 1983 Violation of the First Amendment to the U.S. Constitution Free Exercise Clause: Law not neutral and generally applicable, individualized assessments, religious targeting

Count II:   42 U.S.C. § 1983 Violation of the First Amendment to the U.S. Constitution: Free Speech Clause: Compelled Speech

Count III:   42 U.S.C. § 1983 Violation of the First Amendment to the U.S. Constitution: Retaliation for protected speech, petition, and religious exercise

Count IV:   42 U.S.C. § 1983 Retaliation for taking action to protect civil rights

Count V:   42 U.S.C. § 1983 Violation of the Fourteenth Amendment to the U.S. Constitution: Equal Protection Discrimination on the basis of religion

This Court has dismissed all claims relating to the Refugee Services Contract and, as such, SVCC's claims as set forth above, are limited to the denial of a Community Agency Grant Application for Fiscal Year 2020. SVCC's evidentiary support for its claims is limited to the following:

1.   On May 20, 2019, at an HSC Meeting, Commissioner Sebolt made a motion to include compliance with the County's Nondiscrimination Policies as part of the 2020 Community Agency Grant funding criteria. (No relationship with the Refugee Services Contract.)

15

2.      Almost 6 months later, on November 4, 2019, during an HSC Meeting, Commissioners Sebolt, Tennis and Stivers made comments regarding SVCC and the LGBTQ community in discussion relating to the Refugee Services Contract. (No relationship to the Community Agency Grant Program.)

3.      Also, on November 4, 2019, Commissioner Morgan made comments critical of the fact that ICBC staff had not included comparisons or alternatives for providing refugee services in a memo to the ICBC. Commissioner Morgan made no negative or critical comments regarding SVCC.

4.      On November 12, 2019, the contract with SVCC for refugee services was approved by the ICBC by an 11-3 vote.

5.      On November 18, 2019, during an HSC Meeting, Commissioner Morgan moved to redirect Community Agency Grant funds from SVCC as recommended by the Deputy Controller to two other agencies who met the requirement of providing "direct services" (i.e., food and meals). The motion was approved. Commissioner Tennis was not present for this meeting. There were literally no negative or critical comments made regarding SVCC. (No relationship to the Refugee Services Contract.)

6.      On November 26, 2019, the ICBC approved 2020 Community Agency Grant funding. SVCC's Application for funding salaries and fringe benefits was not approved for funding. No negative or critical comments were made regarding Plaintiff.

7.      SVCC was approved for grant funding for services similar to those proposed for 2020 for fiscal year 2019.

The facts listed above are not sufficient to sustain SVCC's claims against ICBC. SVCC's arguments that ICBC's denial of Community Agency Grant funding violates the First Amendment (Establishment Clause, Free Speech Clause) and the Fourteenth Amendment (Equal Protection) are without merit. SVCC's claims for retaliation are equally without merit. There is no genuine dispute as to any material fact in this case, and therefore ICBC is entitled to Summary Judgment as to all Counts.

I.  **SVCC is Unable to Establish a Violation of Any of Its Constitutional Rights and ICBC is Entitled to Summary Judgment as to Counts I, II and V of SVCC's Complaint.**

The facts surrounding the denial of SVCC's Application for FY2020 Community Agency Grant funding are set forth in detail above. To summarize, ICBC adopted a resolution setting the criteria and priorities for its FY2020 Community Agency Grant Program early in 2019 in Resolution #19-243. The Resolution was considered on May 20, 2019, by the HSC. Recalling that significant resources had just gone into reviewing and revising Nondiscrimination Policies, Commissioner Sebolt made a motion to amend the resolution setting priorities for 2020 Grants to include as a condition the Applicant's adherence to the County's Nondiscrimination Policies. Six months later, on November 18, 2019, Community Agency Grant funding for 2020 was considered by the HSC. Commissioner Morgan made a motion to transfer the recommendation for funding from SVCC and to approve additional funding to two other applicants to provide food and meals instead because SVCC's Application did not meet the criteria of "meeting basic needs" at any level or in any respect. The resolution as amended was approved by the HSC and ultimately by the ICBC. No disparaging, critical, unsavory or other comments were made about SVCC tenets, or beliefs, during this process; there were no references of any kind to the *Buck* lawsuit, or to any of SVCC's positions regarding the LGBTQ community.

