# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ST. VINCENT CATHOLIC
CHARITIES,

     *Plaintiff,*

    v.

INGHAM COUNTY BOARD OF
COMMISSIONERS,

     *Defendant.*

Civil No. 1:19-CV-1050

Hon. Robert J. Jonker

**PLAINTIFF'S
MEMORANDUM IN SUPPORT
OF MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ..................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................. 4

I. Ingham County "values and benefits from" St. Vincent's refugee ministries .............................................................................. 4

II. The Community Agency Grant Program funds a wide variety of programs. ........................................................................ 5

    A. The Board generally relies on the controller's recommendation. ................................................................... 6

    B. The Board construes "basic needs" expansively. ................. 7

    C. The Board regularly funds charitable work by religious ministries. .................................................................. 10

    D. A single Commissioner can influence grant funding. ........ 11

III. The Board denies St. Vincent's Grant application. ...................... 12

    A. St. Vincent defends its religious exercise in *Buck* and the Board responds. ................................................... 12

    B. St. Vincent applies for a FY2020 grant, using the same application it used in FY2019. ..................................... 14

    C. The Board threatens St. Vincent's contracts and grants. ................................................................................ 15

    D. The Board turns to St. Vincent's Grant. ............................. 19

    E. St. Vincent protects its rights. ............................................ 22

    F. The Board continues its religious hostility. ........................ 22

1. The FY2021 Community Agency Grant. ............................... 22

2. An RFP to replace St. Vincent. ................................. 25

PROCEDURAL HISTORY ...................................................... 26

LEGAL STANDARD ......................................................... 27

ARGUMENT ............................................................. 28

I. The Board violated the Free Exercise Clause. .............................. 28

   A. The Board's conduct was not neutral to St. Vincent's religious practice. ...................................................... 28

   B. The Board failed to apply any generally applicable law. ............................................................. 34

   C. The Board cannot satisfy strict scrutiny. ................................ 38

II. The Board violated the First Amendment by retaliating against St. Vincent for protected activity. ..................................... 39

   A. St. Vincent engaged in protected conduct. ............................... 40

   B. The Board took adverse action against St. Vincent. ................. 40

   C. There was a causal connection between St. Vincent's conduct and the Board's adverse action. ................................ 41

   D. The Board's excuses for denying St. Vincent a grant are pretextual. .......................................................... 45

III. The Board's actions compelled St. Vincent's private speech. ............................................................. 47

IV. The Board's actions violated the Equal Protection Clause. ............................................................. 48

V. St. Vincent is entitled to relief. ...................................... 48

   A. St. Vincent is entitled to nominal and actual damages. .......................................................... 48

B. St. Vincent is entitled to permanent injunctive
   relief. ............................................................... 49

   1. St. Vincent will suffer a continuing
      irreparable injury. ....................................... 50

   2. St. Vincent has no adequate remedy at law ......................... 53

CONCLUSION ................................................... 54

CERTIFICATE OF COMPLIANCE ......................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ..................................................................... 34, 47

*Bible Believers v. Wayne Cnty.*,
    805 F.3d 228 (6th Cir. 2015) .............................................................. 48

*Buck v. Gordon*,
    429 F. Supp. 3d 447 (W.D. Mich. 2019) ..................................... *passim*

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................ 27

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) .......................................................... 28, 30, 33, 34

*Cnty. Sec. Agency v. Ohio Dep't of Com.*,
    296 F.3d 477 (6th Cir. 2002) .............................................................. 50

*DiCarlo v. Potter*,
    358 F.3d 408 (6th Cir. 2004) ....................................................... 41, 45

*Douglas v. Muzzin*,
    No. 1:15-cv-41, 2019 WL 1332015
    (W.D. Mich. Mar. 25, 2019) ............................................................... 27

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ........................................................................ 46

*Fritz v. Charter Twp. of Comstock*,
    592 F.3d 718 (6th Cir. 2010) .............................................................. 41

*Frontier Ins. Co. v. Blaty*,
    454 F.3d 590 (6th Cir. 2006) .............................................................. 49

*Holzemer v. City of Memphis*,
    621 F.3d 512 (6th Cir. 2010) ....................................................... 40, 41

*InterVarsity Christian Fellowship/USA v. Bd. of Governors*
  *of Wayne State Univ.*,
  No. 19-10375, 2021 WL 1387787 (E.D. Mich. Apr. 13,
  2021) ........................................................................................ *passim*

*Maben v. Thelen*,
  887 F.3d 252 (6th Cir. 2018) .................................................. 39, 40, 45

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S. Ct. 1719 (2018) ........................................................... 29, 30, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................ 27

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ...................................................... *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ........................................................................ 47

*Planned Parenthood of Greater Ohio v. Hodges*,
  917 F.3d 908 (6th Cir. 2019) .............................................................. 47

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ............................................................................ 53

*Saboury v. City of Lansing*,
  366 F. Supp. 3d 928 (W.D. Mich. 2017) ....................................... 27, 28

*Scarbrough v. Morgan Cnty. Bd. of Educ.*,
  470 F.3d 250 (6th Cir. 2006) .......................................................... 39, 41

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021) ................................................................ *passim*

*Thaddeus-X v. Blatter*,
  175 F.3d 378 (6th Cir. 1999) .............................................................. 40

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017) ........................................................................ 46

*United States v. Miami Univ.,*
    294 F.3d 797 (6th Cir. 2002)................................................................. 54

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021)......................................................................... 48

*Ward v. Polite,*
    667 F.3d 727 (6th Cir. 2012)........................................................ 31, 38

*Women's Med. Pro. Corp. v. Baird,*
    438 F.3d 595 (6th Cir. 2006)............................................................... 49

**Statutes**

MCL § 15.268......................................................................................... 24

**Other Authorities**

Audio: Ingham Cnty. Human Servs. Comm. Meeting
    (Nov. 4, 2019) ................................................... 14, 15, 18, 52

Fed. R. Civ. P. 56............................................................................... 27

## INTRODUCTION

St. Vincent Catholic Charities provides crucial services to refugees in Ingham County. Members of the Ingham County Board of Commissioners have admitted that St. Vincent is the best game in town when it comes to serving refugees, and agree that the agency is "doing great work for the community." Indeed, St. Vincent is the only agency in the County with both the federal authorization and expertise necessary to provide these crucial services. Nevertheless, for FY2020, the Board took an unprecedented step—it denied St. Vincent a grant that would directly support refugees. That grant would help St. Vincent teach refugees valuable skills like English fluency, computer literacy, and how to purchase and maintain homes. The Board denied this grant despite approving a grant for the exact same program just one year earlier and despite funding every other timely applicant. Why?

Discovery confirmed the answer: The Board did not deny St. Vincent's grant over concerns about its refugee services. Rather, the denial was in direct response to St. Vincent's well-publicized lawsuit in this Court defending its foster and adoption ministry (*Buck v. Gordon*) and its Catholic beliefs on marriage.

1

Undisputed evidence confirms that the Board singled out St. Vincent for discriminatory treatment in violation of the First Amendment. St. Vincent was the *only* agency—out of thirty-two—to be both recommended by the County Controller for grant funding in FY2020 and then denied funding by the Board. Strikingly, St. Vincent's FY2020 application was also one of just three denials in the past decade—a record spanning 332 applications. As multiple Commissioners acknowledged when deposed, there's never been a denial like St. Vincent's in 2020.

"The major issue" for the Board, as one Commissioner put it, was "the adoptions." Indeed, the Board denied St. Vincent's grant mere weeks after multiple Commissioners confirmed their hostility to St. Vincent's religious beliefs—during public, recorded Board meetings. The Board took these actions even though, as the Board now admits, the County has nothing to do with St. Vincent's foster and adoption ministry. The First Amendment and the Equal Protection Clause prohibit governments from punishing a religious charity out of disdain for its religious beliefs or to ostracize it for defending those beliefs in this Court. Yet that is exactly what the Board did here.

