UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ST. VINCENT CATHOLIC CHARITIES,

       Plaintiff,

                                           CASE NO. 1:19-CV-1050

v.

                                           HON. ROBERT J. JONKER

INGHAM COUNTY BOARD OF
COMMISSIONERS,

       Defendant.

_____/

## OPINION AND ORDER

This case is about is whether Defendant Ingham County Board of Commissioners ("the Board") violated the First Amendment when it denied Plaintiff St. Vincent Catholic Charities' application for a community grant.  Before the Court are Plaintiff's and Defendant's cross motions for summary judgment.  (ECF Nos. 59, 57.)  The motions are fully briefed.  This is the decision of the Court.

### BACKGROUND

Plaintiff St. Vincent Catholic Charities ("St Vincent") is a Michigan non-profit corporation with charitable and religious purposes.  (ECF No. 1, PageID.3-4.)  St. Vincent is affiliated with the Catholic Diocese of Lansing, Michigan and has as its mission "the work of the Catholic Church: [t]o share the love of Christ by performing the corporal and spiritual works of mercy." (*Id.*, PageID.4.)  As part of its ministry, St. Vincent provides refugee services programs in Ingham County, Michigan.  St. Vincent has done so under "annually renewed contracts with Ingham County for at least the past twenty years."  (*Id.*, PageID.10-11.)  Grants under the auspices of

Ingham County have also supported St. Vincent's refugee work.  (*Id.*)  St. Vincent considers its work with refugees "an integral, fundamental, and central part of St. Vincent's religious exercise." (*Id.*, PageID.5.)   Federal, state, and local government agencies oversee and fund refugee resettlement programs.  (*Id.*, PageID.9.)  Without government contracts and grants, including those with Ingham County, "St. Vincent's refugee services ministry could not exist[.]"  (ECF No. 59-1, PageID.1463.)

All parties acknowledge that St. Vincent's services have been essential to refugee resettlement in Ingham County.  All parties further acknowledge that St. Vincent "excels at serving refugees, and . . . has developed expertise and programs that no other agency in Ingham County can provide."  (ECF No. 39, Answer at PageID.969.)   And all parties acknowledge that "St. Vincent is a priority resettlement site for LGBTQ refugees, including those who have fled their homelands due to persecution for their sexual orientation."  (*Id.*)  In fact, St. Vincent has "welcomed twenty-four LGBTQ refugees from seven countries" over the years.  (*Id.*)  The summary judgment record does not identify a single instance in which St. Vincent has discriminated against LGBTQ individuals in the provision of refugee services.

Defendant Ingham County Board of Commissioners (the "Board") has fourteen members, all of whom are elected from single-member districts approximately equal in population.  (ECF No. 1, PageID.5-6.)  The Board governs Ingham County, exercising legislative and administrative functions.  (*Id.*, PageID.5-6.)   The Board controls the County budget and is responsible for authorizing County contracts and grants.  (*Id.*, PageID.6.)   The County Controller, who is appointed by a two-thirds vote of the Board and serves at its pleasure, guides the administration of the County.  (*Id.*)  The Board has two standing committees, the Human Services Committee (the "HSC") and the Finance Committee.

## THE *BUCK* LITIGATION

On April 15, 2019, St. Vincent sued Michigan state officials and the United States Department of Health and Human Services, claiming that the State of Michigan will no longer permit St. Vincent to operate its adoption services in accord with its religious beliefs on marriage. (*Buck v. Gordon*, 1:19-cv-286, ECF No. 1.)  In the present action, St. Vincent contends that the Board developed hostility towards it for its position in *Buck*.  (ECF No. 59-1, PageID.1470-71.) Board Commissioners Morgan, Sebolt, and Tennis disapproved of St. Vincent's religious beliefs on marriage and expressed worry that St. Vincent would violate the County's non-discrimination policy.   (ECF No. 59-1, PageID.1471.)   For example, Commissioner Sebolt considered St. Vincent's lawsuit "not an appropriate stance."  (ECF No. 59-7, PageID.1580.)  Commissioner Morgan stated that he hopes "St. Vincent's [sic] will find compassion in their hearts and – and not discriminate against folks when they want to adopt or take a child in their home."  (ECF No. 59-5, PageID.1556.)   St. Vincent's refugee program is separate from its adoption program, and St. Vincent argues that it "is committed to serving all refugees in need regardless of race, sex, religion, and sexual orientation, or gender identity."  *Id.*  St. Vincent maintains that the Board's hostility motivated it to deny St. Vincent a Community Agency Grant administered by the Board.

