# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ST. VINCENT CATHOLIC
CHARITIES,

     *Plaintiff,*

  v.

INGHAM COUNTY BOARD OF
COMMISSIONERS,

     *Defendant.*

Civil No. 1:19-CV-1050

Hon. Robert J. Jonker

**BRIEF ON PLAINTIFF'S
PROPOSED RELIEF**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ................................................................................... 1

   I.  St. Vincent is entitled to money damages ......................................... 3

      A.  St. Vincent is entitled to the $4,500 it lost because of the Board's religious discrimination...................................... 4

      B.  St. Vincent is entitled to $6,303.28 for the time its staff lost contending with the Board's religious discrimination............................................................................. 5

      C.  St. Vincent is entitled to $50,000 for damage to its reputation from the Board publicly denigrating St. Vincent's religious beliefs............................................................. 8

   II.  St. Vincent is entitled to declaratory relief................................. 15

   III.  St. Vincent is entitled to a permanent injunction ....................... 18

      A.  Injunctive relief is the proper remedy ...................................... 18

      B.  St. Vincent's proposed injunction is properly tailored............ 20

          1.  The Board should be ordered to follow the Constitution in its funding decisions ................................. 20

          2.  The Board should be ordered to state its reasons for defunding St. Vincent in the future ............................. 21

          3.  The injunction could be dissolved if the Board adopts better procedural safeguards ................................. 27

CONCLUSION ................................................................................... 28

CERTIFICATE OF COMPLIANCE ....................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Neeb,*
523 F. Supp. 1 (N.D. Ohio 1980 ........................................................... 21

*Brown v. Neeb,*
644 F.2d 551 (6th Cir. 1981) ................................................................ 21

*Buck v. Gordon,*
No. 1:19-cv-00286 ................................................................................ 14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................................. 20

*Cole v. City of Memphis,*
108 F. Supp. 3d 593, 604 (W.D. Tenn. 2015) ..................................... 16

*Cole v. City of Memphis,*
839 F.3d 530 (6th Cir. 2016) ............................................................... 16

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville &
Davidson Cnty.,*
274 F.3d 377 (6th Cir. 2001) .................................................. 23-24, 27

*Dunn Appraisal Co. v. Honeywell Info. Sys., Inc.,*
687 F.2d 877 (6th Cir. 1982) ................................................................. 6

*E. River S.S. Corp. v. Transamerica Delaval, Inc.,*
476 U.S. 858 (1986) ............................................................................... 4

*Elrod v. Burns,*
427 U.S. 347 (1976) ............................................................................. 19

*Fla. State Conf. of NAACP v. Browning,*
522 F.3d 1153 (11th Cir. 2008) ............................................................. 6

*Freedman v. Maryland,*
  380 U.S. 51 (1965) .............................................................................. 24

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
  23 F.3d 1071 (6th Cir.1994) ................................................................ 19

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.,*
  746 F.2d 323 (6th Cir. 1984) ............................................................... 15

*Halliburton Energy Servs. Inc. v. Snyder,*
  No. 2:17-cv-349, 2018 WL 6839741 (S.D. Ohio Dec. 31,
  2018) ................................................................................................. 15-16

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,*
  452 U.S. 640 (1981) ............................................................................ 23

*Johnson v. City of Cincinnati,*
  119 F. Supp. 2d 735 (S.D. Ohio 2000) ................................................ 16

*Kallstrom v. City of Columbus,*
  136 F.3d 1055 (6th Cir. 1998) ........................................................ 22, 23

*Memphis Cmty. Sch. Dist. v. Stachura,*
  477 U.S. 299 (1986) .............................................................................. 9

*Meyers v. City of Cincinnati,*
  14 F.3d 1115 (6th Cir. 1994) ....................................................... 9-10, 11

*People for the Ethical Treatment of Animals v. U.S. Dep't of
  Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................. 6

*Peterson v. Minidoka Cnty. Sch. Dist. No. 331,*
  118 F.3d 1351 (9th Cir. 1997) ............................................................. 10

*Reaching Hearts Int'l, Inc. v. Prince George's County,*
  368 Fed. Appx. 370 (4th Cir. 2010) ..................................................... 10

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) ............................................................................ 19

*S. Ohio Sand Co. v. ProFrac Servs., LLC,*
    No. 19-cv-1686, 2020 WL 4877134 (N.D. Ohio Aug. 20,
    2020) ................................................................................ 15

*Saieg v. City of Dearborn,*
    641 F.3d 727 (6th Cir. 2011) ........................................... 20

*Sherwin Manor Nursing Ctr., Inc. v. McAuliffe,*
    37 F.3d 1216 (7th Cir. 1994) .............................................. 6