A.    **The criteria for Community Agency Grant funding established by Resolution #19-243 is neutral and generally applicable and does not constitute an individualized assessment or religious targeting. Therefore, SVCC cannot establish a violation of the Free Exercise Clause.**

SVCC claims that the policy set by Resolution #19-243 on May 20, 2019, and as applied to SVCC violates the Free Exercise Clause of the First Amendment. This claim is without merit.

The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, see *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520, 531 (1993). "In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* Neutrality and general applicability are interrelated. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. *Id.*, at 532. At a minimum, the protections of the Free Exercise Clause apply if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons. See, e.g., *Braunfeld v. Brown*, 366 U.S. 599, 607 (1961) (plurality opinion); *Fowler v. Rhode Island*, 345 U.S. 67, 69-70 (1953). "There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct. To determine the object of a law, we

must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id*.

Resolution #19-243 sets the criteria for awarding Community Agency Grant funding. This includes prioritizing "proposals that directly contribute to addressing the Community's overarching long-term objective of 'Meeting Basic Needs', such as food, clothing, and shelter, **as well as priority given to those agencies that comply with the County's non-discrimination policies**". (ECF No. 19-3, PageID.466-467; emphasis added.) There is no reference to religion or any indication on the face of the policy that the object of the policy is religious suppression.

However, SVCC claims, without evidentiary support, that Resolution #19-243 is not neutral and generally applicable and that decisions about grant funding are made in a "system of individualized assessments" (ECF No. 1, PageID.28, ¶ 70-71).  "A law is not neutral and generally applicable unless there is "neutrality between religion and non-religion." *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir.1995). And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones. See *Id*., at 979; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1233-35, 1234 n.16 (11th Cir.2004); *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir.2020).

Resolution #19-243 is a neutral policy of general applicability by its terms. The policy guides discretionary appropriation of County funds by favoring programs providing direct benefits to county residents or otherwise furthering established County goals. It applies to all applicants seeking Community Agency Grant funding and does not favor secular agencies over comparable religious agencies. Nothing in the criteria

would cause religious agencies to be treated differently from secular agencies. SVCC made no effort to comply with the criteria set forth in Resolution #19-243. Contrary to the policy set in Resolution #19-243, SVCC's 2020 Community Agency Grant Application did not propose spending any money on any service resembling or responsive to "meeting basic needs."

To support its position SVCC cites to the fact that it received funding for Fiscal Year 2019 for similar programming. SVCC also cites to the fact, that in the past ICBC has approved funding for other agencies that have not fully satisfied the criteria. However, SVCC cites no authority barring government from enforcing established policy once recognizing a violation, where previously it failed to spot the problem. In fact, all of SVCC's contracts with ICBC uniformly contain two provisions that belie Plaintiff's claims: (1) THIRTY-FIRST: Waivers. A. "No failure or delay on the part of [the County] … in exercising any right, power or privilege hereunder shall operate as a waiver thereof …" (ECF No. 17-2, PageID.258, ¶Thirty-First A; ECF No. 28-4, PageID.694, ¶Twenty-Third; ECF No. 28-4, PageID.729, ¶Twenty-Eighth); and (2) FIFTEENTH: Nondiscrimination and Procurement Policy:

> The [Second Party], as required by laws and/or Ingham County's Equal Opportunity Employment/Nondiscrimination Policy, shall not discriminate against a person to be served or an employee or applicant for employment with respect to hire, tenure, terms, conditions or privileges of employment, or a matter directly or indirectly related to employment because of race, color, religion, national origin, age, sex, sexual orientation, gender identity, disability that is unrelated to the individual's ability to perform the duties of a particular job or position, height, weight, marital status, political affiliation or beliefs.
>
> The [Second Party] shall adhere to all applicable Federal, State or local laws, ordinances, rules and regulations, and policies prohibiting discrimination, including, but not limited to, the following:

    A.     The Elliott-Larsen Civil Rights Act, 1976 PA 453, as amended.

    B.     The Persons with Disabilities Civil Rights Act, 1976 PA 220, as amended.

    C.     Title VI of the Civil Rights Act of 1964 (P.L. 88-352) which prohibits discrimination on the basis of race, color or national origin; * * *

(ECF No. 17-2, PageID.250, ¶Fifteenth; ECF No. 28-4, PageID.690, ¶Fourteenth; ECF No. 28-4, PageID.721, ¶Eighteenth.)