Finally, because St. Vincent's religious practices are still "the major issue," the Board must be enjoined from unconstitutionally denying St. Vincent future contracts or grants. The Board took steps to zero out St. Vincent's FY2021 grant, until it was warned that doing so might result in liability in this case. Two Commissioners also admitted that the County is actively looking to replace St. Vincent's refugee services altogether—not just on a grant, but also a larger contract by which St. Vincent provides significant health services to refugees. To that end, the Board authorized a now ongoing Request for Proposal ("RFP") process. As one Commissioner said, finding an alternative to St. Vincent is "absolutely the intent." This would both devastate St. Vincent's refugee services ministry and disrupt health care services for the refugees depending on it. Of course, the Board is free to contract with another refugee services provider for *constitutionally valid* reasons. But the Board's continued targeting will continue unless this Court states the obvious: Disdain for St. Vincent's religious views is not a constitutionally valid reason.

St. Vincent is entitled to summary judgment and relief on all its claims.

## STATEMENT OF UNDISPUTED FACTS

### I. Ingham County "values and benefits from" St. Vincent's refugee ministries.

Over the past four decades, St. Vincent has resettled thousands of refugees in Ingham County. Doc. 5-3 at PageID.110-111 ¶ 7 (declaration of Judi Harris). St. Vincent treats every refugee with inherent human dignity: from picking them up at the airport to helping them access housing and food, acquire professional skills, find work, enroll in school, and acclimate to American life. Doc. 5-3 at PageID.111 ¶ 8. St. Vincent's religious beliefs animate its ministry—which includes serving all refugees, regardless of race, sex, religion, or sexual orientation. Doc. 5-3 at PageID.113 ¶¶ 12-13. Indeed, St. Vincent is a priority resettlement site for LGBTQ refugees. Doc. 5-4 at PageID.122-123.

St. Vincent's refugee services are supported by contracts and grants with Ingham County. Doc. 5-3 at PageID.112-113 ¶ 11; *see also* Doc. 28-1 at PageID.598-603 (discussing the Refugee Health Services Contract, the Community Agency Grant, and the Health Center Interpreting Contract). St. Vincent's refugee services ministry could not exist "[w]ithout government contracts, including its contracts with Ingham County." Doc. 36 at PageID.941.

As the Board admits, it "values and benefits from the assistance that St. Vincent provides to refugees living in Ingham County." Ex. 3, RFAs at 4 (#4). "St. Vincent is the only federal designated agency for refugee resettlement serving Ingham County." *Id.* (#5). Indeed, Refugee Development Center—another Ingham County community agency—said, "self-sufficiency for . . . refugees in the community" "would not be possible without [St. Vincent's] refugee employment program." Ex. 27, RDC Letter.

## II. The Community Agency Grant Program funds a wide variety of programs.

Ingham County's Community Agency Grant Program helps St. Vincent provide these crucial services. For well over a decade, the Board has dispensed grants to "community agencies" that "provide important services . . . to Ingham County residents." Doc. 17-14 at PageID.400 (Resolution 16-493). Since 2011 (for FY2012), the grant process gave "priority . . . to those proposals that directly contribute to addressing the County's long-term priority of 'Meeting Basic Needs', such as food, clothing, and shelter." *See* Resolution 11-199, https://perma.cc/S7BG-7TRK. St. Vincent began applying for community agency grants in 2006 (for

FY2007). *See* Resolution 06-310, https://bc.ingham.org/Portals/BC/2006%20Resolutions/06-310.doc. Since 2006, St. Vincent received a grant every year it applied—until FY2020.[1]

### A. The Board generally relies on the controller's recommendation.

If an agency's application receives approval from the Controller, the Board approves it. This has been the practice for at least the past decade. Commissioners noted that they rely on the Controller's recommendations "[q]uite a bit" and that those recommendations are "not very often" questioned. *See* Ex. 4, Morgan Transcript at 16:13-14, 17:5; *see also* Ex. 6, Sebolt Transcript at 32:17-21 (explaining that outside of St. Vincent's FY2020 application, he cannot recall a time when the Board has disregarded the Controller's recommendation and not funded an agency). Commissioners typically do not review every application, particularly if an agency previously received grant funding. *See* Ex. 4, Morgan Transcript at 17:13; Ex. 6, Sebolt Transcript at 19:17 (explaining that he generally "tend[s] to scroll through" them); Ex. 7, Tennis Transcript at 35:7 ("I review the new ones."); Ex. 5, Schafer Transcript at 36:7-9 ("I may

---

[1] St. Vincent did not request grant funding for FY2015 or FY2016.

glance very quickly, but, generally, I will – I would do as the controller staff wishes."). And, generally, the Board tries "to make everyone happy"—meaning that every controller-recommended applicant usually receives some funding, even if it means "rob[bing] the contingency fund a little bit." Ex. 7, Tennis Transcript at 34:21-22; *see also* Doc. 28-1 at PageID.601 (quoting Commissioner Tennis at May 20, 2019 meeting); Ex. 5, Schafer Transcript at 37:14-17 (same).

Only "on three occasions from FY2010-2020 [the Board] did not accept the Controller's recommendation for Community Agency Grant funding" and, instead, awarded less or none. Ex. 3, RFAs at 12 (#38); *see also id.* at 6-12 (#10-38). And those three occasions were unusual. In one instance, an application was withdrawn because the agency closed. *Id.* at 8-9 (#20-22). In another, an agency's funding was reduced because it exceeded the "cap" the Board placed on the percentage of allowable grant funding an agency can receive. *Id.* at 9-10 (#25-27). The third was St. Vincent's denial in FY2020.

## B. The Board construes "basic needs" expansively.

The Board has adopted an elastic approach to determine what constitutes "contribut[ing]" to "basic needs." When deposed Commissioners

7

were asked to explain how the basic needs criteria applied to various past grantees, the Commissioners could neither articulate an objective "basic needs" standard nor agree among themselves if any particular applicant should receive funding (even if the Board ultimately funded it). *See, e.g.*, Ex. 6, Sebolt Transcript at 17, 42-44; Ex. 7, Tennis Transcript at 29-32; Ex. 4, Morgan Transcript at 15, 20-22, 30-34. As Commissioner Morgan put it, "different people might have different definitions of what [a basic need] is." Ex. 4, Morgan Transcript at 40:11-14; *see also* Ex. 7, Tennis Transcript at 29:18-20, 79:13 (repeatedly describing the criteria as "subjective").

The Board has awarded grants to programs that do not directly provide food, clothing, or shelter. For example, the Board has given grants for "garden supplies and improvements, transportation and delivery, tilling, compost, [and] seeds" (Ex. 8, Garden Project at 3), as well as a nutritional program that specifically says it "does not provide direct crisis care" (Ex. 13, Y Achievers). The Board has also funded "emotional support" hotlines (Ex. 9, Listening Ear) and mileage reimbursement "for volunteers who provide medical driving to older adults" (Ex. 11, RSVP).

Among other things, Commissioners have recognized that funding personnel costs can directly contribute to "basic needs"—multiple Commissioners said so when they were deposed. *See, e.g.*, Ex. 6, Sebolt Transcript at 45:12-48:7; Ex. 4, Morgan Transcript at 33:13-17, 40:7-12 (agreeing that funding employees' salaries can be providing direct aid and meeting a basic need); Ex. 7, Tennis Transcript at 35:7, 58:19-59:1 ("[T]here may have been mitigating circumstances why something that in one part of the application looks like it's just for personnel, but in other parts of the application explain how that personnel will be used[.]"). The Board admitted that it has funded other community agency grants where either all, or nearly all, of the awarded grant money went to salaries and benefits. *See, e.g.*, Ex. 3, RFAs at 15 (#47: Allen Neighborhood Center's entire grant award went to salaries and benefits); *id.* at 18 (#54: $11,000 of the $12,250 awarded to Refugee Development Center for FY2020 went to salaries and benefits). Other grant awards for personnel include grants to cover the "salary of a new part-time person to work . . . with formerly incarcerated individuals" (Ex. 10, NorthWest Initiative) and matching funds for "college advisors" (Ex. 18, CACAN Budget).

In depositions, multiple Commissioners agreed that the services St. Vincent would have provided with its FY2020 grant could constitute meeting basic needs. St. Vincent proposed to provide refugees with instruction in the English language, computer literacy, and home purchasing and maintenance, which would help them obtain jobs and housing. *See* Ex. 12, FY2020 SOW. Commissioners admitted that such instruction could constitute meeting basic needs. *E.g.*, Ex. 4, Morgan Transcript at 33:13-34:18 (ESL classes "essential. . . in order to get the services"); Ex. 6, Sebolt Transcript at 43:17-44:3 ("a case could be made" for job training and language skills as basic needs); Ex. 5, Schafer Transcript at 92:3-93:1 (ESL, computer literacy, housing maintenance "meets a community's basic needs").