## REFUGEE SERVICES CONTRACT

The HSC met on November 4, 2019 to discuss reauthorization of a Refugee Health Services Contract with St. Vincent (the "Contract").[1]  (ECF No. 59-1, PageID.1473.)  Ingham County Health Department staff recommended reauthorization.   During the HSC meeting, multiple Commissioners criticized St. Vincent's religious beliefs, speech, and its decision to defend itself

---

[1] The 2019/2020 contract encompasses both refugee health and interpretive services, which in previous years St. Vincent provided under two distinct contracts. (ECF No.28-4.) It appears that St. Vincent also provides interpretive services under a separate contract that renews automatically and is no longer at issue in the case.

3

in *Buck*.  (*Id.*, PageID.1473-74.)   For example, Commissioner Sebolt expressed concern that St. Vincent would discriminate based on its "publicly stated stances and lawsuit against the state of Michigan toward same-sex couples."  (*Id.*)  The HSC Chairman, Commissioner Tennis, spoke of having "a difference of ideology" with St. Vincent.  (*Id.*)  Commissioner Stivers stated that she opposed working with St. Vincent because of the organization's anti-LGBTQ stance and described St. Vincent as "morally bankrupt."  (*Id.*, PageID.1474.)   Commissioner Sebolt inaccurately claimed that "other Catholic charities permit 'adoption to same-sex couples,'" but "St. Vincent's [sic] is specifically choosing not to."  (ECF No. 1, PageID.17.)  Commissioner Tennis suggested that by reducing the term of the Contract from twelve months to six months, the Board could signal to St. Vincent that "it is being given time to 'come around.'"  (ECF No. 59-1, PageID.1474.)  The HSC voted to recommend reauthorization for a term of six months to give St. Vincent an opportunity to change its policy or for the County Health Department to identify a different provider that did not share St. Vincent's religious beliefs.  (*Id.*, PageID.1475-76.)  The HSC proposed a resolution reflecting a six-month term.

The full Board considered the HSC's proposed resolution at its meeting on November 12, 2019.  (*Id.*, PageID.1476)[2]  The minutes of the meeting reflect that Board members discussed a risk that a six-month term "was not a long time and could lead to service disruption."  (ECF No. 19-2, PageID.463.)  Commissioner Tennis "stated that it was tough to be in a position between offering refugee services and treatment of the LGBT community" and that he would oppose a twelve-month term.  (*Id.*)  He observed that no one on the Board "is questioning the quality of services or the wonderful work St. Vincent's has done for the refugee community.  The issue at

---

[2] After the HSC meeting, and before the meeting of the full Board, "St. Vincent contacted County Commissioners to correct false allegations and explain the important work that St. Vincent does to serve refugees, including LGBTQ refugees." (ECF No. 1, PageID.19.) St. Vincent notes that it is "a priority resettlement site for LGBTQ refugees, including those who have fled their homelands due to persecution for their sexual orientation." (*Id.*, PageID.9.)

hand is regarding other areas of St. Vincent's work and litigation pending against the State that goes against the principles of many of us on the Board."  (ECF No. 1, PageID.21.)  Commissioner Celentino "stated that a year-long contract would provide time to have a robust conversation about the issues raised without interrupting services to refugees."  (ECF No. 19-2, PageID.463.)  The Board voted 9-5 to amend the proposed resolution to reflect a twelve-month term.  (*Id.*, PageID.464.)[3]  The motion to adopt the resolution, as amended, carried by a vote of 11-3, with Commissioners Morgan, Sebolt, and Stivers voting against it.  (*Id.*)  No one disputes that the Contract was in effect for a twelve-month term, but the history of the Board's handling of the Contract provides additional context for the parties' dispute over the grant denial during the same timeframe.