*Speers v. Univ. of Akron,*
    196 F. Supp. 2d 551 (N.D. Ohio 2002) ................... 10, 11, 14

*Wells Fargo, N.A. v. Centro Richland, LLC,*
    No. 1:14 CV 1998, 2015 WL 3540069 (N.D. Ohio June 4,
    2015) ................................................................................ 16

*Wiskotoni v. Mich. Nat'l Bank–West,*
    716 F.2d 378 (6th Cir. 1983) ......................................... 9, 11

*Women's Med. Pro. Corp. v. Baird,*
    438 F.3d 595 (6th Cir. 2006) ......................................... 18, 19

## Other Authorities

Fed. R. Civ. P. 60(b) ...................................................... 20

*Annual Report,* St. Vincent Catholic Charities ....................... 7

*Bid Archives*, Ingham County ............................................. 26

*Bidding Methods & Procedures*, Ingham County ................... 26

E. Borchard, *Declaratory Judgments* (2d ed. 1941) ............... 16

Dec. 8, 2020 Board of Commissioners Approved Minutes .......... 25

*Ethics Policy*, Board of Commissioners (Amended Sept. 24,
    2019) ................................................................................ 27

## INTRODUCTION

Despite St. Vincent being the best refugee services provider in Ingham County, the Ingham County Board of Commissioners zeroed out a grant supporting St. Vincent's ministry. The Board targeted that ministry, as the Court said, "to punish St. Vincent for its religious beliefs" about marriage—beliefs relevant to a different ministry (foster and adoption), and already protected in law by another case (*Buck v. Gordon*). Courts are familiar with government actions burdening religious exercise. But this case is different. Here, the Board retaliated against St. Vincent simply for defending its religious beliefs in a court case that had zero connection to the Board. "The only viable reason" for the Board's ideological virtue signaling, the Court held, is "animosity against St. Vincent's religious beliefs." Those actions caused real harm to St. Vincent's refugee services, and to the vulnerable people they serve. Accordingly, the Court directed the parties to brief St. Vincent's remedies.

For a start, St. Vincent is owed the $4,500 grant amount that it should never have been denied. Beyond the grant, St. Vincent lost over $6,000 in expenses and diverted staff time attempting to repair the reputational damage the Board caused. And the damage to St. Vincent's reputation—

from donor and staff concerns, another government inquiry following the Board's smears, and public humiliation in front of St. Vincent's community partners—is at least an additional $50,000, a mere 1% of St. Vincent's annual revenue during the year the injury began. That's over $60,000 in total money damages to which St. Vincent is entitled under Sixth Circuit precedent.

Making St. Vincent whole requires more than money. Declaratory and injunctive relief are also appropriate. A declaration is necessary to make clear, as the Court suggested, that "the Board . . . has learned it may not deny grants, cancel contracts, or otherwise withhold benefits from St. Vincent because of" its religious beliefs on marriage.

An injunction is appropriate, too, because the Board's highly discretionary and subjective contract and grant-making systems are an invitation for continued, unchecked discrimination. This injunction wouldn't require the Court to oversee those programs or direct their outcomes. Rather, the injunction St. Vincent proposes would: (1) prohibit unlawful discrimination; (2) require the Board to adopt and release a written reason when it denies St. Vincent funding; and (3) could be modified or dissolved

upon Ingham County adopting procedural safeguards to ensure a consti-
tutionally valid process. Requiring the Board to explain in writing why it
decides to not award St. Vincent funds would avoid the "obviously pre-
textual" behavior that the Court admonished in this case. And requiring
the Board to explain its reasons in writing would not be a meaningful
burden on the Board—unless it is trying to justify an unlawful denial
after the fact.

St. Vincent is entitled to $60,803.28 in money damages, exclusive of
attorney's fees and costs, along with its requested declaratory and injunc-
tive relief. *See* Proposed Final Judgment, Attach. 2.

## I.   St. Vincent is entitled to money damages.

St. Vincent is entitled to three forms of compensatory damages. First,
St. Vincent is entitled to the $4,500 it would have received from the Board
but for its religious discrimination. Second, St. Vincent is entitled to the
$6,303.28 it spent on staff and public relations responding to the Board's
religious discrimination. And third, St. Vincent is entitled to $50,000 in
damages due to the reputational harms caused by the Board's religious

discrimination. In total, St. Vincent should receive $60,803.28 in money damages.

### A. St. Vincent is entitled to the $4,500 it lost because of the Board's religious discrimination.

St. Vincent lost a $4,500 community agency grant. "The only viable reason" for that loss was the Board's "animosity against St. Vincent for its religious beliefs." Doc. 74 at PageID.2094, *see also id.* at PageID.2095 ("Something more than neutral application of general rules is obviously going on"). "St. Vincent had a reasonable expectation that it would receive the grant again for 2020 and relied on receiving the funds." *Id.* at PageID.2098. Yet instead of the Board fulfilling that "reasonable expectation," the Board "forced St. Vincent to administer its [refugee services] program without the grant funding . . . ." *Id.* at PageID.2099. Compensating for that loss begins with the amount of the lost grant: $4,500.