       Government "is neither bound nor estopped by the acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408-09 (1917); *Heckler v. Community Health Services*, 467 U.S. 51, 63 (1984) ("Respondent [non-profit] cannot raise an estoppel without proving that it will be significantly worse off than if it had never obtained the CETA funds in question.); *Schweiker v. Hansen*, 450 U.S. 785 (1981) (misinformation provided by government agent not grounds for excusing "'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'").  Even regarding SVCC itself, there is no showing any Commissioner in 2018 noticed or was consciously aware of the fact that SVCC's requested grant for 2019 was entirely for salaries and fringe benefits when the Application was approved. Part-time Commissioners faced with a pile of paperwork (2020 Applications comprise 334 pages—Exhibit 5) might easily miss such a detail— especially as Community Agency Grants were but one of multiple agenda items. Hence, any "error" in previously funding SVCC's Community Agency Grant Applications did not waive ICBC's right to enforce the "basic needs" priority policy for 2020 funding. For Fiscal Year 2021 SVCC submitted a Grant Application that was in compliance with the

funding criteria and was awarded grant funding. (See Exhibit 8, Resolution approving 2021 Community Agency Grant Funding.)

SVCC next argues that comments made by individual Commissioners during meetings relating to the Refugee Services Contract demonstrate hostility on the part of ICBC toward SVCC on the basis of religion and somehow support its claim that therefore the policy set forth in Resolution #19-243 was not applied neutrally. The record demonstrates conclusively ICBC never, by majority vote (or even majority sentiment), "stated on the record at a public meeting that it wants to stop working with St. Vincent solely because it disagrees with St. Vincent's speech, religious exercise, and audacity to defend those rights in court."  This assertion is unsupported by the evidence.

Three Ingham Commissioners—out of 14—made remarks critical of SVCC's role in *Buck v. Gordon* during an HSC Meeting discussion regarding the Refugee Services Contract (NOT a meeting of the full ICBC) (ECF No. 28-4, PageID.751-730), and were ultimately outvoted 11-3 when the contract matter came before the ICBC. The contract was, indisputably, renewed (ECF No. 36, PageID.943).[5]  SVCC conflates statements by a minority of Commissioners with final actions in the form of motions and resolutions of the ICBC.

Neither SVCC nor this Court can inquire into the mind or motives of individual legislators for voting on legislation; such inquiries are prohibited. *United States v. O'Brien*, 391 U.S. 367, 383-4 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *McCoy Elkhorn Coal Co. v.*

---

[5] The contract was renewed again for 2020-2021.

*United States E.P.A.*, 622 F.2d 260, 266 (6th Cir.1980) ("We will not inquire into the motives of individual legislators for proposing and voting in favor of [pending legislation].").

Meanwhile, ICBC acts and speaks solely through majority votes of its members, MCL 46.3(2).   Neither comments, debates, nor votes by a minority can possibly represent action of the ICBC itself. Statements by individual Commissioners or recommendations of Committees do not equate to statements or actions of the ICBC itself.  MCL 46.3(2); *Saginaw County v. Kent*, 209 Mich. 160, 167, 176 N.W. 601, 604 (1920) (" 'The powers of county boards must be exercised by them as boards and not as individuals. An individual member unless expressly authorized cannot bind the county by his actions * * *'.").

SVCC wrongly contends "strict scrutiny" applies to Resolution #19-243.  In the Free Exercise context, rational-basis review applies to neutral, generally applicable laws, *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877-879 (1990). Strict scrutiny only applies to laws that "target [ ] religious conduct for distinctive treatment," *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 534.

Policy as set by Resolution #19-243 does not burden SVCC's religious beliefs free exercise thereof; it simply requires SVCC show its use of grant funds will "directly contribute" to "meeting basic needs" of county residents or to furthering "overarching objectives" of Ingham County.  With its proposed 2020 budget devoted 100% to salaries and fringe benefits of personnel and 0% for "direct contributions" (ECF No. 28-4, PageID.682), SVCC did not meet the criteria or priority requirements. SVCC argues that the Refugee Development Center, one alternate recipient ($750) of "its $4500",

submitted a Grant Application containing a proposed budget devoting major portions of the funds to salaries and fringe benefits.  But Refugee Development Center—as SVCC concedes (ECF No. 28-1, PageID.634)—also proposed spending $1,000 on direct assistance ($500 for food, $500 for interpreters and transportation)—ECF No. 16-7, PageID.207.  SVCC mysteriously ignores Haven House ($3,750), the other beneficiary of the motion transferring SVCC's proposed funding, whose budget showed $0 for salaries, and $15,000 (100%) for direct benefits (food) (ECF No. 16-7, PageID.208). Again, SVCC holds the distinction of being the only 2020 Applicant that made no effort to comply—even nominally—with Resolution #19-243 and that the only Applicant that received no funding.