## C. The Board regularly funds charitable work by religious ministries.

Beyond St. Vincent, the Board admits it is "common knowledge" that at least two other frequent grant recipients either are focused on "meeting the 'spiritual needs' of individuals" or have publicly observable "roots" in a religious tradition. Ex. 3, RFAs at 16-17 (#51: discussing Advent House and Cristo Rey).

In this litigation, the Board has asserted that it might decide not to fund St. Vincent over Establishment Clause concerns. *See* Doc. 32 at PageID.808, 817; Doc. 19 at PageID.445. Yet during the FY2020 grant process—the year St. Vincent was denied—the Board "did not adopt any Resolutions . . . that set forth particular concerns over potential violations of the Establishment Clause." Ex. 3, RFAs at 18 (#55). Nor were Commissioners aware of any Establishment Clause concern with funding St. Vincent. *See* Ex. 7, Tennis Transcript at 77:4 ("Not to my knowledge."); Ex. 5, Schafer Transcript at 43:5-8 (Q: "Would you agree with me, Commissioner Schafer, that funding St. Vincent presently wouldn't violate the establishment clause?" A: "Yes."). Similarly, other religious entities like Cristo Rey are "not aware of a single instance in the history of [the organization's] relationship with Ingham County where the Establishment Clause was raised as a concern." Ex. 2, Garcia Declaration at 5.

### D. A single Commissioner can influence grant funding.

Commissioners understand that they're "not doing [their] job if [they]'re not trying to influence the board as a whole." Ex. 7, Tennis Transcript at 30:11-13. In the community agency grant context, this means

that a single, "stubborn" Commissioner can persuade his colleagues to either fund or defund applicants. *Id.* at 81:10; *see also id.* at 80:19-81:11 (one board member could "certainly" influence whole Board).

As every deposed Commissioner acknowledged, the grant program is one where Commissioners have "pet project[s]," play "favorites," and "pay a little bit closer attention to" certain applications for personal reasons. *Id.* at 34:18; *see* Ex. 5, Schafer Transcript at 30:12; Ex. 6, Sebolt Transcript at 20:3-4. As one former Commissioner put it, he voted to give some organizations grants "[b]ecause I like them. That's my prerogative as a legislator." Ex. 4, Morgan Transcript at 30:4-5.

### III. The Board denies St. Vincent's Grant application.

#### A.  St. Vincent defends its religious exercise in *Buck* and the Board responds.

When St. Vincent was forced to defend its foster and adoption ministry, several Commissioners noticed. *See* Compl., *Buck v. Gordon*, No. 1:19-cv-286 (W.D. Mich. Apr. 15, 2019) (describing lawsuit). "[I]t's a fairly big deal," said Commissioner Tennis, and multiple Commissioners knew of the case from the moment it was "publicly announced." Ex. 7, Tennis Transcript at 47:1; Ex. 6, Sebolt Transcript at 56:7; *see also* Ex. 4, Morgan Transcript at 76:6-12.

The lawsuit generated opposition to St. Vincent among the Board. Some Commissioners erroneously gave others "the impression that it was the intent of St. Vincent's to refuse services that would violate our county non-discrimination policy." Ex. 7, Tennis Transcript at 47:4-7. Commissioner Sebolt, for example, considered St. Vincent's lawsuit "not an appropriate stance" and discussed it extensively, both with fellow Commissioners and with others in his personal capacity. *See* Ex. 6, Sebolt Transcript at 55:7-8. Even now, former Commissioner Morgan laments St. Vincent: "I hope St. Vincent's will find compassion in their hearts and – and not discriminate against folks when they want to adopt or take a child in their home." Ex. 4, Morgan Transcript at 79:21-80:1-2. It is undisputed, however, that St. Vincent's refugee services program is committed to serving all refugees in need regardless of race, sex, religion, sexual orientation, or gender identity. Ex. 3, RFAs at 13 (#40). It is similarly undisputed that Ingham County is not involved in providing adoption or foster services. *Id.* (#56).

Just a few weeks after *Buck* was filed, the Board changed its "priorities" for awarding grants to include compliance with the County's non-discrimination ordinance. Compliance was already part of a grantee's

contract, however, and neither Commissioner Sebolt nor anyone else could identify a single non-compliant agency. Audio: Ingham Cnty. Human Servs. Comm. Meeting at 3:45 (May 20, 2019). He wanted to "make sure" of that, however, by prioritizing that requirement going forward. *Id.* at 3:37-3:49; *see also* Doc. 28-4 at PageID.712-713 (Resolution No. 19-243, adopting the amendment).

### B. St. Vincent applies for a FY2020 grant, using the same application it used in FY2019.

Later that summer, St. Vincent submitted its FY2020 grant application. This was the same program St. Vincent had sought—and received—funding for in FY2019. In fact, St. Vincent used the same application it used for FY2019, proposing the exact same services on the same budget. *Compare* Ex. 12, FY2020 SOW (FY2020 grant application scope of work), *with* Ex. 19, FY2019 SOW (FY2019 grant application scope of work).

No Commissioner disagreed that St. Vincent's FY2019 application satisfied the "basic needs" criteria. *See* Doc. 17-16 at PageID.414 (Resolution 18-467 authorizing St. Vincent $4,500 with no "Nay" votes). As Commissioner Sebolt put it when asked if the 2019 application met the criteria, "I voted in support of it, . . . so, yes." Ex. 6, Sebolt Transcript at 54:5-9. Based on that understanding, St. Vincent thought that the Board would

14

"still fund[]" its grant request for FY2020. *See* Ex. 26, Harris Email. But things would look different by the time St. Vincent's FY2020 grant application went before the Board.

### C.  The Board threatens St. Vincent's contracts and grants.

At the end of September 2019, this Court protected St. Vincent from Michigan's religious discrimination in *Buck*. Later that fall, all three of St. Vincent's refugee services contracts and grants with Ingham County went before the Board.

As the Board's Human Services Committee[2] considered St. Vincent's largest refugee services contract on November 4, 2019 (the interpretive services contract), several Commissioners openly stated their desire to terminate St. Vincent's funding. The reason was succinctly put by Commissioner Sebolt: "St. Vincent Catholic Charities' publicly stated stances and lawsuit against the State of Michigan toward same sex couples." Audio: Ingham Cnty. Human Servs. Comm. Meeting at 1:05:00 (Nov. 4,

---

[2] Like the Board's other committees, the Human Services Committee is comprised entirely of Board members and is "the place where the work of the board gets done." Ex. 7, Tennis Transcript at 18:9-10; *see also* Ex. 5, Schafer Transcript at 35:18 (Board committees are "a segment of the board, yes.").

2019), https://perma.cc/NR7G-SRAJ; *see also* Tr., Doc. 17-11 at PageID.354 (transcript of Nov. 4, 2019 meeting).

Multiple Commissioners supported Commissioner Sebolt enthusiastically. Commissioner Stivers, for example, said that St. Vincent "is an organization that I feel is kind of morally bankrupt." *Id.* at PageID.358. Commissioner Tennis said he "do[es] share [these] concerns," and the Health Department expressed its awareness of the Board's concerns. *Id.* at PageID.359.

Commissioner Tennis said he was comfortable funding St. Vincent for only six months—because it gave St. Vincent some time for its religious beliefs to "come around." This was the Committee's recommendation coming out of the November 4 meeting. In addition to the audio recording and transcript, St. Vincent has repeatedly catalogued these and other disparaging statements. *See, e.g.*, Doc. 28-1 at PageID.606-607 (bulleting out various statements); Doc. 1 at PageID.16-17 ¶ 42 (same).

The Board has never disavowed these statements, even as it later admitted that some may have been erroneous. Doc. 32 at PageID.806 n.5. For example, the Board conceded that Commissioner Stivers—who called St. Vincent "morally bankrupt"—was "possibly ill-informed" when she

further claimed that St. Vincent was involved in forcibly separating children at the U.S.-Mexico border to give them to "Christian white families." Doc. 28-1 at PageID.606-607.