### COMMUNITY AGENCY GRANT

Under Ingham County's Community Agency Grant Program, the Board issues grants to community agencies that provide important services to Ingham County residents.  (ECF No. 59-1, PageID.1463.)  Since 2011, the Board has given "priority . . . to those [grant] proposals that directly contribute to addressing the County's long-term priority of 'Meeting Basic Needs,' such as food, clothing, and shelter."  (*Id.*)  St. Vincent's grant applications always passed muster under this standard until 2019.  On May 28, 2019, the Board passed Resolution #19-243, which further described the Board's budgetary policy for 2020 grants.  (ECF No. 58, PageID.1220.)  It restated that priority should be given to "proposals that directly contribute to addressing the Community's overarching long-term objective of 'Meeting Basic Needs,' such as food, clothing, and shelter . . . ."  (*Id.*)  The Resolution added that "priority [be] given to those agencies that comply with the

---

[3] Commissioner Grebner "stated that this would be a good time to add a new WHEREAS to the effect that [ST. Vincent] discriminated against people and a THEREFORE, BE IT RESOLVED that the Board wished it would stop." (*Id.*)

County's non-discrimination policies." (*Id.*)  St. Vincent has been applying for a community grant since 2006 and has received a grant every time it has applied until its denial in 2019.

In the summer of 2019, St. Vincent submitted its grant application to receive a grant for the following year.  St. Vincent used the same grant application it had used for the previous year, which satisfied the "basic needs" criteria and was granted.  (ECF No. 59-1, PageID.1472.) St. Vincent requested funding for its "Living in America" program, which provides classes to refugees on home purchasing and maintenance, small business development, English, and computer literacy.  (ECF No. 59-13, PageID.1612.)  This time, though, the Board denied the grant. The Board claims the reason for the denial was St. Vincent's failure to satisfy the long-standing "basic needs" criteria, even though earlier applications for the same program passed muster. Moreover, though the Board added the non-discrimination prong in Resolution #19-243 – the only change from earlier years – the Board does not claim that St. Vincent failed to meet this requirement.  Nor could the Board make such a claim considering the record establishes that St. Vincent serves all refugees regardless of sexual orientation.

On November 18, 2019, the HSC met to discuss community agency grants.  (ECF No. 59-1, PageID.1477.)  St. Vincent's application for a $4,500 community agency grant came up before the HSC at the meeting.  (*Id.*)  The County Controller recommended that St. Vincent and every other organization that timely applied for a community agency grant – a total of 32 organizations – receive a grant.  Commissioner Morgan moved to amend the tentative or draft resolution prepared by the Controller's Office by transferring funds from St. Vincent to the Refugee Development Center and Haven House.  (ECF No. 58, PageID.1221-22.)  During the meeting, Commissioner Morgan explained:

> I wish we had the money to fund everything . . . But it is one of our strategic
> goals as county to provide funding first and foremost for direct aid, the

> basics, the necessities of life, food, shelter and clothing. And so by helping the Refugee Development Center get closer to its goal, we are providing direct aid to them, and Haven House as well with providing meals to the homeless.

(ECF No. 17-13, PageID.393.)   Commissioner Morgan testified in his deposition, further explaining the reasons for his motion to redistribute St. Vincent's funding.  He stated:

> Sometime between November 6th and that meeting, I was made aware that the proposed funding would be going directly to the director's salary and that -- so when the proposal came up before us, I made the motion to amend our overall agency funding to remove the amount from St. Vincent's Catholic Charities for $4500, placing it both into the request from the Refugee Development Center, and I believe Haven House, who were both providing direct services as opposed to funding the salary of someone already making $157,000 a year.

(ECF No. 58-3, PageID.1313.)   He stated that he chose Haven House and the Refugee Development Center

> [b]ecause I like them.  That's my prerogative as a legislator.  Specifically with refugees, I know St. Vincent's was doing a lot of work with refugees, and I thought, you know, we could really help out with a service that's providing direct help to refugees by giving them additional funding, especially if it's a smaller organization that really makes a huge difference to them.

(*Id.*, PageID.1314.)

Ultimately, the HSC voted against awarding a grant to St. Vincent. The Committee explained that it was giving priority to direct aid for the basics and necessities of life, such as food, shelter, and clothing, and found that funds for salaries did not meet the priority criteria.  (ECF No. 58, PageID.1222.)  St. Vincent points out that it sought the grant to provide direct aid to refugees through its "Living in America" program.  It notes that other organizations received funding for services such as home repairs and modification and at least two other religious entities received grant funding.  (ECF No. 59-1, PageID.1468.)  Further, the Refugee Development Center listed in its grant application that it planned to spend around $11,000 of its $12,250 grant on personnel

expenses, including salaries and benefits, but the Board approved this grant anyway.  (*Id.*, PageID.1478).