"Tort damages," like those stemming from religious discrimination, "are analogous to reliance damages" in that they aim to "compensate the plaintiff for loss and return him to the position he occupied before the injury." *See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 873 n.9 (1986). Here, that means awarding St. Vincent the lost grant amount. Indeed, not even the Board disputes that St. Vincent is entitled

4

to these damages should it prevail on the merits. *See, e.g.*, Doc. 72 at PageID.1963 (acknowledging "a one-time award of $4,500" could be "an adequate remedy"); *see also* Doc. 67 at PageID.1890 (explaining the Board did not dispute damages at summary judgment). St. Vincent should receive the money that it was wrongly denied.

### B. St. Vincent is entitled to $6,303.28 for the time its staff lost contending with the Board's religious discrimination.

As St. Vincent explained at summary judgment, its damages also include "expend[ed] staff time dealing with the Board's threats and disparaging accusations." Doc. 59-1 at PageID.1507. "All parties acknowledge that St. Vincent's services have been essential to refugee resettlement in Ingham County." Doc. 74 at PageID.2082. And yet rather than spend more time serving refugees, the Board's religious discrimination forced St. Vincent to spend over two years operating with "a justifiable concern that funding would be in jeopardy going forward unless St. Vincent changed its religious view or kept these views to itself." *Id.* at PageID.2099. St. Vincent is entitled to compensation for the staff time it lost contending with the Board's religious discrimination—when St. Vincent could have been serving the vulnerable.

Proper compensatory damages can account for the "drain on [St. Vincent's] resources . . . from the 'organization's need to "counteract" the [Board's] illegal practices.'" *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *see also Dunn Appraisal Co. v. Honeywell Info. Sys., Inc.*, 687 F.2d 877, 884 (6th Cir. 1982) (upholding $20,000 in lost staff time damages "due to time spent on problems caused by defendant's equipment"); *Sherwin Manor Nursing Ctr., Inc. v. McAuliffe*, 37 F.3d 1216, 1222 (7th Cir. 1994) ("A plaintiff in a civil rights action should be allowed fees in a state criminal action where the expenditure is a foreseeable result of the acts of the defendant.") (cleaned up).

Here, St. Vincent staff lost over $6,303.28 contending with the Board's unconstitutional retaliation.[1] This request has two components:

First, the Board's public disparagement of St. Vincent's religious disbeliefs compelled St. Vincent to hire a public relations firm. Seyka Decl. ¶ 5 (Attach. 1). St. Vincent spent $5,040 dollars working with that firm

---

[1]   St. Vincent also lost time consulting with outside legal counsel before this case began. This amount does not include that time, although it is compensable. *See, e.g.*, *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1097 (D.C. Cir. 2015) ("if an organization expends resources 'in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] rather than in anticipation of litigation,' . . . it has suffered a 'concrete and demonstrable injury'").

6

to, as the Court noted in its summary judgment decision, "'correct [the Board's] false allegations.'" Doc. 74 at PageID.2084 n.2; Attach. 1 ¶¶ 7-8. Correcting those false allegations also required substantial time from St. Vincent staff. This time included St. Vincent's CEO personally writing letters to every Board Commissioner to keep St. Vincent's funding, meeting with a Commissioner, and coordinating an overall public relations response. *See* Attach. 1 ¶¶ 7-8, 12; Doc. 59-16 (Tennis response to St. Vincent letter to Board members). These efforts were crucial to St. Vincent's survival, as 76.6% of St. Vincent funding comes from government grants and contracts. *See Annual Report,* St. Vincent Catholic Charities, https://perma.cc/RC7L-X72C.

Second, the Board's behavior also took Judi Harris—St. Vincent's Program Director for Refugee Services—away from serving refugees. Instead of helping the vulnerable acclimate to life in America, Judi needed to work with the County's Health Department to "get [the Board's defunding] recommendation overturned." Doc. 59-23. St. Vincent was also forced to spend time responding to the Board's unprecedented Request for Proposal ("RFP"), implemented with "absolutely the intent" of finding an alternative to St. Vincent for the refugee interpretive services contract that

it has held for years. Doc. 59-1 at PageID.1483-1484 (testimony of Com-

missioner Tennis); *see also* Attach. 1 ¶ 9. All this time could have been

spent on direct services to refugees. Instead, it was spent overcoming the

Board's unconstitutional hostility toward St. Vincent's religious beliefs.