SVCC can offer no proof others violated the policy set by Resolution #19-243 with impunity—SVCC has not identified any grant recipient to which a grant was made despite an identified policy violation.   Thus, given SVCC's Application violated the policy, enforcement of which is not objectively unreasonable (SVCC does not even contend it is so), SVCC cannot claim violation of its right to free exercise of religion. *Nieves v. Bartlett*, 139 S.Ct. 1715, 1723-1724 (2019).

**B.    There is no genuine issue of fact and SVCC cannot establish a violation of the First Amendment Free Speech Clause: compelled speech.**

SVCC claims that ICBC violated SVCC's First Amendment rights by seeking to compel SVCC to make affirmative statements that contradict SVCC's religious beliefs. "The Board is conditioning St. Vincent's contracts and grants, and the ongoing ability to engage in the religious exercise of serving refugees, on St. Vincent's willingness to make statements contrary to its religious beliefs. (ECF No. 1, PageID.29, ¶ 77.) SVCC

asserts that such compulsion amounts to compelled speech in violation of the Free Speech Clause of the First Amendment to the United States Constitution. (*Id.*, PageID.30, ¶ 78.)  This claim is unsupported by the facts in this case.

It appears that SVCC is referencing comments made by an individual Commissioner during the November 4, 2019 HSC Meeting and regarding the Refugee Services Contract.  At that meeting Commissioner Tennis stated:

> Like I said, we had looked into that before and at least that, at that time, I think galvanized St. Vincent's to come around and start abiding by our living wage policy. I doubt that -- I think this-- the issue at hand is probably larger than just St. Vincent's Catholic Charities. I don't think they could probably comply with the other one. But at least it would give our staff some time to look for alternatives and not put refugee health in jeopardy. (ECF No. 17-11, PageID.356.)

This comment was specific to the Refugee Services Contract and the question of whether there were any alternative service providers for refugee services. Ultimately though, notwithstanding the comments, the Refugee Services Contract was approved by an 11-3 vote and was signed by the parties.  Clearly, a majority of the ICBC did not share concerns expressed in this comment.

All claims relating to the Refugee Services Contract have been dismissed. This comment is not and cannot be material to the claims relating to the denial of the Community Agency Grant funding for the very simple reason that Commissioner Tennis was not present for either the November 18, 2019 HSC Meeting or the November 26, 2019 ICBC Meeting where the 2020 Community Agency Grant Applications were on the Agenda. Any motive that this comment might be used by SVCC to illustrate as to the Refugee Services Contract cannot be imputed to a motive for the decision to deny the requested $4,500 in Grant funding for salaries and benefits as Commissioner Tennis

was not present and did not participate in either vote regarding 2020 Community Agency Grant funding.

Summary Judgment is proper as to any claims for violation of SVCC right to free speech.

### C.    There is no genuine issue of fact and SVCC cannot establish a violation of the Equal Protection Clause of the Fourteenth Amendment.

SVCC claims that ICBC's denial of Community Agency Grant funding penalizes St. Vincent because of its religious beliefs. (ECF No. 1, PageID.32, ¶93.)  SVCC asserts that contractors and grantees that espouse religious beliefs contrary to those espoused by SVCC are allowed to maintain their grantee relationships and that ICBC's preference for one set of religious beliefs and against SVCC religious beliefs violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (*Id.*, ¶¶94-95.) There is no factual support for these claims.

> The Equal Protection Clause of the Fourteenth Amendment commands that no state shall….deny to any person within its jurisdiction the equal protection of the laws. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment ... burdens a fundamental right, targets a suspect class, or has no rational basis.

*Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir.2011). "In determining whether individuals are 'similarly situated,' a court should not demand exact correlation, but should instead seek relevant similarity." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir.2012) (internal quotation marks omitted).

SVCC has not established that it has been treated disparately from similarly situated persons.  There is no disagreement that SVCC was the sole applicant not to

receive Grant funding for 2020. SVCC is also the only applicant that completely disregarded the Resolution #19-243 priority criteria and the warning set out on the Grant Application that priority would be given to services that "meet basic needs" and that "funds for personnel related expenditures is strongly discouraged." As set forth in the Statement of Material Facts, Section D above, SVCC attempts to parse by identifying other agencies that were awarded Grant funding even though they requested funding that did not technically meet basic needs. This effort falls far short. Every single agency identified by SVCC proposed directing at least some portion of the requested funding to the meeting of basic needs with food, meals, clothing, shelter, crisis intervention, etc. The Applications do not support SVCC's claim for violation of its equal protection rights.