The hostility continued after the November 4 meeting. Four days later, Commissioner Tennis—then-Chair of the Human Services Committee—wrote St. Vincent, explaining his reasoning: "The issue before us today, however, concerns how [St. Vincent] treats same-sex couples for adoption services. [The] claim that [St. Vincent] does not discriminate against the LGBT community is belied by the litigation your organization is currently pursuing against the state of Michigan." Exhibit 15, Tennis Email. Tennis explained to St. Vincent that he could not "reconcile [its refugee services] with the discrimination exhibited by [St. Vincent] under the guise of religious freedom." *Id.* This "put me and the rest of my colleagues in an impossible position." *Id.* If St. Vincent did not change its religious position, "I see no alternative but for the county to explore options that do not compromise our principles." *Id.*

Jared Cypher, the County's Deputy Controller, would subsequently confirm that "the main implication" from the Board's November 4 meeting was "that [St. Vincent] discriminated against people who identify as

LGBT." Ex. 21, Crenshaw Email. As Cypher's email confirms, County staff understood that the Human Services Committee desired to "shorten the term" of the interpretive services contract, "and directed the Health Department to seek alternatives for interpreter services." *Id.*; *see also* Ex. 7, Tennis Transcript at 89:14-15 ("I remember having that discussion [about alternatives] with our health department staff at the time.").

On November 12, 2019, having identified no ready alternative refugee services provider, the Board chose not to cut St. Vincent's interpretive services contract. *See* Audio: Ingham Cnty. Human Servs. Comm. Meeting at 10:32 (Nov. 12, 2019), https://perma.cc/X7EY-X4ZH; Tr., Doc. 17-12 at PageID.366. This outcome, according to Commissioner Tennis, was "truly horrible." *Id.* Commissioner Morgan "really prefer[ed]" that the Health Department provide a "list" of St. Vincent alternatives. Doc. 17-11 at PageID.356. And Commissioner Stivers called it a "shame." *Id.*

Importantly, the Health Department clearly understood that "[t]he direction to explore alternatives still remain[ed]" even after the Board reauthorized St. Vincent's contract. Ex. 23, Cypher Email. Indeed, this understanding was relayed to St. Vincent. When St. Vincent asked a Health

Department staff member who was familiar with the quality of St. Vincent's services to "make a case" for keeping St. Vincent's contract before the full Board, the staff member responded: "It is not appropriate . . . for me to go to a larger group [of the Board] and disagree with the direction I've been provided." Ex. 22, Vail Email.

### D. The Board turns to St. Vincent's Grant.

Discussion of St. Vincent's funding continued just two days after the November 4 meeting. On November 6, Commissioner Sebolt again raised St. Vincent's County funding with a fellow Board member:

> Sebolt: "Did you have a chance to review what Jared sent?"
> Morgan: "Not yet. Anything you want to flag?"
> Sebolt: "St. Vincent Catholic Charities, $4,500."
> Morgan: "That's a no from me."

Ex. 14, Sebolt Emails. Commissioner Morgan, then, was ready to vote "no" against St. Vincent's FY2020 grant request without having even seen the Controller recommendation or St. Vincent's application.

On November 18, the Human Services Committee met to award community agency grants. Immediately before the Committee was going to approve the Controller's recommendations, Commissioner Morgan acted on the "no" that he communicated to Commissioner Sebolt. Morgan moved to zero-out St. Vincent's $4,500 grant and re-allocate it to two

19

other agencies, Refugee Development Center and Haven House. The meeting minutes put it this way:

> Commissioner Morgan stated he wished the County had enough money to fund everything, but one of the strategic goals of the County was to provide funding for direct aid to the residents, including clothing, food, and shelter. He further stated this amendment would achieve that goal by supporting the Refugee Development Center and Haven House.

Doc. 16-3 at PageID.188.

The Board subsequently admitted, however, that Refugee Development Center's own application showed that the agency planned to spend over $11,000 of its $12,250 grant on personnel, including salary and benefits. Ex. 3, RFAs at 18 (#54); *see also* Doc. 16-7 at PageID.207 (proposed budget). Nor does the Board dispute that it used $17,300 from the contingency fund "to cover all Grants approved" by the Controller. Ex. 3, RFAs at 6 (#11).

When deposed, Commissioner Morgan explained his actions differently. Directing St. Vincent's grant money elsewhere had nothing to do with St. Vincent's work. Ex. 4, Morgan Transcript at 29:15-16 ("No. They're doing fine work in the community."). Rather, his reason for funding Refugee Development Center and Haven House instead of St. Vincent was simple: "Because I like them. That's my prerogative as a legislator."

*Id.* at 30:4-5.[3] This action was humiliating to St. Vincent's representative, who had been invited to the meeting, asked to stand and be recognized with her peers, and was then singled out in front of her peers. Doc. 17-1 at PageID.240.

The chart adopted with the Board's resolution shows that every agency recommended for a grant by the Controller received one—except St. Vincent. *See* Doc. 1-1 at PageID.44. Not even Commissioner Sebolt could recall another instance like this. Ex. 6, Sebolt Transcript at 32:17-21.

Relaying his frustration over the Board's actions, Commissioner Randy Schafer said it was "obvious the votes were lined up prior to the meeting." Doc. 28-3 at PageID.655. As he would later attest, it is clear to him that "the major issue" for the Board's decision wasn't related to St. Vincent's grant application—it was "the adoptions." Ex. 5, Schafer Transcript at 40:13-14.

---

[3] Commissioners Morgan and Sebolt subsequently exchanged messages about how to defend zeroing out St. Vincent in the face of public criticism. *See* Ex. 24, Morgan Texts. Sebolt said he was "looking for a good quote from Pope Francis." *Id.* at 6. Morgan responded with laughter ("hahaha") and Sebolt then mockingly suggested "'F*** you' – Pope Francis (probably)." *Id.*

### E.  St. Vincent protects its rights.

With the grant denied and a directive out to replace St. Vincent on its interpretive services contract—plus another $40,000 contract up for renewal in January—St. Vincent sued and sought a preliminary injunction. *See generally* Doc. 1 (Complaint).

### F.  The Board continues its religious hostility.

#### 1. The FY2021 Community Agency Grant.

Following the Board's decision to zero out St. Vincent for FY2020, the Controller recommended that, for FY2021, St. Vincent should again receive nothing. *See* Ex. 20, FY2021 Funding at 6. As it had in 2019, the Board's Human Services Committee voted to zero out St. Vincent. Dec. 8, 2020    Board    of    Commissioners    Approved    Minutes    86, https://perma.cc/B6GK-D4U9 (chart showing recommendations). Counsel sent the Board a warning letter explaining that a further grant denial was likely to lead to further liability in this litigation. *See* Ex. 30, Windham Letter.

On November 17, 2020, Commissioner Schafer, again frustrated with his colleagues' behavior, phoned St. Vincent's CEO, Andrea Seyka. *See* Ex. 1, Seyka Declaration ¶ 4; *see also* Ex. 29, Schafer Voicemail. He said

he was "sorry" that St. Vincent was "going through this again," and told Ms. Seyka that he would move, with the support of Commissioner Randy Maiville, to fully fund St. Vincent's grant application when the Finance Committee would meet. Ex. 29, Schafer Voicemail. He had "suspicions that it may not pass in Finance, in which case we'd take the issue up on the Board floor as a whole." *Id*. Commissioner Schafer explained why he thought the Board may not agree: "You have probably five, six people who are always going to be strongly opposed no matter what." *Id.*

Privately, other Commissioners exchanged messages critical of Commissioner Schafer's actions. Commissioner Naeyaert sent Commissioner Morgan a screenshot of a message from Commissioner Schafer seeking support for St. Vincent—mentioning that "[s]ome people in [Schafer's district] are very upset with the exclusion." Ex. 25, Naeyaert Texts at 2. Morgan responded: "Oh lord. Also tell him St. Vincent's isn't on the agenda tonight. I pulled it off. We'll be discussing in closed session at the next Finance meeting." *Id.* at 3. Later in the text message—after the Finance Committee meeting—Morgan shared a message from a Lansing

City Pulse reporter asking why the grant funding resolution was removed. *Id.* at 5. Morgan's reaction was contemptuous. *Id.* ("F\*\*\*ing Randy.").