The full Board accepted the HSC's recommendation to deny St. Vincent's grant application.  (ECF No. 58, PageID.1222.)  The Board reasoned that St. Vincent's application did not comply with the Board's 2020 Policy for appropriation of limited discretionary funds.  (*Id.*, PageID.1220.)  The Board approved the applications of all the other thirty-one community agencies seeking grants.  (*Id.*)

Since the 2010 grant year, the County Controller recommended approving 332 Community Agency Grant applications.  (ECF No. 59-1, PageID.1488.)  The Board either adopted the County Controller's recommendation or awarded additional funds 329 times.  St. Vincent's application is one of only three instances in which the Board did not follow the County Controller's recommendation or did not depart upward.  (ECF No. 59-1, PageID.1465.)

### CURRENT MOTIONS

St. Vincent contends that the Board's rejection of St. Vincent's grant application violates the Free Exercise Clause, and the Board retaliated against St. Vincent for activity protected by the First Amendment.  The Board argues that its action was constitutional as the application was denied only because it did not meet neutral criteria.  Parties have filed cross summary judgment motions.

### LEGAL STANDARDS

#### A.  Summary Judgment

Summary judgment is proper where the evidence presents no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a). A fact is material if it is so defined by substantive law and will affect the outcome of the suit under

the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists if the court finds that a reasonable jury could find in favor of the non-moving party.  *Id.*  Summary judgment is required where "after adequate time for discovery and upon motion . . . a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the court draws all inferences in the light most favorable to the non-moving party.  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992).

## B.  Free Exercise Clause

The Free Exercise Clause of the First Amendment is applicable to the States under the Fourteenth Amendment.  The Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  Generally, "a law that is neutral and of general applicability need not be justified by a compelling interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)).  However, "[i]f the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice, the law satisfies the First Amendment only if it 'advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests.'"  *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (quoting *Lukumi*, 508 U.S. at 546).  If the law is not neutral and generally applicable, strict scrutiny applies and the law must be justified by a compelling interest.  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

If the purpose of "a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533.  Furthermore, "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877.  Government action that targets religious conduct cannot be shielded merely because the action is facially neutral.  *Lukumi*, 508 U.S. at 534.  The Free Exercise Clause "forbids subtle departures from neutrality . . . and covert suppression of particular religious beliefs." *Id.* (internal quotation omitted).  A "court must look beyond the text [of a law] and scrutinize the history, context, and application of a challenged law" to determine whether a law is neutral.  *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021). "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

Additionally, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (internal quotation omitted).  If a government employs a "system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason." *Id.* (internal quotation omitted).  A law also is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*

### C.   First Amendment Retaliation

As "a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct.

1715, 1722 (2019) (internal quotation omitted).  An injured party may seek relief under the First Amendment "[i]f an official takes adverse action against [the party] based on [a] forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences." *Id.*  To prevail on this claim, St. Vincent must prove that: (1) it engaged in conduct protected by the First Amendment; (2) the Board took an adverse action against it; and (3) a causal connection exists between the two.  *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020).  To determine whether a defendant had a retaliatory motive, courts consider the totality of the circumstances, including the temporal proximity between the protected conduct and adverse action.  *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010).  A defendant will prevail on a motion for summary judgment if it can prove that it would have taken the same action absent the protected activity.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999).

## ANALYSIS

### A.  Free Exercise

St. Vincent argues that the Board violated the Free Exercise Clause because its denial of the grant application was not according to any neutral or generally applicable law consistently applied.  (ECF No. 59-1, PageID.1486.)  It contends that the Board had targeted St. Vincent for its religious views in *Buck* by denying its grant application.  The Board argues that its decision was not motivated by any hostility or discriminatory purpose.  Instead, the Board denied St. Vincent's grant because it did not comply with neutral grant criteria, and thus, it did not violate the Free

Exercise Clause.  The Court agrees with St. Vincent that strict scrutiny applies, and that the Board cannot clear the hurdle on this record.

### 1.   *Strict Scrutiny Applies*

Here, strict scrutiny applies to the Board's denial of St. Vincent's community agency grant because even though the text of the grant criteria under Resolution #19-243 appears facially neutral and generally applicable, the "history, context and application" of the Resolution demonstrates that disapproval of St. Vincent's religious beliefs is what really drove the decision.  The Court must look beyond the facial neutrality of the language in Resolution #19-243 to determine whether the Board used that language as a cover to punish St. Vincent for its religious convictions.  An examination of the historical background, the series of events leading up to the denial, and contemporaneous statements made by the Board Commissioners leave no genuine issue of material fact that the Board denied St. Vincent's application based on the organization's religious beliefs, not because of a neutral application of the Resolution.