To recover some of this loss, St. Vincent is seeking $1,263.28 in diverted

staff time. Attach. 1 ¶ 9. Combined with the $5,040.00 spent on public

relations, this amount to a loss of $6,303.28. St. Vincent is entitled to an

award of these costs as damages.

### C. St. Vincent is entitled to $50,000 for damage to its reputation from the Board publicly denigrating St. Vincent's religious beliefs.

Board members denigrated St. Vincent's constitutionally protected re-

ligious beliefs in two public—and publicly recorded—Board meetings

(Nov. 4, 2019 and Nov. 12, 2019). Those recordings remain accessible on

the Board's website. Attach. 1 ¶ 11. To follow up on this humiliation, the

Board invited St. Vincent's representative to attend the meeting award-

ing community agency grants, where she was asked to stand and be rec-

ognized along with her peers, then the committee zeroed out St. Vincent's

grant request in public, in front of St. Vincent's peer organizations. *See*

Doc. 17-1 at PageID.240 ¶ 4 (Harris declaration). Those organizations, as

8

well as other government entities, began asking St. Vincent whether its religious beliefs made it a reliable community partner. So did St. Vincent's donors. Attach. 1 ¶¶ 12-13. These concerns demonstrate the ongoing reputational injury caused by the Board's religious discrimination. These damages are part of the "the loss of its rights as protected by law," and St. Vincent should be compensated for them. See Doc. 1 (Compl. Prayer for Relief "d."). A conservative estimate of that compensation for reputational damage is $50,000.

The "impairment of reputation [and] personal humiliation" experienced by St. Vincent is compensable. *See, e.g.*, *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306-07 (1986). Courts within the Sixth Circuit routinely award substantial damages for reputational injury and humiliation that follow from retaliation against constitutional rights. *See Wiskotoni v. Mich. Nat'l Bank–West*, 716 F.2d 378, 390 (6th Cir. 1983) (upholding $25,000 damages award for loss of professional reputation due to former employer firing claimant after he testified in a grand jury proceeding); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1116-17 (6th Cir. 1994) (upholding $25,000 damages award "for mental anguish, humiliation, and loss of reputation" when claimant was forced "to retire based

9

upon disapproval of statements made by [claimant] which were protected by the First Amendment."); *Speers v. Univ. of Akron*, 196 F. Supp. 2d 551, 557 (N.D. Ohio 2002) ($85,000 for retaliation against professor's free-speech rights).[2]

*Speers*, from the Northern District of Ohio, is particularly instructive here. In that case, a professor sued the University of Akron and received a jury award of $85,000 for violations of her free speech rights. The University challenged that award as excessive and sought a new trial, arguing that "Speers did not offer evidence upon which a reasonable jury could award $85,000." 196 F. Supp. 2d at 556. The district court in *Speers* rejected the effort to overturn the damages award.

As the district court in *Speers* explained when instructing the jury:

> No evidence of the monetary value of such intangible things as impairment of reputation, embarrassment, and/or humiliation has been, or need be, introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damages.

---

[2] The same is true nationwide. *See, e.g., Peterson v. Minidoka Cnty. Sch. Dist. No. 331*, 118 F.3d 1351, 1356, 1360 (9th Cir. 1997) ($100,000 in damages for humiliation from free-exercise violation); *cf. Reaching Hearts Int'l, Inc. v. Prince George's County*, 368 Fed. Appx. 370 (4th Cir. 2010) (sustaining $3.7 million jury verdict in favor of church against religious discrimination under Equal Protection Clause).

196 F. Supp. 2d at 557. The jury was instead instructed to use its "common sense" based upon the evidence presented—including "the importance of Speers's professional reputation and the impact of the defendant's treatment on Speers." *Id.* at 557. Because that (intangible) evidence was considered, the district court rejected the defendant's effort to overturn the damages award. *See id.*

Other Sixth Circuit cases follow the same approach. For example, a claimant can receive reputational damages when he is wrongfully discharged and shows he was denied "[t]he prestige and future prospects" of employment in that field. *See Wiskotoni*, 716 F.2d at 390 ($25,000 in reputational damages). And compensatory damages for humiliation can be awarded in a First Amendment retaliation case where "these damages were caused in part by the substantial unfavorable publicity surrounding" the retaliatory conduct. *Meyers*, 14 F.3d at 1119 ($25,000 in humiliation damages).

Here, there is uncontestable evidence of St. Vincent's reputational damage. Board members openly vented their displeasure with St. Vincent's religious views and its lawsuit defending them—both among one another, with those in state government, and throughout the County.