Additionally, SVCC purports to have studied 10 years of ICBC Grant Applications starting in 2009 (ECF No. 28-3, PageID.652), which includes:

Total Applications:   390
Controller's Recommendations followed:  341
Controller's Recommendations exceeded:  46
Controller's Recommendations reduced/rejected:  3

Based on these numbers as presented by SVCC, the Controller recommendations were not followed on average more than 1 time out of 8.  Of the 3 "reduced/rejected" items, SVCC represents 1; the other 2 are Cristo Rey Community Center and Oasis Center. These "statistics" only prove ICBC rejected non-binding Controller's Office staff recommendations on 49 occasions out of 390 or 12.5% of the time, with one rejection involving SVCC.

These "statistics" neither provide insight into the reasons Controller recommendations were rejected, nor suggest ICBC ever *knowingly* overlooked a policy violation to approve a grant, whether for SVCC or other applicants.  The "statistics" omit

the most important information, and have no evidentiary value at all.  As held in *Haig v. Agee*, 453 U.S. 280, 302 (1981), "The exercise of a power emerges only in relation to a factual situation, and the continued validity of the power is not diluted simply because there is no need to use it."

SVCC has failed to identify any similarly situated agencies that failed to comport their applications in any respect to the priorities set by Board policy that were treated differently from SVCC by having their applications approved. ICBC agrees that the agencies seeking Community Agency Grant funding are all similarly situated in the sense that they all seek the same form of funding. However, only SVCC wholly failed to comply with the funding priority requirements. This is true notwithstanding Plaintiff admits it was fully aware of the jeopardy in which its hubris placed its funding application.  As such, SVCC's claim for violation of its right to equal protection fails and ICBC is entitled to Summary Judgment.

## II.     SVCC is Unable to Establish Retaliation for Protected Speech, Petition, and Religious Exercise or Retaliation for Taking Action to Protect Civil and ICBC is Entitled to Summary Judgment as to Counts III and IV.

### A.      There is no competent evidence of retaliatory animus by ICBC.

SVCC claims that ICBC's refusal to approve Community Agency Grant funding is sufficient to deter a person of ordinary firmness from exercising his or her constitutional and civil rights. (ECF No. 1, PageID.30, ¶81.) SVCC claims that there is a causal link which exists between the Board's adverse actions against SVCC and SVCC's religious exercise, protected speech, and petitions to the government and that such actions are retaliation for religious exercise, protected speech, and petitioning the government in violation of the First Amendment to the United States Constitution. (*Id.*, PageID.30-31,

¶¶82-83.) Similarly, SVCC claims that there is a causal link between the ICBC decision to not approve SVCC grant funding for salaries and fringe benefits and SVCC's actions to protect its rights under Section 1983 in the *Buck* litigation. SVCC argues that the decision to not provide grant funding is retaliation for St. Vincent's actions to protect its civil rights under Section 1983. (*Id.*, PageID.31, ¶¶ 87-88.)

To support the claims of retaliation, SVCC argues that the comments of three Commissioners (out of a total of 14 Commissioners) during one HSC Meeting regarding an unrelated contractual relationship between SVCC and Ingham County establish the requisite retaliatory animus by ICBC in denying SVCC Community Agency Grant funding.[6] This is untrue.[7]

In *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir.2006), the Sixth Circuit held that a plaintiff seeking to hold a municipal board liable for First Amendment retaliation must demonstrate its "protected conduct was a substantial factor in the Board's decision, and not just in the votes of certain members" and bears "the initial burden of demonstrating that [its] protected conduct motivated the Board to take adverse * * * action." *Id.*, at 262. A "but for" test is determinative: "a board is liable for actions that it would not have taken 'but for' members acting with improper motive." *Id.* In other words, "where improperly motivated members supply the deciding margin, the board [or county] itself is liable." *Id.*  Here, 3 Commissioners out of 14 made critical

---

[6] SVCC contends ICBC "made further disparaging statements about St. Vincent in the course of this litigation."  Any such statements are absolutely privileged, *Theiss v. Scherer*, 396 F.2d 646 (6th Cir.1968). SVCC cites no authority holding that defense of this lawsuit can itself violate SVCC's First Amendment rights.