Commissioner Randy Schafer would later attest that the grant resolution "was [pulled] for attorney/client privilege with a discussion and actions of the board." Ex. 5, Schafer Transcript at 74:2-3. The Michigan Open Meetings Act allows for closed sessions with a Board's attorney "regarding trial or settlement strategy in connection with specific pending litigation, *but only if* an open meeting would have a detrimental financial effect on the litigating or settlement position of the public body." MCL § 15.268(e) (emphasis added).

After Commissioners emerged from the closed meeting (presumably with new advice from their legal counsel), St. Vincent's FY2021 grant recommendation went from $0 to $5,000. *See* Dec. 8, 2020 Board of Commissioners Approved Minutes 86, https://perma.cc/B6GK-D4U9 (chart showing recommendations). The Board subsequently approved funding St. Vincent's FY2021 grant without further public discussion. *See id.* In the 36 years Commissioner Schafer has been on the Board, he could "not recall another time where" the Board agreed to fund an agency after the

Controller and one of its Committees voted not to fund it at all. Ex. 5, Schafer Transcript at 85:17-21.

### 2. An RFP to replace St. Vincent.

Around this same time, the Board chose to give St. Vincent only a six-month extension of its interpretive services contract. The Board made clear that extending St. Vincent's contract was intended to give the Health Department time to "prepare[] to work with Ingham County's Purchasing Department to issue a Request for Proposals for inter-preter/translator services and supportive case management." Resolution 20-461, https://perma.cc/4LE9-UDPF.

After giving St. Vincent one additional six-month extension, the County is now moving forward with the RFP as announced in Resolution 20-461. The new contractor would begin work on November 1, 2021, for a period of three years with a potential two-year renewal. Ex. 28, Ingham RFP at ¶ 13.4, ¶ 13.5. Commissioner Tennis confirmed the purpose of this process:

```
1        Q    Okay.  Would you agree, given the
2   language of this resolution, that the purpose of
3   any such RFP would be to determine whether an
4   alternative to St. Vincent is available?
5        A    Yes.  That was absolutely the intent.
```

Ex. 7, Tennis Transcript at 97:1-5. Similarly, Commissioner Sebolt confirmed that the RFP's goal is "to see if other services exist." *See* Ex. 6, Sebolt Transcript at 69:21-22.

## PROCEDURAL HISTORY

On September 18, 2020, this Court denied the Board's motion to dismiss and rejected its principal argument of absolute legislative immunity. *See* Doc. 36 at PageID.946. Instead, the Court found sufficient First Amendment and Equal Protection Clause claims because the Complaint plausibly alleged that, as to St. Vincent's FY2020 grant application, "the Board singled out St. Vincent to discourage St. Vincent from disfavored religious practice." *Id.* at PageID.948.

Because "[t]he parties disagree[d] on the basis for the Board's decision to deny [St. Vincent's] grant application," the Court denied St. Vincent's pre-discovery motion for partial summary judgment and ordered "plenary discovery" on "[t]he issue." *Id.* at PageID.949.

## LEGAL STANDARD

"To prevail on a motion for summary judgment, a movant must show—point out—that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, No. 19-10375, 2021 WL 1387787, at *5 (E.D. Mich. Apr. 13, 2021) (quoting Fed. R. Civ. P. 56(a)). While this initial burden is on the moving party, "[t]here is no requirement, however, that the moving party 'support its motion with [evidence] negating the opponent's claim.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

After the moving party makes its initial showing, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). Arguments over "[h]ow to characterize" material facts will not suffice. *Douglas v. Muzzin*, No. 1:15-cv-41, 2019 WL 1332015, at *1 (W.D. Mich. Mar. 25, 2019) (Jonker, C.J.) (a characterization dispute "does not preclude summary judgment"). Nor will "conclusory allegations and unsubstantiated assertions." *Saboury v. City of Lansing*, 366 F. Supp. 3d

928, 932 (W.D. Mich. 2017) (Jonker, C.J.). Unless the nonmoving party "identif[ies] specific admissible evidence and show[s] how that evidence supports their claims," summary judgment is proper. *Id.*

## ARGUMENT

### I.  The Board violated the Free Exercise Clause.

The Board must face strict scrutiny under the Free Exercise Clause because its denial of St. Vincent's FY2020 community agency grant application did not apply any neutral or generally applicable law. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-34 (1993) (neutrality and general applicability are the Free Exercise Clause's general principles). Once St. Vincent has shown that the Board's actions are either not neutral, or that the Board failed to apply a generally applicable law, "the government has the burden to establish that the challenged law satisfies strict scrutiny." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam). Here, the Board cannot hope to pass strict scrutiny.

### A.  The Board's conduct was not neutral to St. Vincent's religious practice.

Government actions are not neutral if: (1) historical practice shows that the government was not applying a neutral principle but instead

was singling out religious exercise; (2) the sequence of events leading to the government's actions show religious animus or targeting; or (3) they include official expressions of hostility toward religious exercise. *See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1729 (2018); *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021); *see also Buck v. Gordon*, 429 F. Supp. 3d 447, 461 (W.D. Mich. 2019). Necessarily, then, determining neutrality means "courts must look beyond the text" of a law. *Meriwether*, 992 F.3d at 512.

**Historical background.** St. Vincent's history with the grant program specifically, and the Board's community agency grant practices generally, together confirm non-neutrality. The Board "was not applying a preexisting policy in a neutral way, but was instead using an evolving policy as pretext for targeting [St. Vincent's] beliefs." *Id.* at 515 (citations omitted).

First, every year St. Vincent applied for a community agency grant for its refugee services, it received one—until FY2020, immediately after it defended its religious views in *Buck. Supra* 5-6, 12-13. At no point, not even for FY2020, has the Board "questioned" "the quality of St. Vincent's refugee services." Ex. 3, RFAs at 13 (#41). Indeed, the Board admits that

St. Vincent received a FY2019 grant for the very same services, and the very same budget, that the Board denied in FY2020. *Supra* 1-4.

Second, the Board has never refused to fund another grant recommended for funding by the Controller. As the Board admits, out of 332 grant requests since FY2010, it has only awarded less than the recommended funding level from the Controller "on three occasions." *Supra* 7. Neither of the two other occasions—where the Board departed from the Controller's recommendation for technical reasons (a withdrawn application in one, and a funding "cap" exceeded in another)—bear any resemblance to St. Vincent's surprise denial in FY2020.

The undisputed facts now show that St. Vincent's application was treated differently, and worse, than 331 other grant applications. It was even treated differently than St. Vincent's *identical* grant application submitted the prior year. This is classic non-neutrality. *Lukumi*, 508 U.S. at 538 (government actions are not neutral when "religious practice is being singled out for discriminatory treatment").

**Sequence of events**. "[T]he specific series of events" leading to the grant denial confirms that the Board desired to punish St. Vincent for defending its religious views. *See Masterpiece*, 138 S. Ct. at 1731.

Commissioner Sebolt laid the groundwork, calling the Board's attention to "prioritize" non-discrimination in grant awards after *Buck* was filed. *See Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012) (non-neutrality indicated when "no such policy existed" until Plaintiff's religiously motivated conduct). This prioritization was a solution in search of a problem. At no point was Commissioner Sebolt "aware of any agencies that had engaged in discrimination using those grants"—including St. Vincent. Ex. 6, Sebolt Transcript at 22:3-4. And as discussed, St. Vincent serves all refugees regardless of sexual orientation. *Supra* 4.

The November 4, 2019 Human Services Committee meeting exposed the Board's motives, with multiple Board members disparaging St. Vincent and its religious views. *Supra* 15-17.

The Board tried, but failed, to retaliate by terminating St. Vincent's interpretive services contract. But terminating that contract was more complicated than simply denying a community agency grant. The contract was already in process and no alternative refugee services provider was feasible. *Supra* 17-18. This was (to Commissioner Stivers) a "shame," not what Board members would "really prefer" (to Commissioner Mor-

31

gan), and (to Commissioner Tennis) "truly horrible." *Supra* 18. Reluctantly, the Board reauthorized that contract, while directing the Health Department to find an alternative—a directive that remains in effect. *See Supra* 18-19 (discussing Ex. 21, Crenshaw Email; Ex. 22, Vail Email; Ex. 23, Cypher Email); *supra* 25-26 (discussing ongoing RFP).