First, the historical background of the Board's approval of community grants shows that the Board adopted a practice of following the County Controller's grant recommendations but departed from its practice when it denied St. Vincent's 2020 grant application.  In fact, in the last ten years, the Board approved 329 grant applications out of the 332 recommended grants; thus, it approved 99% of the recommended grants by the Controller.  The Board denied or reduced a grant that was recommended by the County Controller only two other times in the last ten years – once because the agency closed and once because the recommended funding exceeded a cap. St. Vincent's grant application for 2020 was the only grant recommended that year by the County Controller that the Board denied.  This alone suggests that the Board was targeting St. Vincent, not simply applying general standards and following established practice.

History also reveals that the Board approved every one of St. Vincent's grant applications since it started applying for grants in 2006.  These were for the same or similar programs and included the same or similar application materials.  In fact, the application denied in 2019 was identical in content to the one approved the year before.  So, the application met the "basic needs" requirements up to the application submitted in 2019.  The only change in the criteria from 2018 to 2019 was the non-discrimination policy, but the Board does not claim St. Vincent violated that requirement.  Instead, the Board changed its position on whether St. Vincent satisfied the "basic needs" requirement that it had done in every year prior.  This history suggests the Board singled out St. Vincent by denying its grant request in 2019.

Second, the context surrounding the denial points to St. Vincent's religious beliefs as the reason the Board singled it out for denial.  About six weeks after St. Vincent brought its claims in *Buck*, the Board amended its rules to prioritize grants from "agencies that comply with the County's non-discrimination policies."  Five months later, at the November 4, 2019 HSC meeting, multiple Commissioners criticized St. Vincent's religious beliefs, speech, and its decision to defend itself in *Buck*.  Some Commissioners were worried that St. Vincent would violate the County's non-discriminatory policy though it had no evidence that St. Vincent discriminated against clients in its refugee program.  Commissioner Sebolt expressed concern that St. Vincent would discriminate based on its "publicly stated stances and lawsuit against the state of Michigan toward same-sex couples."  (ECF No. 59-1, PageID.1473-74.)  Commissioner Tennis spoke of having "a difference of ideology" with St. Vincent.  (*Id.*)  Commissioner Stivers stated that she opposed working with St. Vincent because of the organization's anti-LGBTQ stance and described St. Vincent as "morally bankrupt."  (*Id.*, PageID.1474.)  Commissioner Sebolt inaccurately

claimed that "other Catholic charities permit 'adoption to same-sex couples,'" but "St. Vincent's [sic] is specifically choosing not to."  (ECF No. 1, PageID.17.)

On November 18, 2019, these same Commissioners along with the rest of the Board voted to deny St. Vincent's grant.  Commissioner Morgan moved to deny the grant and gave a brief explanation, stating that:

> I wish we had the money to fund everything . . . But it is one of our strategic goals as county to provide funding first and foremost for direct aid, the basics, the necessities of life, food, shelter and clothing. And so by helping the Refugee Development Center get closer to its goal, we are providing direct aid to them, and Haven House as well with providing meals to the homeless.

Even though St. Vincent sought the grant to provide direct aid to refugees through its "Living in America" program, the Board denied its grant and distributed the funds to other agencies. Commissioner Morgan's explanation at the meeting and his later reasonings do not adequately provide a convincing explanation of the application of neutral and generally applicable principles. Commissioner Morgan's expressed concern about not having the "money to fund everything" is obviously pretextual because the Commissioner gave the money St. Vincent requested to other agencies.  Obviously, there was enough money.  He later stated that he likes the Refugee Development Center and Haven House more, and it is his prerogative as a legislator to decide which agencies receive funding, but that is only true if the reasons for his preference are not constitutionally protected beliefs or conduct of the disfavored party.  Just fourteen days earlier, multiple Commissioners vehemently disagreed with and criticized St. Vincent's religious beliefs. The only viable reason for the Board's denial of the grant request on this record is its animosity against St. Vincent for its religious beliefs, not lack of funds or neutral application of the "basic needs" criterion.