11

*See, e.g.*, Doc. 59-1 at PageID.1471 (discussing depositions of Commissioners Tennis and Sebolt). The Board's open religious discrimination produced substantial public interest—from other agencies within Ingham County, individual citizens, and local press. *See, e.g.*, Doc. 59-25 (Commissioners Sebolt and Morgan texting about how to respond to the public criticism); Doc. 59-26 (Commissioner text chain noting that "[s]ome people in [Commissioner Schafer's district] are very upset with the exclusion" and responding to an inquiry on the matter from a Lansing City Pulse reporter). The public scrutiny compelled St. Vincent to hire a public relations firm to begin restoring its reputation. *Supra* 6-7. The intense public scrutiny required St. Vincent to reassure its community partners and donors that it was still a valuable community agency. Attach. 1 ¶¶ 12-14. These restorative efforts were crucial, as St. Vincent's ministry relies heavily on government contracts and grants, in addition to private donations. *Id.* ¶ 13 (citing 2020 annual report).

Even with these ongoing restorative efforts, St. Vincent was still zeroed out from grant funding in front of its fellow community agencies with an "obviously pretextual" excuse. Doc. 74 at PageID.2094. Judi Har-

ris represented St. Vincent at the grant-awarding ceremony. She has devoted her career to serving refugees and vulnerable populations within Ingham County. And she was humiliated by the Board "stripping St. Vincent of its funding in front of the entire assembly of other leaders from community service organizations across Lansing." *See* Doc. 17-1 at PageID.240 ¶ 4 (Harris declaration).

And the collateral fallout continues. Since the Board's conduct in late 2019, numerous donors have had to be reassured that St. Vincent does in fact serve all refugees in need. Attach. 1 ¶¶ 12-14. In late 2020, St. Vincent was again forced to endure the Ingham County Board's public refusal to fund St. Vincent's community agency grant program—and the Board only reversed course after a closed session meeting with its lawyers. *See* Doc. 59-1 at PageID.1480-1483. In March 2021, the City of Lansing followed Ingham County's playbook—writing to express "concern" from City Council Members regarding St. Vincent's religious beliefs on marriage, suggesting this concern could justify the City in ending its work with St. Vincent in serving immigrants. Attach. 1 ¶ 13. To this day, St. Vincent staff must now expend additional time and legal review when preparing grant applications, government contracts, and interactions

with government officials. Attach. 1 ¶ 14.  In addition to the time loss this imposes on St. Vincent staff, the toll on morale costs even more. *Id.*

While "[t]he very nature of injuries arising from impairment of reputation, embarrassment, or humiliation make damages hard to quantify," $50,000 is a reasonable, conservative approximation of "the importance of [St. Vincent's] professional reputation and the impact of the defendant's treatment." *Speers*, 196 F. Supp. 2d at 557 (holding same with $85,000 award). St. Vincent had a nearly $9.8 million budget in FY2020—the same fiscal year where St. Vincent was zeroed out by the Board. Attach. 1 ¶ 13 (citing 2020 annual report). Fifty thousand dollars represents less than 1% of that amount—a token of the humiliation that St. Vincent endured for over two and a half years.

* * *

St. Vincent should be awarded $60,803.28 in total money damages, exclusive of attorney's fees and costs.[3]

---

[3]   *Cf. Buck v. Gordon*, No. 1:19-cv-00286, Doc. 113 at PageID.3127 (W.D. Mich. Jan. 26, 2022) (order requiring the State of Michigan to pay St. Vincent $550,000 in attorney's fees and costs).

## II.    St. Vincent is entitled to declaratory relief.

St. Vincent is entitled to declaratory relief confirming that the Board's discriminatory conduct violated St. Vincent's First Amendment rights. St. Vincent has pressed for declaratory relief in both its summary judgment motions, explaining in detail why such relief is appropriate under the five *Grand Trunk* factors. *See* Doc. 28-1 at PageID.638-640 (applying *Grand Trunk* factors); Doc. 59-1 at PageID.1506 (confirming request for declaratory relief). The Board has not made any argument why St. Vincent should not receive declaratory relief if it succeeds on the merits. The Board's silence confirms that declaratory relief, coupled with injunctive relief and damages, is a straightforward and necessary remedy.