[7] SVCC appears to seek to retaliate against individual Ingham County Commissioners by targeting them for exercising their own First Amendment rights to free speech and their First Amendment legislative and political rights, *Bond v. Floyd*, 385 U.S. 116, 135-137 (1966).

comments about SVCC during discussions regarding the Refugee Services Contract at the HSC Meeting. The Contract was nevertheless approved 11-3 by the ICBC. Clearly, the views and opinions expressed by the three Commissioners did not represent the views and opinions of the ICBC.

SVCC seeks to impute the "losing" viewpoint from the Contract vote onto the ICBC and its decision to deny Grant funding to SVCC for 2020. SVCC ignores the fact that one of the three Commissioners who voted against the Refugee Services Contract, Commissioner Tennis, was absent from both the HSC and ICBC votes on FY2020 Community Agency Grant funding. Any critical comments (23 days earlier) by three Board members did not supply the deciding margin, and *Scarborough's* "but for" test is not satisfied. *Kuivila v. City of Newton Falls* (N.D. Ohio E.D., No. 4:14-cv-01593, Feb. 11, 2016) (City granted summary judgment per *Scarborough*, where plaintiff Chief of Police claimed two of the five City Council members voted to terminate his employment based on First Amendment-prohibited reasons).

No ICBC majority ever approved or endorsed or adopted the challenged remarks, and SVCC simply cannot and does not cite authority to indicate that the "retaliatory" statements of a minority prove (or even permit judicial inquiry into whether) the majority necessarily subscribed to those motives when it had perfectly valid, independent reasons for its action. *O'Brien*, 391 U.S. at 383-4; *Elkhorn Coal Co. v. United States E.P.A.*, 622 F.2d 260, 266 (6th Cir.1980).  The law is contrary to SVCC's unsupportable position.  MCL 46.3(2); *Saginaw Co.*, 209 Mich. at 167.

SVCC has previously cited *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719, 1731 (2018), for the proposition that contemporaneous

statements by members of decision-making bodies are relevant for determining motive. But, here, the <u>only</u> contemporaneous statement regarding Grant funding was from Commissioner Morgan who moved to redirect the Deputy Controller's recommendation for funding away from SVCC because the Application from SVCC was unabashed in failing to meet the Board's criteria to receive Grant funding as set out in its policy setting priorities for funding.

SVCC wrongly assumes that, if a *minority* of Commissioners secretly harbors animus toward certain of SVCC's religious tenets, sweeping judicial inquiry into the motives of the ICBC is somehow justified.  But where, as here, neutral principles have been invoked, nothing of the kind is allowed.

> We summarize succinctly. Kearney had to proffer evidence sufficient to ground an inference that the defendants' actions were not based on legitimate justifications, but, rather, that their stated reasons for ousting him were invoked merely as a pretext. See *Gray v. New Engl. Tel. & Tel. Co.*, 792 F.2d 251, 256 (1st Cir.1986). * * * Even **if we assume, as Kearney urges, that the defendants were gratified by having an opportunity to rid themselves of a gadfly who had demonstrated a penchant for using the FLSA as a sword against them, that is not enough to ground a retaliation claim**. See *Champagne v. Servistar Corp.*, 138 F.3d 7, 13 (1st Cir.1998) (holding that **the existence of a retaliatory motive cannot overcome a showing that an employee's dismissal resulted from a plainly neutral test, applied even-handedly**); *DeNovellis v. Shalala*, 135 F.3d 58, 66 (1st Cir.1998) (**denying relief to an employee despite a showing of personal animosity because the "animus did not cause [the employee] to be treated any differently than her similarly situated co-workers"**); *cf. Blackie*, 75 F.3d at 723-24 (explaining that **an employee**, "by engaging in a protected activity [under the FLSA], ... **does not acquire immunity"** **from the same discipline to which his co-workers are subject**). In short, **Kearney had to adduce some significantly probative evidence that the defendants' retaliatory animus played a materially causal role** in the termination of his employment. He did not do so.

*Kearney v. Town of Wareham*, 316 F.3d 18, 25-26 (1st Cir.2002) (emphasis added).[8]

Here, likewise, SVCC can produce no "*significantly probative*" evidence—merely the isolated remarks of 3 of 14 Commissioners made <u>more than 3 weeks earlier</u>—to suggest retaliatory animus played a material or causal role in denial of its Community Agency Grant Application. This is especially so when, as here, one of those three Commissioners was not even present for either vote relating to Community Agency Grant funding.