The Board was able to deny St. Vincent's FY2020 grant request without wrestling with any of these complications. As explained, the grant criteria are subjective, Commissioners can and do play "favorites," and Commissioner Sebolt had already attempted to change the grant's priority criteria in light of *Buck*. Unsurprisingly then, just two days after Sebolt moved to terminate St. Vincent's interpretive services contract, he "flag[ged]" St. Vincent's grant application to Commissioner Morgan. That produced a prompt response from Morgan: "That's a no from me." *Supra* 19.

Less than two weeks after the Board disparaged St. Vincent, Morgan led the charge to deny St. Vincent's FY2020 grant before the Board. *Supra* 20. As he admitted, his last-minute reallocation of St. Vincent's grant award to Refugee Development Center and Haven House was done "[b]ecause I like them." Ex. 4, Morgan Transcript at 30:4.

So, despite receiving funding for an identical set of services the year before, St. Vincent became the only agency to have been recommended for funding by the Controller and denied it altogether. *Supra* 21. This is exactly the "irregular, discriminatory application of 'neutral' laws" that the Free Exercise Clause guards against. *Meriwether*, 992 F.3d at 515 n.9.

**Hostility**. At no point has the Board disputed—let alone disavowed—that multiple Commissioners, on multiple occasions, expressed hostility toward St. Vincent's religious practices. This, too, is obvious non-neutrality. *See, e.g.*, *Masterpiece*, 138 S. Ct. at 1732; *Lukumi*, 508 U.S. at 541 (Kennedy, J., concurring). "It doesn't matter that some stages of a proceeding are fair and neutral if others are not. What matters is whether unconstitutional animus infected the proceedings." *Meriwether*, 992 F.3d at 517.

Beyond the disparaging statements made at the November 4 and November 12 meetings—which St. Vincent has repeatedly catalogued (*Supra* 15-21 (citations omitted))—discovery revealed more hostility. From condescendingly suggesting that Pope Francis would rebuke, with profanity, those who questioned the Board's actions (Ex. 24, Morgan Texts);

to Commissioner Tennis telling St. Vincent's CEO that *Buck* confirms St. Vincent is discriminating "under the guise of religious freedom" (Ex. 15, Tennis Email); to Commissioner Sebolt claiming that St. Vincent's defense of religious freedom in *Buck* is "not an appropriate stance" (Ex. 6, Sebolt Transcript at 55:8); to Commissioner Morgan saying St. Vincent needs to find "compassion" and "not discriminate" (Ex. 4, Morgan Transcript at 79:21-80:2); and to Commissioner Tennis claiming that there should be no religious accommodation when a religious ministry receives taxpayer funding—even if the grant has nothing to do with the religious activity being objected to. (Ex. 7, Tennis Transcript at 45:8-16).[4]

Even "'subtle departures from neutrality'" violate the Free Exercise Clause. *Meriwether*, 992 F.3d at 514 (quoting *Lukumi*, 508 U.S. at 534). The Board's hostility is unvarnished. Summary judgment is required.

### B.  The Board failed to apply any generally applicable law.

Even apart from overt hostility, the Board's standard for awarding community agency grants is a "moving target," rendering it not generally

---

[4] *But see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) ("*AOSI*") (First Amendment is violated when government imposes "conditions that seek to leverage funding to regulate speech outside the contours of the program itself").

applicable and unable to survive strict scrutiny. *Meriwether*, 992 F.3d at 514-15. The premise of the general applicability rule is that the government has some standard that is being applied to everyone. Yet the Board is missing the predicate: a standard.

Here, the Board's reasons for denying St. Vincent a grant have shifted. Initially, the Board argued it didn't need to have a justification. It claimed various theories of immunity absolved it from justifying its decision, or explaining any Board conduct beyond the plain language of its resolutions. This Court rejected this immunity argument in its motion to dismiss decision. *See* Doc. 36 at PageID.946-948.

On the merits, the Board has offered the following justifications to zero out St. Vincent. *See* Doc. 39 at PageID.1000-1002 (Board's answer).

First, the Board argues that St. Vincent failed to satisfy the new "priority" criteria that the Board added regarding non-discrimination. Doc. 19 at PageID.422, 433, 435; Doc. 16 at PageID.158; Doc. 39 at PageID.1002 ¶ 16; *Supra* 13-14 (explaining how this was added shortly after *Buck* was filed). But, as Commissioner Sebolt admitted in deposition, there is no evidence that either St. Vincent—or any other agency—has used grants in violation of the non-discrimination ordinance. Instead,

St. Vincent provides refugee services to all refugees—including LGBTQ refugees. *Supra* 13.

Second, the Board has suggested (but refused to say for certain) that funding St. Vincent could violate the Establishment Clause. Doc. 32 at PageID.808; *see also id.* at PageID.817; Doc. 19 at PageID.445. But not a single deposed Commissioner ever recalled this being an issue when St. Vincent's grant was considered. *Supra* 11. Moreover, the Board has admitted that it funds other religious agencies through the grant program, like Cristo Rey and Advent House. *Supra* 11.

Third, the Board contends that St. Vincent failed to satisfy the "basic needs" criteria, because grant money would cover personnel services. *See, e.g.*, Doc. 29 at PageID.1002 ¶¶ 17-19; Doc. 32 at PageID.808. But as multiple Commissioners explained, funding personnel services *can* meet basic needs. *Supra* 8-9 (quoting Commissioners Morgan and Tennis). And many grants have been funded that send money directly to personnel costs. *Supra* 9 (citing examples). Indeed, St. Vincent received funding in FY2019 for the same services it sought in FY2020. *Supra* 14-15. No Commissioner voted against that request in FY2019—or disputed that there

is any material difference between the applications. *Supra* 14. As Commissioner Sebolt put it when asked about whether St. Vincent's FY2019 application satisfied the "basic needs" criteria: "I voted in support of it, then I would say so, yes." Ex. 6, Sebolt Transcript at 54:5-9. Moreover, Commissioners acknowledged that the very services St. Vincent sought to provide—classes in language, computer literacy, and home maintenance—could be considered meeting basic needs. *Supra* 10. And in FY2020, the agency that received most of St. Vincent's reallocated grant money (Refugee Development Center) budgeted about 90% of its grant funds for personnel salaries and benefits. *See* Ex. 3, RFAs at 18 (#54) ($11,000 of $12,250).

Fourth and finally, the Board has reiterated the initial justification provided by Commissioner Morgan (in a footnote). The Board claims that "available funds were exhausted and hard decisions had to be made." Doc. 32 at PageID.823 n.23. But this is belied by what the Board did: It *reallocated* St. Vincent's grant funding to two other agencies. It did not return the grant to the County treasury. *Supra* 20.

The mere fact that the Board cannot settle on why St. Vincent's grant was denied suggests what the undisputed facts confirm: The Board

reached a desired result and, ever since, has been searching for a constitutionally permissible rationale. By definition, that is not a generally applicable standard. *See Ward*, 667 F.3d at 740 ("exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy").

General applicability for purposes of the Free Exercise Clause "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296 (citation omitted). But the Board has not been able to articulate an interest behind its rules, other than "mak[ing] everyone happy" and applying an amorphous definition of "basic needs." The factually supported answer is the straightforward one: The Board's religious hostility led it to defund St. Vincent.

### C. The Board cannot satisfy strict scrutiny.

Because St. Vincent has carried its burden of showing that the Board's actions are either not neutral or not generally applicable, the Board must satisfy strict scrutiny. *See Tandon*, 141 S. Ct. at 1296 ("[T]he government has the burden to establish that the challenged law satisfies strict scrutiny."). It cannot hope to do so. None of the Board's *post-hoc* rationalizations constitute a compelling government interest that, as applied to

38

St. Vincent, had to be achieved by denying St. Vincent a grant. *See id.* (articulating standard).

For all the foregoing reasons, St. Vincent is entitled to summary judgment on its free-exercise claim.

## II. The Board violated the First Amendment by retaliating against St. Vincent for protected activity.

The Board also violated the First Amendment's prohibition on retaliation. St. Vincent is entitled to summary judgment on that claim, too.