Lastly, the Board was inconsistent in its application of the supposedly neutral grant requirements.  The Board did not fund St. Vincent's "Living in America" program but funded at least two other religious entities and other organizations for similar services, such as home repairs and modification.  Moreover, the Refugee Development Center listed in its grant application that it planned to spend around $11,000 of its $12,250 grant on personnel expenses, including salaries and benefits, which is the same kind of thing that supposedly disqualified St. Vincent.  Thus, the Board found that similar grant applications and agencies met its requirements but denied St. Vincent's application.  Moreover, the St. Vincent application the Board denied was no different than the one it approved the previous year.  Something more than neutral application of general rules is obviously going on, and the Board's disagreement with St. Vincent's religious beliefs as expressed in *Buck* is the only explanation supported by the record.

Overall, the Board's application of its grant criteria was not neutral, and strict scrutiny applies.

### 2.   *The Board Fails to Meet Strict Scrutiny*

For the Board's denial to satisfy the commands of the First Amendment, the Board's action must advance a compelling interest and be narrowly tailored in pursuit of the interest.  *Lukumi*, 508 U.S. at 546.  If the Board "can achieve its interests in a manner that does not burden religion, it must do so."  *Fulton*, 141 S. Ct. at 1881.  The Board argues that it has an interest in providing essential services to County residents and funding agencies that help residents meet basic needs.  Resolution #19-243 helps prioritize grants that contribute to "basic needs, such as food, clothing, and shelter" and prioritize agencies that agree to comply with the County's non-discriminatory policies.  The Board justifies denying St. Vincent's grant by arguing that it did not meet the criteria

or priority requirements set forth in Resolution #19-243.  Specifically, it argues that St. Vincent planned to use the grant for salaries and fringe benefits instead of direct services.

However, the Board's denial does not meet strict scrutiny for reasons already apparent in the Court's discussion of why strict scrutiny applies here.  Even assuming the Board has a compelling interest in only funding agencies that provide basic needs services and do not engage in discriminatory conduct, St. Vincent's application achieves those goals.  Even the Board is not arguing St. Vincent violated the non-discrimination requirement.  And at the same time the Board denied St. Vincent's application, it granted the application of at least one other agency that was materially indistinguishable on provision of "basic needs."  Indeed, the Board itself found St. Vincent's earlier applications perfectly acceptable on the criterion, including an identical application approved the year before the *Buck* litigation.  The history of the Board's prior grant approvals coupled with the hostile statements from Commissioners shows that the Board has singled out St. Vincent, not for its compelling interest in advancing certain community programs, but to punish St. Vincent for its religious beliefs.

The Board fails to show how giving St. Vincent a grant will put any compelling interest at risk, or how denying the application was essential to achieving a compelling interest.  If anything, funding St. Vincent will advance the direct services goal, especially given the Board's admission that St. Vincent's refugee program is the best in the community.  The Board's real goal was not to promote non-discriminatory and direct services but to punish St. Vincent for its religious beliefs. That is the only reasonable conclusion to draw on the summary judgment record.  Thus, the Board violated the Free Exercise Clause by denying St. Vincent's grant application.

## B.  First Amendment Retaliation

St. Vincent argues that the Board violated the First Amendment by retaliating against it for its protected activity in *Buck*.  (ECF No. 59-1, PageID.1497.)  It argues that the Board retaliated given statements from Commissioners, their alleged hostility towards St. Vincent, and the quick succession of all the events between its filing in *Buck* and the denial.  The Board contends that it did not retaliate against St. Vincent because most of the Board never approved nor endorsed the challenged statements from the three Commissioners.  The Court agrees with St. Vincent.

### 1.  Protected Conduct

St. Vincent's allegations implicate both the freedom to free exercise of religion and the freedom to petition under the First Amendment.  As established above, St. Vincent has a right to freely exercise religion.  St. Vincent's right means that the Board cannot take action that hinders St. Vincent's free exercise in a religiously targeted manner.  In addition, St. Vincent has a First Amendment right to petition the government for redress of grievances.  *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011).  By filing its complaint in *Buck*, St. Vincent was exercising its rights under the First Amendment.  The parties do not dispute that St. Vincent's pursuit of the *Buck* litigation is protected conduct.  (ECF No. 59-1, PageID.1498.)

### 2.  Adverse Action

St. Vincent must show that the Board took a sufficiently serious "adverse action" against it.  *Rudd*, 977 F.3d at 514.  An adverse action is "one that is capable of deterring a person of ordinary firmness from exercising the constitutional right in question."  *Id.* (internal quotation omitted).  The harassment necessary to rise to a level sufficient to deter an individual does not have to be extreme.  *Holzemer v. City of Memphis*, 621 F.3d 512, 524 (6th Cir. 2010).  An adverse action can include "nonrenewal of contracts."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir.