As the Sixth Circuit has explained, declaratory relief is appropriate when it will clarify the legal relationship between the parties and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). *See, e.g.*, *S. Ohio Sand Co. v. ProFrac Servs., LLC*, No. 19-cv-1686, 2020 WL 4877134, at *7 (N.D. Ohio Aug. 20, 2020) (clarifying respective contractual rights of the parties); *Halliburton Energy Servs.*

*Inc. v. Snyder*, No. 2:17-cv-349, 2018 WL 6839741, at *1 (S.D. Ohio Dec. 31, 2018) (declaring contract invalid and clarifying agency relationship between parties); *Wells Fargo, N.A. v. Centro Richland, LLC*, No. 1:14 CV 1998, 2015 WL 3540069, at *3 (N.D. Ohio June 4, 2015) (declaring the property rights of competing parties). And courts frequently grant declaratory relief when constitutional rights have been violated. In *Cole v. City of Memphis*, for example, the court clarified the legal relationship between the City of Memphis and its citizens, declaring that "since at least 2007," the City's "Beale Street Sweep" program had "violated [citizens'] constitutional rights." 108 F. Supp. 3d 593, 604, 606 (W.D. Tenn. 2015), *aff'd* 839 F.3d 530 (6th Cir. 2016); *see also Johnson v. City of Cincinnati*, 119 F. Supp. 2d 735, 749 (S.D. Ohio 2000) ("the Court declares Chapter 755 Cincinnati Municipal Code to be unconstitutional as applied to Plaintiffs in that it violates their fundamental right of freedom of association").

Here, the Board violated St. Vincent's constitutional rights. Doc. 74 at PageID.2096 ("[T]he Board violated the Free Exercise Clause by denying St. Vincent's grant application"); *Id.* at PageID.2101 ("[T]he Board retaliated against St. Vincent as a matter of law under the First Amendment."). At a minimum, therefore, it is necessary for this Court to declare

the legal relationship between the parties and confirm that the Board's conduct is unconstitutional. This will allow the parties—who continue to interact frequently—to better understand their rights and responsibilities going forward.

Accordingly, St. Vincent asks that this Court enter the following declaratory relief:

1. The First Amendment to the United States Constitution requires the Ingham County Board of Commissioners, its members, agents, employees, and those it acts in concert with ("the Board") not to discriminate against St. Vincent Catholic Charities ("St. Vincent") by "deny[ing] grants, cancel[ing] contracts, or otherwise withhold[ing] benefits" from St. Vincent on the basis of St. Vincent's sincere religious beliefs, "even if it continues to disagree with St. Vincent's religious views[.]" Accordingly, by denying St. Vincent's FY2020 community agency grant application because of "animosity against St. Vincent for its religious beliefs," the Board violated the United States Constitution. Doc. 74 at PageID.2094, 2102.

2. The First Amendment to the United States Constitution requires the Ingham County Board of Commissioners, its members, agents,

employees, and those it acts in concert with ("the Board") not to re-
taliate against St. Vincent Catholic Charities ("St. Vincent"), such
as by "deny[ing] grants, cancel[ing] contracts, or otherwise with-
hold[ing] benefits" from St. Vincent for exercising its constitutional
and statutory rights or from seeking legal redress to protect those
rights in court. Because "hostility" toward St. Vincent "influenced
the votes for St. Vincent's grant," and because "[w]ithout St. Vin-
cent's religious beliefs and its actions in *Buck*, the Board would
have approved St. Vincent's grant," the Board violated the United
States Constitution. Doc. 74 at PageID.2101, 2102.

This declaratory relief clarifies the rights of both St. Vincent and the
Board, and it is consistent with this Court's holding on the merits. More-
over, the Court noted that the Board "has learned" a lesson from losing
this case. Doc. 74 at PageID.2102. This lesson will be remembered by en-
tering St. Vincent's proposed declaratory relief.

## III.   St. Vincent is entitled to a permanent injunction.

### A. Injunctive relief is the proper remedy.

The Sixth Circuit has long held that a permanent injunction is the
"'well-settled'" remedy for violating constitutional rights with continued

irreparable harm. *See* Doc. 71 at PageID.1939 (quoting *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 616 (6th Cir. 2006)); *see also* Doc. 73. Indeed, the Sixth Circuit has said that a party is "*entitled*" to such relief. *Baird*, 438 F.3d at 616 (emphasis added).

St. Vincent has detailed why it satisfies the elements of injunctive relief, *see, e.g.*, Doc. 59-1 at PageID.1507-1512; Doc. 71; Doc. 73, and reaffirms all those arguments here. In brief, the Court has already found that St. Vincent's First Amendment rights were violated by the Board. *See* Doc. 74. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (applying to the Free Exercise Clause). Nor would there be an adequate remedy at law to compensate another loss of St. Vincent's First Amendment rights. *See, e.g.*, Doc. 71 at PageID.1940-1944 (St. Vincent's brief discussing this problem). Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994).

The injunction requested by St. Vincent would prevent the Board from (1) unconstitutionally discriminating against St. Vincent when awarding contracts or grants and (2) require the Board to adopt a statement giving the reasons why it denied any such funding to St. Vincent. Moreover, this injunction could be dissolved by a motion from the Board to this Court, should the Board adopt procedural safeguards to encourage transparency and prevent future retaliation. *See Saieg v. City of Dearborn*, 641 F.3d 727, 741 (6th Cir. 2011); *see also* Fed. R. Civ. P. 60(b).