*Grossbaum v. Indianapolis-Marion County Building Auth.*, 100 F.3d 1287, 1292-1296 (7th Cir.1996) (boldfaced emphasis added) has extraordinary parallels to this case:

> Both parties in this case seem to assume that if the Building Authority Board was motivated by an intent to retaliate against Lubavitch or to discriminate against religious viewpoints then *ipso facto* the Board violated the Constitution. This **leap from nefarious motive to constitutional violation, however, is by no means an automatic one under constitutional case law.**
>
>      * * *
>
> The relevance of motive in these instances of constitutional adjudication does not, however, allow the inductive conclusion that a universal, all-purpose cause of action exists whenever a plaintiff can allege an unconstitutional motive. **In a Free Speech Clause case**, for example, the Supreme Court went so far as to say that **"it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."** *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Although that statement may be hyperbole, one constitutional commentator has concluded that, rather than focusing on motive, "most descriptive analyses of First Amendment law, as well as most normative discussions . . . have considered the permissibility of governmental regulation of speech by focusing on the effects of a given regulation." Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413, 413 (1996);

---

[8] Retaliation claims by government contractors like SVCC are treated according to the principles developed for government employees claiming retaliation.  *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 720-726 (1996).  Thus, citation here of such government worker retaliation cases is apt.

cf. *McCray v. United States*, 195 U.S. 27, 56 (1904) (**"The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."**)

A number of factors explain this reluctance to probe the motives of legislators and administrators. For starters, **the text of the Constitution prohibits many government actions but makes no mention of governmental *mentes reae* (*i.e.*, guilty minds)**. The First Amendment, for example, forbids Congress and (through the Fourteenth Amendment's Due Process Clause) the States from making laws "abridging the freedom of speech" -- **a far different proposition than prohibiting the intent to abridge such freedom. "We are governed by laws, not by the intentions of legislators."** *Conroy v. Aniskoff*, 113 S.Ct. 1562, 1567 (1993) (Scalia, J., concurring in judgment). Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, **an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution**. See *Church of the Lukumi Babalu Aye*, 113 S.Ct. at 2240 (Scalia, J., concurring in part and concurring in judgment); see also Laurence H. Tribe, The Mystery of Motive, Private and Public: Some Notes Inspired by the Problems of Hate Crime and Animal Sacrifice, 1993 S.Ct. Rev. 1, 23.

Beyond these theoretical objections to investigating motive, practical considerations also suggest caution. **Government actions may be taken for a multiplicity of reasons, and any number of people may be involved in authorizing the action.** Doubting the propriety of judicial searches for corrupt motives, Chief Justice Marshall thus asked:

> Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130 (1810). Moreover, once a court finds an illicit motive, may the legislature or administrative body ever take the same action again without the imputation of improper intent? **The Court in *O'Brien* declined to strike down a law allegedly tainted by improper motive in part because Congress could then re-enact the law "in its exact form if the same or another legislator made a 'wiser' speech about it."** 391 U.S. at 384; * * *.

In short, the relevance of motive to constitutional adjudication varies by context. **No automatic cause of action exists whenever allegations of unconstitutional intent can be made**, but courts will investigate motive when precedent, text, and prudential considerations suggest it necessary in order to give full effect to the constitutional provision at issue.

### C. Lubavitch's Retaliation Claim

* * * Lubavitch first alleges that the Building Authority's adoption of Rule 13 was in retaliation for plaintiffs' exercise of their free speech rights and for their exercise of their right to petition the courts for redress of grievances. Lubavitch undoubtedly has such rights. **Whether Lubavitch also has a legitimate cause of action for retaliation, however, is another matter**.

The plaintiffs cite numerous cases for the general proposition that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir.1987). * * *

Claims of retaliation admittedly almost always turn on the issue of motive. See, *e.g., Perry v. Sindermann*, 408 U.S. 593, 598 (1972) (holding that a public employee must show "the decision not to renew his contract was, in fact, made in retaliation for his exercise of the constitutional right of free speech"). An examination of the cases cited in the briefs, however, indicates that **both parties fundamentally misconceive the nature of retaliation claims**. * * *

Of the 21 cases cited * * *however, all of the cases cited involved challenges to discretionary government actions taken *vis-à-vis* individual citizens. **None of these cases involved a challenge to the mere adoption of a rule, let alone a prospective and generally applicable rule like the Building Authority's Rule 13**.