To succeed on a First Amendment retaliation claim, a plaintiff must show: (1) "he engaged in constitutionally protected speech or conduct"; (2) "an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) "there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). "[O]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quotation omitted). Then, the defendant must prove by a preponderance of evidence that "he would have taken the same action in

the absence of the protected activity." *Id*. This burden shifting applies at summary judgment. *Id*. at 263. And, as here, when a defendant has "done little more than deny the allegations," the defendant fails as a matter of law to carry this burden. *Id*. at 268 (quotation omitted).

## A. St. Vincent engaged in protected conduct.

There is no dispute that St. Vincent's litigation in *Buck*, and the religious exercise at issue in that case, are protected conduct. Doc. 36 at PageID.947-948 ("Defendant does not dispute that St. Vincent's pursuit of the *Buck* litigation is protected conduct.").

## B. The Board took adverse action against St. Vincent.

"'An adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake.'" *Maben*, 887 F.3d at 266 (citation omitted). This is not a high bar. *Holzemer v. City of Memphis*, 621 F.3d 512, 524 (6th Cir. 2010) ("Our First Amendment retaliation cases demonstrate that the harassment necessary to rise to a level sufficient to deter an individual is not extreme.") (collecting cases). An "adverse action" can include the "nonrenewal of contracts." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999).

40

The undisputed "rejection of [St. Vincent's] grant application" by the Board is adverse action. Doc. 36 at PageID.948. This is more than sufficient to deter the exercise of constitutional rights. *See, e.g., Holzemer*, 621 F.3d at 524; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 726 (6th Cir. 2010) ("A person of ordinary firmness would be deterred from engaging in protected conduct, if as a result, a public official encouraged her employer to terminate the person's contract or to have her change her behavior.").

### C. There was a causal connection between St. Vincent's conduct and the Board's adverse action.

Finally, a plaintiff must show that the "protected conduct was a *substantial factor* in the Board's decision[.]" *Scarbrough*, 470 F.3d at 262 (emphasis added); *see Holzemer*, 621 F.3d at 520 ("[A]dverse action was taken at least *in part* because of the exercise of the protected conduct." (emphasis added)). In addition to direct evidence of hostility, circumstantial evidence—like temporal proximity—can establish causation. *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("[C]lose proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.") (collecting cases). Here, the undisputed evidence confirms that *Buck* and

St. Vincent's religious practices were motivating factors in denying St. Vincent's FY2020 grant.

***Commissioner admissions.*** Statements from Commissioners and county employees illuminate the reason the Board denied St. Vincent's grant application. Indeed, Commissioner Tennis confirmed that the Board acted in response to St. Vincent's litigation and related religious beliefs: "The issue before us today, however, concerns how SVCC [St. Vincent] treats same-sex couples for adoption services" and "the litigation your organization is currently pursing against the state of Michigan." Ex. 15, Tennis Email. As Chair of the Human Services Committee, he claimed to speak for his colleagues too: St. Vincent's actions "put me *and the rest of my colleagues* in an impossible position." *Id*. (emphasis added). And Commissioner Tennis repeatedly confirmed the reason for the Board's actions in his deposition: "I think the issue . . . was the fact that there had been allegations that St. Vincent[] was not following our non-discrimination policy [in providing adoption and foster-care services]." Ex. 7, Tennis Transcript at 92:2-5; Ex. 15, Tennis Email; *supra* 15-21.

Commissioner Tennis's statement is no outlier. Both Commissioners Morgan and Sebolt admitted they opposed St. Vincent's religious exercise

in its foster-care and adoption program. Ex. 4, Morgan Transcript at 79:21-80:2; Ex. 6, Sebolt Transcript at 55:5-15. Unsurprisingly, document discovery confirmed that they singled out St. Vincent and agreed over email to vote against its grant funding. Ex. 14, Sebolt Emails. Commissioner Schafer too explained that several Board members dislike St. Vincent because of its policy on "adoptions." Ex. 5, Schafer Transcript at 40:9-14. And Deputy County Controller Cypher, summing up the Board's sentiment in an email to Commissioner Crenshaw, confirmed that the "main implication" from the November 4, 2019 Human Services Committee meeting "was the feeling that SVCC discriminated against people who identify as LGBT," and Board "directed the Health Department to seek alternatives for interpreter services." Ex. 21, Crenshaw Email; *Supra* 17-19.

**Hostility.** The record is littered with statements and testimony from Commissioners disparaging St. Vincent's religious practices. *Supra* 15-21. This hostility confirms that the surprise denial of St. Vincent's grant funding was motivated at least in part by the Board's disapproval of St. Vincent's protected conduct. And the Board's conduct in this Court has confirmed that hostility—claiming (among other things) that St. Vincent

is simply engaging in "predations on the public fisc[.]" Doc. 16 at PageID.171 n.10; Doc. 19 at PageID.442. Nor did the deposed Commissioners attempt to hide their disdain for St. Vincent's religious beliefs and exercise. *See, e.g.,* Ex. 6, Sebolt Transcript at 55:8 (stating that SVCC's adoption policy "is not an appropriate stance"); Ex. 7, Tennis Transcript at 48:19-49:1 (stating that when an organization "step[s] into the public square," it can't expect to act according to its "own religious beliefs"); *supra* 34.

**_Incriminating circumstances._** The Board's decision to deny St. Vincent grant funding did not occur in a vacuum. Instead, it was the culmination of a series of actions by "stubborn" Board members who succeeded in causing the full Board to act against St. Vincent. *Supra* 11-12, 15-21. The timeline bears this out.

Once St. Vincent filed *Buck*, Commissioners quickly became aware of St. Vincent's religious practices. *Supra* 12-14. When St. Vincent's contracts and grants went before the Board that fall, the Board denied St. Vincent's grant application. *Supra* 19-21; Doc. 28-1 at PageID.608-611. In fact, the quick succession of these events alone: St. Vincent's prelimi-

nary injunction (September 26, 2019), the Board's disparaging statements (November 4-12, 2019), and the Board's denial of grant funding (November 26, 2019) confirm—and independently satisfy—the causation requirement. *DiCarlo*, 358 F.3d at 421.

Similarly, the Board's past practices point only toward animus and retaliation. St. Vincent received grant funding for the same program the prior year. *Supra* 14-15. And, over the prior 10 years, St. Vincent's was the *only* denial of grant funding recommended by the Controller, for supposedly failing to meet the Board's "basic needs" criteria—after the very same budget and services met the criteria the year before. *Supra* 14. These allegations, which the Court previously called "striking," Doc. 36 at PageID.947, are now undisputed facts. They are more than sufficient to establish a prime facie case of retaliation for St. Vincent's protected religious exercise.

### D. The Board's excuses for denying St. Vincent a grant are pretextual.

Once St. Vincent establishes its *prima facie* case of First Amendment retaliation, the burden shifts to the Board to prove that it would have taken the same actions *absent* St. Vincent's protected conduct. *Maben*, 887 F.3d at 262-63.

The Board contends that St. Vincent's grant application didn't satisfy the "[b]asic [n]eeds" criteria, which "priorit[ized]" providing "food, clothing, and shelter." Doc. 5-2 at PageID.72. Instead, the Board claims, St. Vincent's application sought funding for "personnel" services (which the Board discouraged) when it should have sought funding for "direct services." Doc. 32 at PageID.808, 829. But, as discussed at length above, the undisputed facts show that the standard was entirely malleable, and the Board had previously determined that similar services met the criteria.

Nor does the Board's *post hoc* invocation of the Establishment Clause fare better. First, funding religious social services providers on equal terms with secular providers does not violate the Establishment Clause. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2256-57 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2023-24 (2017). Second, not a single fact in the record suggests this was ever a concern until the Board briefed it in this Court. *Supra* 11.

In short, the undisputed evidence establishes that the Board's justifications are nothing more than pretext. The Board's action was unprecedented and not a single explanation advanced by the Board holds water.

The Board bears the burden of proof to rebut this showing, and it cannot do so.

### III. The Board's actions compelled St. Vincent's private speech.

The First Amendment prohibits government from leveraging funding to coerce private speech it does not fund. *AOSI*, 570 U.S. at 214-15 (striking down "conditions that seek to leverage funding to regulate speech outside the contours of the program itself"); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019) (Sutton, J.) (explaining unconstitutional conditions doctrine). Such restrictions trigger strict scrutiny. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018).