1999).  Though St. Vincent has "no constitutional property interest in the [grant] because it was a benefit within the city's discretion to grant or deny, there are constitutional limitations to that discretion."  *Holzemer*, 621 F.3d at 525.  "The government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.'"  *Id.* (quoting *Rutan v. Republican Party*, 497 U.S. 62, 72 (1990)).  In *Holzemer*, the court found sufficient evidence to hold that a sergeant's adverse actions against a buggy company and its owner could deter a person of ordinary firmness from further exercising their right to petition local government officials.  *Id.* at 524.  The adverse actions included purposefully delaying permit renewals, during which the company could not operate, and displaying hostility towards the plaintiffs.  *Id.*

Here, the Board's denial of the grant application amounts to an adverse action.  The denial limits the funds available to St. Vincent for its refugee program and was done in response to St. Vincent's religious beliefs and litigation in *Buck*.  Similar to the permit delay in *Holzemer*, which halted the plaintiff's income, here, the denial of the grant decreased St. Vincent's funding.  Though the grant only provides $4,500 and may not make up a significant portion of St. Vincent's total funds, the money withheld still impacted St. Vincent's ability to conduct its refugee program, at least in so much as St. Vincent was required to draw funding from elsewhere.  Even though St. Vincent is required to reapply for the grant each year and does not have a constitutional property interest in the grant, St. Vincent had a reasonable expectation that it would receive the grant again for 2020 and relied on receiving the funds.  St. Vincent received the grant every time it has applied since 2006, including in 2018 when it submitted the same grant application as the one denied in

2019.  The denial forced St. Vincent to administer its program without the grant funding and created a justifiable concern that funding would be in jeopardy going forward unless St. Vincent changed its religious views or kept these views to itself.

There is no genuine issue of material fact regarding the deterrent effect of the Board's adverse action.  The denial was meant to punish St. Vincent for its religious beliefs, which would deter any person of ordinary firmness from engaging in constitutionally protected religious exercise and petition.

### 3.  Causation

"It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury."  *Nieves*, 139 S. Ct. at 1722.  The motive must be a but-for cause, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id.*  To determine whether a defendant had a retaliatory motive, courts consider the totality of the circumstances, including the temporal proximity between the protected conduct and adverse action.  *Vereecke*, 609 F.3d at 401.

Here, based on the record, the Board had a motive to retaliate against St. Vincent for its beliefs and actions in *Buck*.  The denial of the grant occurred in November 2019, only seven months after St. Vincent filed its complaint in *Buck*.  During the November 4, 2019 HSC meeting, multiple Commissioners voiced their strong disagreements with St. Vincent's religious beliefs.  Though the Commissioners had no evidence that St. Vincent discriminated against clients in its grant-funded refugee program, they criticized St. Vincent's religious beliefs and worried that St.  Vincent would discriminate in the refugee program.  For example, Commissioner Stivers stated that she "can't support working with this group" because of "the anti-LGBT stance of the greater organization" and that St. Vincent is "an organization that I feel is kind of morally bankrupt."

(ECF No. 1, PageID.17-18.)  Commissioner Tennis said that St. Vincent is "the best game in town . . . when it comes to [refugee resettlement]," but "I do share concerns with some of the more recent decisions the organization has made."  (*Id.*, PageID.17.)  Commissioner Sebolt believed that St. Vincent would discriminate "based on St. Vincent's Catholic Charities publicly stated stances and lawsuit against the state of Michigan toward same-sex couples."  (*Id.*, PageID.16.)  Ten days later, the Commissioners voted to deny St. Vincent's grant.  Given the totality of the circumstances, including the Commissioners' statements and the proximity of the St. Vincent's actions in *Buck* and the denial, no reasonable trier of fact could fail to find that the Board had a retaliatory motive.

Based on the evidence on record, the Board's retaliatory motive was the but-for cause of the grant denial.  Prior to the denial, the Board always approved St. Vincent's grant applications, including an identical application in the prior year.  The Board also approved grant applications recommended by the County Controller 99% of the time but refused to do so here.  The only explanation the Board tries to provide is that the application did not comply with grant requirements even though the same application and other agencies' similar applications did comply.  The explanation is a pretext for denying the grant based on St. Vincent's religious beliefs and its litigation in *Buck*.  Without the retaliatory motive, the Board would not have denied St. Vincent's grant application, especially given that it had approved the grant application before.  Thus, the Board's motive caused St. Vincent to lose the grant.