## B. St. Vincent's proposed injunction is properly tailored.

### 1. The Board should be ordered to follow the Constitution in its funding decisions.

The proposed injunction is appropriately tailored to the facts of this case and to Sixth Circuit precedent. The first provision prohibits unconstitutional discrimination. The "minimum standard necessary [for] protecting First Amendment rights" requires "that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). St. Vincent's proposed injunction would prohibit the Board from selectively burdening St. Vincent's religious exercise again.

20

The Court rightly noted that courts sitting in equity are not to sup-
plant government decisions about how taxpayer money is spent. Doc. 74
at PageID.2102. St. Vincent agrees. St. Vincent does not here—and has
not ever—suggested that St. Vincent must always be funded, or that the
Court should "order the City, or its officers, to increase taxes, or to spend
its money in particular ways." *Id.* (citing *Brown v. Neeb*, 523 F. Supp. 1,
3 (N.D. Ohio 1980), *aff'd*, 644 F.2d 551 (6th Cir. 1981)); *see also, e.g.*, Doc.
73 at PageID.2075-2076 (an example of St. Vincent's briefing on this
point). Instead, St. Vincent's proposed injunction language is properly
tailored to address the harms that gave rise to this case and the future
irreparable harms threatened by the Board's conduct throughout litiga-
tion. Only unconstitutional discrimination and retaliation would be pro-
hibited.

> ### 2. The Board should be ordered to state its reasons for defund-
> ### ing St. Vincent in the future.

The injunction's second provision requires the Board to produce writ-
ten reasons for why St. Vincent's funding requests would be canceled,
denied, or terminated.

On this point, the Sixth Circuit's decision in *Kallstrom v. City of Columbus* is instructive. There, Columbus police officers invoked their constitutional due process rights "under §1983 for the City's past disclosure of certain personal information contained in their personnel files." 136 F.3d 1055, 1067 (6th Cir. 1998). These prior disclosures led the officers to request (along with money damages) "permanent injunctive relief . . . to require the City 'to maintain in confidence the personal information regarding plaintiffs.'" *Id.* (citation omitted). The district court "refused the officers' request for injunctive relief containing a broad prohibition against the release of personal information about the officers." *Id.* at 1068.

While the Sixth Circuit agreed that a "broad prohibition" was factually unwarranted, it "nevertheless h[e]ld that the officers are entitled to notice prior to the release of any information contained in their personnel files that has the potential to compromise the personal security of the officers and their family members." *Id.* This narrower injunction, the Court held, would follow from both the City's "voiced . . . intention" to keep disclosing personnel information upon request, and the "fundamental notion of fairness underlying the Due Process Clause." *Id.* at 1069.

The Sixth Circuit therefore remanded the case to the district court to reconsider the officer's request for injunctive relief and "fashion[] the procedural protections that are appropriate to provide the officers with meaningful notice and the opportunity to be heard." *Id.* at 1069.

Similarly here, a tailored injunction is warranted—one that ensures appropriate procedural protections for St. Vincent's contract, grant, and other funding requests. Such an injunction would require the Board to adopt a statement of written reasons why it would deny, cancel, or terminate a contract, grant, or other funding for which St. Vincent has applied. Requiring the Board to explain, in writing, why it is taking an adverse act against one of St. Vincent's applications for funding guards St. Vincent's First Amendment rights against the "discrimination that may result when arbitrary discretion is vested in some governmental authority" and could assist in preventing future litigation before this Court. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (explaining that an injunction against a licensing system "assure[s] a prompt judicial decision" and

23

"minimize[s] the deterrent effect of an interim and possibly erroneous denial.") (quoting *Freedman v. Maryland*, 380 U.S. 51, 59 (1965)); *see also* Doc. 71 at PageID.1943-1944, 1947-1951 (explaining the Board's highly discretionary and arbitrary processes for awarding contracts and grants). The Court should require this disclosure.

A written explanation is also warranted here because the Board's stated rationales for zeroing out St. Vincent constantly shifted. As the Court found, the Board's rationales were "obviously pretextual" and failed to distinguish permissible governmental prerogatives from discriminating against "constitutionally protected beliefs or conduct of the disfavored party." Doc. 74 at PageID.2094. The Board's pretext continued after the FY2020 grant denial.