**Indeed, retaliation case law demonstrates that retaliation causes of action are challenges to the application of governmental rules, not to the rules themselves**. * * *

* * *

Nonetheless, **courts will not sustain a retaliation claim where a plaintiff challenges only the enactment of a prospective, generally applicable rule. Executive and legislative branches of government must not be paralyzed by the prospect of a retaliation claim (and the attendant fact-based motive inquiry whenever they make new policy that is arguably in response to someone's speech or lawsuit.** Suppose, for example, that a group of drug addicts successfully sues to

34

get disability benefits for their addiction and Congress subsequently amends the law to prohibit benefits to drug addicts. **No one would reasonably suggest that Congress's motives would then be subject to a retaliation inquiry just because it acted in response to the addicts' success in the courts**.[9]

Plaintiffs can, of course, attack the substance of a rule as being facially unconstitutional. * * * **Plaintiffs may not, however, use a retaliation claim to challenge a truly prospective and generally applicable rule that is even-handedly enforced**.

In short, **retaliation claims protect constitutional rights only against their unequal infringement**. We recognized as much in *Vukadinovich v. Bartels*, 853 F.2d 1387 (7th Cir.1988), where a teacher brought both retaliation and equal protection claims after he was dismissed, allegedly for statements he had made to a local newspaper. After disposing of the retaliation claim, we said his equal protection claim alleged "only that he was treated differently because he exercised his right to free speech" and thus was "a mere rewording of plaintiff's First Amendment-retaliation claim." *Id.* at 1391-92; see also *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 468 (5th Cir.1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amount[ed] to no more than a restatement of his first amendment claim"). **In other words, retaliation doctrine protects citizens against those individualized, discretionary government actions where the government's coercive power is greatest, not against government rules that affect both majority and minority alike**.

Returning to the specifics of this case, Rule 13 is unequivocally a prospective and generally applicable rule because it bans all private displays henceforth. Furthermore, **no one has even hinted that the rule has been or is being applied unequally. Lubavitch therefore has not stated facts sufficient for a retaliation claim. To hold otherwise would be a significant expansion of retaliation doctrine and would encourage only litigiousness and governmental paralysis**.

Here, identically, SVCC seeks to punish ICBC for having ever had a Commissioner who has uttered a critical word about SVCC practices. The policy set by Resolution #19-243 is clearly neutral, representing a valid prioritization for a program of discretionary appropriations (SVCC has not claimed otherwise), and was duly applied to all applicants for the FY2020 Grant—one of which decided to test the Board's

---

[9] This passage should directly resolve this Court's *Buck*-related concerns.

convictions by proposing to spend $0 towards prioritized services. Although SVCC acknowledged the policy in internal emails prior to submitting its Application, it failed to comply, choosing instead to rely on the fact that the ICBC did not enforce its policy as to the Plaintiff the previous year. (Exhibit 4.)

SVCC has attempted to show unequal enforcement of the rule, but its "evidence" fails miserably. SVCC's effort to replace the policy with a prohibited inquiry into motivations underlying the policy is misconceived and must be rejected. At most, per *Grossbaum*, SVCC might show a *non-actionable* "failed attempt to violate the Constitution."

SVCC's claims for retaliation as the basis for denial of its FY2020 Community Agency Grant Application are wholly without merit, and ICBC is entitled to Summary Judgment.

## RELIEF REQUESTED

Summary Judgment as to all remaining claims should be granted to ICBC under Fed.R.Civ.P. 56(a).

Respectfully submitted,

Dated: June 1, 2021

By: /s/ Bonnie G. Toskey
Bonnie G. Toskey (P30601)
Sarah K. Osburn (P55539)
Cohl, Stoker & Toskey, P.C.
Attorneys for Defendant
601 N. Capitol Avenue
Lansing, MI 48933
(517) 372-9000
btoskey@cstmlaw.com
sosburn@cstmlaw.com

## CERTIFICATE OF COMPLIANCE

Bonnie G. Toskey (P30601) certifies, under LCivR 7.2(b)(1), that this Brief contains  10,753 words, inclusive of headings, footnotes, citations and quotations, as counted by Microsoft Word 365, the word processing software used to create this Brief.

Dated: June 1, 2021                    By:   /s/ Bonnie G. Toskey
                                              Bonnie G. Toskey (P30601)


N:\Client\Ingham\Litigation\St Vincent Catholic Charities\Pleadings\Motion for Summ Judgment\Motion for Summary Judgment Brief - Final 6.1.2021.doc