Here, the Board does not fund St. Vincent's foster and adoption program. *Supra* 13. Yet it is seeking to leverage funding for St. Vincent's refugee services ministry—which the Board repeatedly has acknowledged does great work—to punish St. Vincent for its private, unfunded speech. For the same reasons that this violates the Free Exercise Clause, this also violates the Free Speech Clause. *See Intervarsity*, 2021 WL 1387787, at *26 ("'Free exercise claims are often considered in tandem with free speech claims and may rely entirely on the same set of facts.'"

(quoting *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 256 (6th Cir. 2015))). The Board's attempt to coerce St. Vincent to change its private, unfunded speech is subject to strict scrutiny. *Supra* 38-39 (explaining how the Board fails strict scrutiny).

## IV. The Board's actions violated the Equal Protection Clause.

As explained, the Board discriminated against St. Vincent based on the agency's religious beliefs and its decision to protect those beliefs through litigation. Just like the Free Exercise Clause, "[t]he Equal Protection Clause does not tolerate irregular, discriminatory application of 'neutral' laws." *Meriwether*, 992 F.3d at 514 n.9. The Board accordingly fails strict scrutiny on this claim as it did on St. Vincent's free-exercise claim. *Supra* 38-39.

## V. St. Vincent is entitled to relief.

Damages, declaratory relief, and a permanent injunction are warranted here. The constitutional violation St. Vincent has shown makes declaratory relief appropriate.

### A. St. Vincent is entitled to nominal and actual damages.

As the Supreme Court recently said, "every violation [of a right] imports damage." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (citation omitted). Nominal damages are therefore warranted, because

St. Vincent "experienced a completed violation of [its] constitutional rights when [defendants] enforced their speech policies against [it]." *Id.*

St. Vincent is also entitled to actual damages. "The basic purpose of the § 1983 damages is to compensate injured persons for their actual harm." *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 601 (6th Cir. 2006) (cleaned up). The Board's unconstitutional targeting caused St. Vincent to lose a $4,500 grant and expend staff time dealing with the Board's threats and disparaging accusations.

## B. St. Vincent is entitled to permanent injunctive relief.

"Under well-settled law, a party is entitled to a permanent injunction if it can establish that [1] it suffered a constitutional violation and [2] will suffer continuing irreparable injury for which there is no adequate remedy at law." *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 616 (6th Cir. 2006) (cleaned up). "Once the court has determined that a First Amendment violation has occurred, the factors weigh heavily in favor of issuing an injunction. . . . [T]he factors 'essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights.'" *InterVarsity*, 2021 WL

1387787, at *34 (quoting *Cnty. Sec. Agency v. Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002)).

Here, St. Vincent has already demonstrated actual success on the merits of its constitutional claims. The remaining factors therefore "weigh heavily in favor of issuing an injunction." *Id.*

### 1. St. Vincent will suffer a continuing irreparable injury.

The Board's actions show that St. Vincent will continue suffering irreparable harm without permanent injunctive relief. For one matter, "the loss of free exercise rights 'for even minimal periods of time'" constitutes irreparable harm. *Tandon*, 141 S. Ct. at 1297. St. Vincent's free-exercise rights have been subjected to coercion since at least November 2019, when Commissioners publicly disparaged St. Vincent, stated their desire not to fund a "morally bankrupt" agency, and ordered the Health Department to find an alternative. *Supra* 15-19. That directive remains in place. *Supra* 18-19. St. Vincent has many interactions with the County over the fiscal year regarding its refugee services. The Board's religious hostility hangs like a dark cloud over them.

Moreover, during discovery, the Human Services Committee voted, again, to deny St. Vincent a Community Agency Grant for FY2021. *Supra*

22-25. It did so despite knowing that St. Vincent was seeking the funds to provide direct rent payments to refugees. The Board only began to reverse course after a letter from St. Vincent, its counsel, and press inquiries. *Supra* 23-25. Tellingly, after a closed session with its attorneys to discuss this lawsuit, the Board officially reversed course and funded St. Vincent. *See supra* 23-25. This behavior confirms that, absent the threat of ongoing litigation, the Board will continue its unconstitutional targeting.

Nor has the targeting been limited to the grant process. St. Vincent previously sought relief because its refugee services contracts were threatened. *See, e.g.*, Doc. 1 at PageID.12, ¶¶ 32-34. The Board has disclaimed any present threat to those contracts, stating that it "has not acted 'to terminate its contracts with or cut grant funding from St. Vincent' for any reason." Ex. 3, RFAs at 14 (# 42).

Yet after this Court's motion to dismiss decision, the Board cut St. Vincent's one-year interpretive services contract into a six-month contract and announced, for the first time, an RFP process on that contract. *Supra* 25-26. This is the very proposal that the Human Services Committee approved at the November 4, 2019 meeting—a proposal to give six

months for St. Vincent's millennia-old religious views on marriage to "come around." *Supra* 16. Nor is the Board shy about the RFP's goal: find an alternative to St. Vincent. *Supra* 26. (Commissioner Tennis saying this is "absolutely the intent" and, separately, Commissioner Sebolt saying that the Board wants "to see if other services exist").

While the Board can seek the best provider of services, it cannot make St. Vincent "an outsider, excluded from equal access to public . . . life, simply because it insists on . . . believ[ing] in its [religious] cause." *Intervarsity*, 2021 WL 1387787, at *15. Yet Commissioners express a desire to do just that. One, for example, erroneously claimed that once an agency "step[s] into the public square," it can be stripped of funds for acting according to its religious beliefs—even for actions wholly unrelated to the program the agency is contracted to undertake. Ex. 7, Tennis Transcript at 48:19-49:1; *see also* Audio: Ingham Cnty. Human Servs. Comm. Meeting at 1:05:00 (Nov. 4, 2019) https://perma.cc/NR7G-SRAJ. The Sixth Circuit recently confirmed that this zero-sum approach is "not the law." *Meriwether*, 992 F.3d at 516. But that has not stopped the Board. As Commissioner Schafer put it, there are "probably, five, six people [on the Board] who are always going to be strongly opposed [to St. Vincent] no

matter what." *Supra* 23. And all it takes is one "stubborn" Board member to influence funding decisions. *Supra* 12 (quoting Commissioner Tennis).

Accordingly, St. Vincent moves for an injunction directing the Board not to defund St. Vincent based upon its protected religious exercise or in retaliation for defending its constitutional or statutory rights. Such relief is appropriate in this scenario. *See, e.g.*, *Intervarsity*, 2021 WL 1387787, at *35 (enjoining Wayne State defendants "from revoking Plaintiffs' [Registered Student Organization] status . . . based on Plaintiffs' religious criteria for student leadership selection"); *Buck*, 429 F. Supp. 3d at 463 (preliminarily enjoining the State of Michigan from replacing "a carefully balanced and established practice" with "a State-orthodoxy test that prevents Catholic believers from participating" when it was clear that "[t]he State's position is not likely to survive strict scrutiny on this record").

## 2. St. Vincent has no adequate remedy at law.

"The loss of free exercise rights 'for even minimal periods of time'" is always "irreparabl[e]"—and thus not reducible to money. *Tandon*, 141 S. Ct. at 1297 (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam)). Similarly, while declaratory relief will resolve the legal questions surrounding the Board's past conduct, the

threats of future irreparable harm are likely to continue. *See United States v. Miami Univ.*, 294 F.3d 797, 820 (6th Cir. 2002) (finding a cease and desist order inadequate because it "requires new enforcement measures each time a violation occurs"). Only injunctive relief will ensure that the Board will not continue targeting St. Vincent and cripple its ability to serve refugees. Preventing such conduct is why we have a First Amendment, and why St. Vincent needs an injunction to enforce its protections.

## CONCLUSION

This Court should grant St. Vincent's motion for summary judgment and all its requested relief.

Dated: June 1, 2021

Respectfully submitted,

/s/ *William J. Haun*
William J. Haun
Lori H. Windham
Mark L. Rienzi
Nicholas R. Reaves
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
whaun@becketlaw.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
wbloomfield@dioceseoflansing.org
(517) 342-2522

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of L. Civ. R. 7.2(b)(i) because, excluding the parts exempted by L. Civ. R. 7.2(b)(i), it contains 10,326 words. The word count was generated using Microsoft Word 2019.

<u>/s/ *William J. Haun*</u>
William J. Haun
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
Tel.: (202) 955-0095
whaun@becketlaw.org