The Board could still defeat St. Vincent's retaliation claim by demonstrating it would have taken the same action even absent St. Vincent's protected conduct.  However, the Board fails to offer any such proof.  Though the Board argues that it denied the grant application because it did not seek funding for direct services, this justification is pretextual.  It accepted the same application from St. Vincent the prior year and always gave a grant to St. Vincent since 2006.  The Board also

funded other religious entities and other agencies for personnel expenses.  The statements from Commissioners just ten days prior to the denial show that multiple Commissioners were hostile towards St. Vincent for its beliefs and litigation.   This hostility influenced the votes for St. Vincent's grant.  Without St. Vincent's religious beliefs and its actions in *Buck*, the Board would have approved St. Vincent's grant as its denial can only be based on its hostility towards St. Vincent.

Overall, the Board retaliated against St. Vincent as a matter of law under the First Amendment.

### C.  Remedy

St. Vincent seeks declaratory relief, permanent injunction, actual and nominal damages, litigation costs and attorneys' fees, and any other equitable relief appropriate.  At the motion hearing on September 28, 2021, the Court invited the parties to file supplemental briefing on the injunctive remedial issue.  In its brief, St. Vincent argues that the Board should be permanently enjoined from denying St. Vincent an interpretive services contract or a Community Agency Grant based on its religious beliefs.  (ECF No. 71, PageID.1937.)  It contends that a permanent injunction is proper because violations of First Amendment create irreparable harm, the Board continues to threaten retaliation, and other remedies are not adequate given the Board's unbridled discretion in applying grant criteria and giving grants and contracts.  (*Id.*, PageID. 1939, 1946-47.)  On the other hand, the Board argues that a permanent injunction is not appropriate because St. Vincent does not suffer ongoing irreparable harm, the grant denial was an isolated one-time occurrence, and adequate remedies at law would be to remand the grant denial or to compensate St. Vincent for the grant amount.  (ECF No. 70, PageID.1901-03.)  It notes, for example, that the Board has approved grant applications from St. Vincent after 2019.  The Board also argues that the grant requirements

will change based on competing budget pressures, so it would be contrary to public interest to permanently favor St. Vincent over other applicants, and an injunction would supplant the Board's legislative authority.  (*Id.*, PageID.1906, 1909.)

A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (internal quotation omitted).  A court needs to be cautious when enjoining a public entity from making particular decisions on how to spend taxpayer money.  *See Brown v. Neeb*, 523 F. Supp. 1, 3 (N.D. Ohio 1980), aff'd, 644 F.2d 551 (6th Cir. 1981) ("Obviously, neither practically nor in law does this Court have the jurisdiction or the power to order the City, or its officers, to increase taxes, or to spend its money in particular ways. The Court cannot determine the priorities that the City Council, or the City Manager, should establish for various activities.")  A court may enjoin an entity to prevent it from making discriminatory decisions, but it cannot dictate how an entity should prioritize its spending. *Id.*

At this time, the Court does not resolve whether St. Vincent is entitled to an injunction nor the amount of damages, or other relief, it should receive.  It may be that a combination of declaratory and damages relief is sufficient in the case because the Board – even if it continues to disagree with St. Vincent's religious views on marriage – has learned it may not deny grants, cancel contracts, or otherwise withhold benefits from St. Vincent because of that.  The Court will convene a hearing to address the remedial issues with the parties.

**ACCORDINGLY, IT IS ORDERED**:

1.      Defendant's Motion for Summary Judgment (ECF No. 57) is **DENIED**.

2.      Plaintiff's Motion for Summary Judgment (ECF No. 59) is **GRANTED IN PART** as to Counts I, III, and IV.  This provides a predicate for all the relief St. Vincent could conceivably seek in the case and makes it unnecessary to address Plaintiff's less developed theories of compelled speech (Count I) and Equal Protection (Count V).

The Court does not resolve any remedial issues at this time.  The Court requests that St. Vincent file an additional brief no later than March 31, 2022, to propose specific declaratory, monetary, and injunctive relief it seeks.  The Board may respond no later than April 29, 2022.  The Court will then set a hearing.


Dated:      March 7, 2022                        /s/ Robert J. Jonker
                                                 ROBERT J. JONKER
                                                 CHIEF UNITED STATES DISTRICT JUDGE