As St. Vincent explained, the Board was prepared to award St. Vincent $0 again when it applied for a FY2021 community agency grant—even as St. Vincent had changed its program to provide refugees direct rent payments (which unquestionably met the Board's "basic needs" criteria). *See* Doc. 59-1 at PageID.1509. The County Controller, when informed of the issue, refused to make any change, and recommended that St. Vincent

take up the matter with the Human Services Committee instead. Nevertheless, the Human Services Committee voted to continue to de-fund St. Vincent. *See* Dec. 8, 2020, Board of Commissioners Approved Minutes 86, https://perma.cc/B6GK-D4U9; *see also* Doc. 59-1 at PageID.1480-1483. Counsel then wrote a threat letter to the Board's attorney, stating St. Vincent would seek relief from this Court if the grant were once again denied. *See id.* at PageID.1480 & Doc. 59-31 (threat letter). After receiving that letter, the Board met with legal counsel in closed session. After that meeting, the Board reversed course and made the award to St. Vincent. *See* Doc. 59-1 at PageID.1482-1483; *see also* Dec. 8, 2020 Board of Commissioners Approved Minutes, https://perma.cc/B6GK-D4U9. Prior to 2019, St. Vincent had never been treated this way. Absent the Board being required to explain itself in writing, St. Vincent has good reason to fear that the Board's unfettered discretion will result in future retaliation.

A statement of reasons would provide the public with a justification for the Board's actions and, should enforcement action be necessary, a statement would streamline review. Articulating the reasons why St. Vincent has had its contracts, grants, or other funding denied, canceled,

or terminated will prohibit the Board from shifting its rationales (as it has done here). And with one clearly stated reason, it would be easier for the Court to determine whether that justification holds water.

Such statements would not be burdensome to Ingham County, since the County already adopts such statements when awarding contracts. *See, e.g.*, Doc. 70-6 (St. Vincent receiving interpretive services contract on Sept. 28, 2021). Indeed, the County already follows detailed bidding procedures when awarding contracts to ensure transparency and demonstrate whether the County is awarding contracts to the lowest bidder. See *Bid Archives*, Ingham County, https://perma.cc/8LJX-G6J2 (record of County bids); *Bidding Methods & Procedures*, Ingham County, https://perma.cc/9TAR-E8TA (County rules regarding bids). This injunction would hold the Board to the same degree of transparency it already uses for other funding decisions. Indeed, the only way stating the Board's reasons could be burdensome is if the Board must spend time searching for a pretext.

> 3. *The injunction could be dissolved if the Board adopts better procedural safeguards.*

Finally, the Board would retain the freedom—acknowledged in Sixth Circuit precedent and provided by Fed. R. Civ. P. 60(b)—to move to dissolve this injunction by adopting procedural safeguards that would prevent future retaliatory action. This is consistent with the approach adopted by the Sixth Circuit in *Deja Vu of Nashville,* 274 F.3d 377. There, the Sixth Circuit directed that an injunction remain in place until a city was able to remedy unconstitutional portions of a law: "Upon remand, the district court should maintain the injunction until Metropolitan Nashville satisfies it that the constitutional problems with the Ordinance's definition of 'sexually oriented' and its judicial review procedures have been corrected." *Id.* at 403.

Here, if Ingham County wants to dissolve or modify this injunction, then the Board can fashion its own policies prohibiting retaliation and creating transparency in the grantmaking process. The Board already has safeguards in place for other actions, including its own lengthy ethics policy, which includes detailed procedures for resolving complaints. See *Ethics Policy*, Board of Commissioners (Amended Sept. 24, 2019), https://perma.cc/4XFW-U7CS. It would not be burdensome for the Board

27

to adopt similar rules requiring transparency and fair play in its award of discretionary grants. This way, the Board does not again repeat the problem of confusing discretion with discrimination. *See, e.g.*, Doc. 74 at PageID.2094.

<div align="center">* * *</div>

This injunction would not entail intrusive Article III oversight, would increase transparency in the Board's decision-making, and could be dissolved should the Board choose to adopt safeguards designed to protect fundamental rights.

## CONCLUSION

For the foregoing reasons, St. Vincent should receive all its requested relief.

Dated: March 31, 2022

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ *William J. Haun*
William J. Haun
Mark L. Rienzi
Lori H. Windham
Nicholas R. Reaves
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
whaun@becketlaw.org
Telephone: (202) 955-0095

</div>

<div align="center">28</div>

Facsimile: (202) 955-0090

William R. Bloomfield (P68515)
Catholic Diocese of Lansing
Lansing, Michigan 48933-1122
wbloomfield@dioceseoflansing.org
(517) 342-2522

*Counsel for Plaintiff*

29

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of L. Civ. R. 7.2(b)(i) because, excluding the parts exempted by L. Civ. R. 7.2(b)(i), it contains 5,385 words. The word count was generated using Microsoft Word 2019.

<div style="text-align: center;">

*/s/ William J. Haun*
William J. Haun
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Ste. 400
Washington, DC 20006
Tel.: (202) 955-0095
whaun@becketlaw.org

</div>